David RUIZ et al., Plaintiff,

United States of America, Plaintiff–Intervenor,

v.

W. J. ESTELLE, Jr., et al., Defendants.

Civ. A. No. H–78–987.

United States District Court,
S. D. Texas,
Houston Division.

Dec. 12, 1980.

William Bennett Turner, Donna Brorby, Gail Saliterman, San Francisco, Cal., for class plaintiffs.

Samuel T. Biscoe, John F. Jordan, Dallas, Tex., Jim Wiginton, Alvin, Tex., for plaintiff, L.D. Hilliard.

David J.W. Vanderhoof, Patricia Gail Littlefield, Charles Ory, Stephen L. Mikochik, Adjoa Burrow, Stephen A. Whinston, Roby Haber, Shawn F. Moore, Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, D.C., J.A. "Tony" Canales, U.S. Atty., Southern Dist. of Texas, Houston, Tex., John H. Hannah, Jr., U.S. Atty., Eastern Dist. of Texas, Tyler, Tex., for plaintiff–intervenor.

Mark White, Atty. Gen. of Texas, Ed Idar, Jr., Richel Rivers, Harry Walsh, Mary N. Golder, Evelina Ortega, Bruce C. Green, Asst. Attys. Gen., Austin, Tex., Leonard Peck, Art Keinarth, David Jones, Asst. Attys. Gen., Huntsville, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. INTRODUCTION | |
| A. Description of the TDC System | 1274 |
| B. Description of the TDC Inmate Population | 1274 |
| C. Procedural History | 1275 |
| D. Outline of the Opinion | 1276 |
| II. OVERCROWDING | |
| A. Findings of Fact | |
| 1. Compendium | 1277 |
| 2. Description of Facilities | 1277 |
| 3. Effects of Overcrowding | 1281 |
| 4. Failure to Ameliorate Overcrowded Conditions | 1283 |
| B. Legal Analysis | 1285 |
| III. SECURITY AND SUPERVISION | |
| A. Findings of Fact | |
| 1. Compendium | 1288 |
| 2. Security Staff/Understaffing | 1288 |
| a. Background | 1288 |
| b. Training | 1289 |
| c. Staff duties and responsibilities; Understaffing | 1290 |
| 3. Building Tender System | 1294 |
| 4. Staff Brutality | 1299 |
| B. Legal Analysis | 1303 |

| | Page |
|---|---|
| IV. HEALTH CARE | |
| Medical Care | |
| A. Findings of Fact | |
| 1. Compendium | 1307 |
| 2. Staffing and Personnel | 1307 |
| a. Physicians | 1307 |
| b. Nurses | 1309 |
| c. Medical Assistants | 1309 |
| d. Inmates | 1311 |
| e. Dental Personnel | 1312 |
| 3. Facilities | 1313 |
| a. Unit infirmaries | 1313 |
| b. Huntsville Unit Hospital | 1314 |
| c. John Sealy Hospital | 1315 |
| 4. Interference Occasioned by Security and Work Concerns | 1315 |
| a. Diagnostic Unit Procedures | 1315 |
| b. Unit Medical Procedures | 1318 |
| c. HUH Hospital Procedures | 1321 |
| 5. Medical Records | 1323 |
| 6. Pharmaceutical Services | 1324 |
| 7. Organization | 1327 |
| B. Legal Analysis | 1328 |
| Psychiatric Care | 1332 |
| A. Findings of Fact | |
| 1. Compendium | 1332 |
| 2. Psychiatric Screening of Inmates | 1332 |
| 3. Psychological and Psychiatric Care at the Unit Level | 1333 |
| 4. TDC Treatment Center | 1334 |
| 5. Treatment Staff in General | 1336 |
| 6. TDC's Defenses | 1338 |
| B. Legal Analysis | 1338 |
| Special Needs Inmates | 1340 |
| A. Findings of Fact | |
| 1. Compendium | 1340 |
| 2. Physically Handicapped Inmates | 1340 |
| 3. Mentally Retarded Inmates | 1344 |
| B. Legal Analysis | 1345 |
| V. DISCIPLINE | 1346 |
| Hearing Procedures | |
| A. Findings of Fact | 1346 |
| B. Legal Analysis | 1350 |
| 1. The *Wolff* Requirements | |
| a. Notice | 1351 |
| b. Statement of reasons | 1352 |
| c. Witnesses | 1353 |
| d. Counsel substitute | 1355 |
| 2. Impartial Hearing Body | 1355 |
| 3. Failure to Follow State Rules | 1356 |
| 4. Vague and Overbroad Rules | 1357 |
| 5. Relief | 1358 |
| Solitary Confinement | 1359 |
| A. Findings of Fact | |
| B. Legal Analysis | 1361 |
| Administrative Segregation | 1364 |
| A. Findings of Fact | |
| B. Legal Analysis | 1365 |
| VI. ACCESS TO THE COURTS | 1367 |
| A. Findings of Fact | |
| B. Legal Analysis | 1370 |

| | | Page |
|---|---|---|
| VII. | OTHER CONDITIONS OF CON-FINEMENT | 1373 |
| | A. Findings of Fact | |
| | 1. Fire Safety | 1373 |
| | 2. Sanitation | 1374 |
| | a. Housing areas | 1374 |
| | b. Water supply and plumb-ing | 1374 |
| | c. Wastewater and solid waste disposal | 1375 |
| | d. Food service areas | 1375 |
| | e. Food processing areas | 1375 |
| | 3. Work Safety and Hygiene | 1376 |
| | B. Legal Analysis | 1377 |
| | 1. Pendent Jurisdiction | 1377 |
| | 2. Applicability of State Health and Safety Laws | 1378 |
| | 3. Constitutional Claims | 1382 |
| VIII. | TOTALITY OF CONDITIONS | 1383 |
| IX. | DEFENDANTS' *RIZZO* ARGUMENT | 1384 |
| X. | GENERAL RELIEF | 1385 |
| | A. Unit Size and Structure | 1385 |
| | B. Prison Location | 1389 |
| | C. Appointment of One or More Spe-cial Masters | 1389 |
| | D. Development of Detailed Remedial Decree | 1390 |
| XI. | CONCLUSION | 1391 |

## I. INTRODUCTION

The issues in this civil action relate to the constitutionality of certain operations of the Texas Department of Corrections (TDC), which is responsible for the confinement and management of adult convicted prisoners of the State of Texas. The plaintiffs are named TDC inmates, who represent a class of all past, present, and future inmates. Defendants are W.J. Estelle, Jr., Director of the Texas Department of Corrections, and the members of the Texas Department of Corrections. Jurisdiction is appropriate under 28 U.S.C. § 1343(3) and § 2201. Before embarking upon a discussion of the numerous specific factual and legal issues posed by the evidence in this civil action, a general overview of the TDC system, a description of the inmate population, the history of the litigation, and a

general outline of this opinion will be set out.

### A. Description of the TDC System

The Texas Department of Corrections currently operates eighteen prison unites in the state of Texas, sixteen for male prisoners and two for female prisoners.[1] All but one of these units are characterized by TDC as maximum security institutions. Most of the units are large; the smallest incarcerates eight hundred inmates, and the largest house some four thousand. On most of the prison units, extensive farming and industrial operations are carried on, with the use of inmate labor. Indeed, self–sufficiency is a trademark of the TDC system––prison inmates produce most of their own food and clothing, provide manpower for prison construction and maintenance projects, and produce a variety of manufactured goods (mattresses, brooms, furniture, etc.), which are used within the prison system or are sold to other state agencies. Responsibility for the management of the prison system, subject to the control and supervision of the Texas Board of Corrections, is vested in the TDC Director. Each unit has its own warden, who is responsible for the day–to–day management of the unit.

### B. Description of the TDC Inmate Population

The number of prisoners confined in the TDC system is very large and increases constantly. The inmate population includes persons of a variety of backgrounds and widely differing abilities, as well as many with acute physical and mental problems. A statistical profile of the TDC inmate population reveals pertinent information concerning persons immured in Texas prisons.

TDC's 1978 Annual Statistical Report discloses that approximately ninety–six per-

---

1. The names of the TDC units, and their reported population levels on June 1, 1978, were as follows: Central (794 males), Clemens (1,127 males), Coffield (4,031 males), Darrington (882 males), Diagnostic (841 males), Eastham (2,617 males), Ellis (2,291 males), Ferguson (1,987 males), Goree (649 females), Huntsville (2,150 males), Jester I and Jester II (870 males),

Mountain View (382 females), Retrieve (786 males), Ramsey I and Ramsey II (2,759 males), Wynne (2,079 males). An eighteenth unit, the Beto Unit, is partially completed at present and houses a small contingent of construction worker inmates working toward its completion. It is designed to hold 4,000 double–celled inmates.

cent of the 24,575 inmates in TDC system were male, and four percent were female. An ethnic breakdown showed that approximately forty–three percent of inmates were black, thirty–nine percent were white, and nineteen percent were of Mexican ancestry. Prior to the incarceration, almost twenty–seven percent resided in the Dallas–Fort Worth area, twenty–five percent in the Houston area, and seven percent in the San Antonio area. In general, a large majority of TDC's inmates were convicted in urban areas.

The mean age of TDC inmates in 1978 was 29.58, with forty–one percent of the population twenty–five years old or younger. These figures represent slight overall increases from previous years in the age of TDC inmates. In 1978, more than sixty–one percent of the new admissions to the TDC system were first offenders.

The average maximum sentence of all inmates was 23.54 years. According to TDC's classification of the offenses for which inmates have been sentenced, approximately twenty percent were incarcerated for "violent" crimes, sixty–five percent for "property" crimes, and fifteen percent for "other" offenses.

The mean intelligence quotient (IQ) for TDC inmates in 1978 was 93.92. Scores of seventy or below were exhibited by 1,609 inmates, or 7.05% of the TDC population. Another 2,157 inmates, or 9.45% of the population, had IQ scores between 71 and 89. Expert witnesses agreed that approximately ten to fifteen percent of the inmates were mentally retarded. It was further

estimated that five percent of the inmates were acutely mentally ill, and that as many as sixty–eight percent were mentally or emotionally disturbed. Thirty percent had histories of serious alcohol abuse, and records of drug abuse and dependency were shown for thirty percent.

Fifteen percent of the inmate population were found to be illiterate. Eighty–five percent were school "drop–outs", eighty percent had less that a seventh grade education, and fifty percent less than a fifth grade education. Average reading ability for TDC inmates was at approximately a sixth grade level.

### C. *Procedural History*

This civil action began in June 1972, when David Ruiz, an inmate of the Texas Department of Corrections, filed suit against the Director of TDC, pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief for alleged violations of his constitutional rights. In the spring of 1974, the civil action instituted by Ruiz was consolidated with the suits of seven other TDC inmates[2] into a single civil action, styled *Ruiz v. Estelle*, 550 F.2d 238. Counsel was appointed to represent the indigent plaintiffs in the litigation, and the United States was ordered to appear in the case as *amicus curiae*. In December of 1974, the motion of the United States to intervene as a plaintiff was granted,[3] and the addition of members of the Texas Board of Corrections, as defendants, was also allowed. A further order was entered which permitted the action to be maintained as a class action, and all

---

**2.** *Montana v. Beto*, Civil Action No. 5637; *Soto v. Estelle*, Civil Action No. 5594; *Hilliard v. Estelle*, Civil Action No. TY–73–20; *Winchester v. Estelle*, Civil Action No. TY–73–32; *Randall v. Estelle*, Civil Action No. TY–73–103; *Pardo v. Estelle*, Civil Action No. TY–73–207; *Johnson v. Estelle*, Civil Action No. TY–73–260. Subsequently, by order of March 3, 1977, the motion of plaintiffs Montano, Soto, Winchester, Pardo and Randall for voluntary dismissal of their complaints was granted.

**3.** Defendants' motions to dismiss the United States as *amicus curiae* and as plaintiff–intervenor, and to stay participation by the United States pending determination of its status were denied on February 10, 1975. Also denied was

a request to certify an interlocutory appeal of the ruling made pursuant to 28 U.S.C. § 1292(b). On February 18, defendant Estelle petitioned the Court of Appeals for the Fifth Circuit for a writ of mandamus and/or other extraordinary relief to prevent further participation by the United States. Pending disposition of the petition, the Fifth Circuit stayed all proceedings involving the United States. On July 24, 1975, the Fifth Circuit denied defendant Estelle's petition and vacated the stay of participation by the United States. *In Re Estelle*, 516 F.2d 480 (5th Cir. 1975). Certiorari was later denied. *Estelle v. Justice*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., with Burger, C.J. and Powell, J., dissenting).

damage issues were severed for later considerations, as to all parties.

Beginning in 1974 and continuing through 1977, the parties engaged in substantial discovery efforts. During this period, several hearings were conducted to consider a variety of outstanding matters, including disputed discovery issues and requests by the named inmate plaintiffs for protection from retaliation by the defendants. On December 30, 1975, an order was issued which enjoined TDC officials from interfering with plaintiffs' access to counsel and the courts, and from engaging in various other forms of harassment, retaliation and discrimination against the plaintiffs.[4]

Trial on the merits was originally set for March 6, 1978, in Tyler, Texas. The motion of the defendants for a continuance was granted, and the case was tentatively reset for trial on September 5, 1978. A preliminary pretrial conference was held February 3, 1978, in Tyler. On February 6, 1978, the defendants moved for a transfer to the Southern District of Texas. On May 30, 1978, an order was entered transferring the civil action to the Southern District of Texas, pursuant to 28 U.S.C. § 1404(a). The order cited "substantial logistical and security concerns generated by the prospect of transporting and housing" hundreds of inmate witnesses, most of whom were confined in the Southern District. On June 8, 1978, the Honorable Reynaldo G. Garza, then Chief Judge of the United States District Court for the Southern District of Texas, assigned the undersigned judge to preside over the trial.

Trial commenced in Houston, Texas, on October 2, 1978. After 159 days of trial, including one significant delay, the parties finally rested on September 20, 1979.[5] At the conclusion of the trial, the court had heard the testimony of 349 witnesses and had received approximately 1,565 exhibits into evidence.

### D. Outline of the Opinion

The named plaintiffs and the plaintiff-intervenor, the United States of America, have alleged that a variety of conditions and practices in TDC prisons violate the eighth and fourteenth amendments to the Constitution of the United States. They have challenged the following aspects of confinement in TDC prisons: overcrowding, security and supervision, health care, discipline, access to the courts, and other gener-

---

**4.** This order supplemented previous protective orders which had been issued. By consent order of June 20, 1974, defendant Estelle and TDC officials were enjoined from interfering with plaintiffs' rights to consult privately or communicate by mail with their attorneys; and from threatening, harassing, or disciplining the plaintiffs for participating in the case. A second protective order, entered on January 20, 1975, supplemented the first order by insuring plaintiffs access to the prison law libraries, setting forth procedures for the handling of incoming and outgoing legal mail, and for the provision of legal materials. Another, more comprehensive, order was entered December 30, 1975.

The defendants appealed the December 30, 1975, order. The Court of Appeals for the Fifth Circuit affirmed the order, finding it to be "supported by the facts as found in the record and necessary for the protection of these inmates during the pendency of this litigation." *Ruiz v. Estelle*, 550 F.2d 238, 239 (5th Cir. 1977). On December 21, 1978, a further protective order was entered, which declared that all previous protective orders were still in full force and which set forth procedures for reporting and investigating alleged violations.

On September 20, 1979, the final day of the trial on the merits, an order was entered (the terms of which had been agreed to by all parties), providing all inmates of the Texas Department of Corrections who had testified during the trial the opportunity to transfer to federal custody. Eighty-one inmates subsequently elected to transfer, and all transfers had been accomplished by November 20, 1979.

**5.** An intervening three-month delay in the proceedings occurred after an order was entered on December 1, 1978, seeking to move the situs of the trial to Tyler and citing as compelling reasons the length of the trial, the lack of adequate courtroom facilities in Houston, and the fact that the original reason for transferring the case to the Southern District had been the security of inmate witnesses for the plaintiffs, most of whom had testified by that time. The defendants applied to the Fifth Circuit for the writ of prohibition to prevent the transfer to Tyler. On January 10, 1979, the Fifth Circuit stayed all district court proceedings pending disposition of the defendants' application. On February 16, 1979, the Fifth Circuit granted the defendants' application. Trial was accordingly resumed on April 2, 1979.

al conditions of confinement. Each of these areas will be considered separately, although many of the relevant factual and legal issues are applicable to several of the categories to be discussed. Within each section of the opinion, in nearly all instances, factual findings will be separately made, followed by a legal analysis of the claims raised.

Because the plaintiffs and plaintiff–intervenor have alleged systemic constitutional violations which adversely affect the entire plaintiff class, the findings of fact will, for the most part, have reference to practices and conditions generally prevalent in TDC prisons, as demonstrated by many reports of specific incidents and experiences which are in evidence. Where examples of particular happenings are referred to, they are used for illustrative purposes only, and they are not to be interpreted as a reflection of the totality of the evidence presented or considered in making the general findings. In reaching the conclusions here made, the trial testimony of the hundreds of witnesses has been considered, including inmates, TDC employees, and experts in a wide variety of fields. Because of the size and complexity of the record, specific citations to it are not included.

## II. OVERCROWDING

### A.

1. *Compendium*

TDC has been, by the admissions of its own officials, severely overcrowded since at least March of 1977. The problem has reached crisis proportions. When Director Estelle testified in August 1979, he reported that approximately 1,000 of the system's 26,000 inmates were sleeping on the floors of TDC institutions. These supernumerary inmates are housed in cells and dormitories already holding almost double the number of persons for which they were designed.

The inmate population continues to increase–as of November 30, 1979, there were 26,392 inmates in the system [6]–and the current intolerable situation promises to become even more acute.

The overcrowding at TDC exercises a malignant effect on all aspects of inmate life. Personal living space allotted to inmates is severely restricted. Inmates are in the constant presence of others. Although some degree of regimentation and loss of privacy is a normal aspect of life in any prison, the high population density at TDC leaves prisoners with virtually *no* privacy at any time of the day or night. Crowded two or three to a cell or in closely packed dormitories, inmates sleep with the knowledge that they may be molested or assaulted by their fellows at any time. Their incremental exposure to disease and infection from other inmates in such narrow confinement cannot be avoided. They must urinate and defecate, unscreened, in the presence of others. Inmates in cells must live and sleep inches away from toilets; many in dormitories face the same situation. There is little respite from these conditions, for the salient fact of existence in TDC prisons is that inmates have wholly inadequate opportunities to escape the overcrowding in their living quarters. The environment outside the housing areas is similarly strained by the demands of the increased prison population and can offer no substantial relief from the pressures and harms generated by living in such close proximity.

2. *Description of Facilities*

With a few exceptions, such as unit infirmaries and disciplinary segregation cells, TDC maintains two types of housing, either traditional cells with barred doors or large dormitories. Most of the approximately 9,000 cells measure nine feet long, five feet wide, and seven feet high.[7] Originally de-

---

6. This fact was reported in an affidavit attached to defendants' response to the plaintiff's motion for preliminary injunction dated December 21, 1979. In their post–trial brief, the plaintiffs requested the court to take judicial notice of this fact. Federal Rules of Evidence, Rule 201(b)(2), (d) and (f).

7. There are some variations in the sizes of TDC cells (from 40 to 66 square feet), but the vast majority are forty–five square feet. Cells at the new Beto Unit, now under construction, will contain 60 square feet. The Ellis Unit has 120 cells which are ninety square feet in size. These cells were originally designed to hold

signed to hold one inmate each, a second bed has been added to these cells in the last few years; almost invariably, they now house at least two inmates. Typical cells are equipped with two steel frame bunks (one above the other) attached like shelves to the wall, a sink, a toilet, a narrow shelf above the front bars, and a naked lightbulb. Inmates in the cells are provided nothing to sit on, except for the toilet—which has no seat—or bunks. No desk or other flat surface is made available to them for writing purposes. The small wall shelf and the space under the lower bunk are the only places to store personal possessions. An aisle about thirty to thirty–six inches wide separates the edge of the bunks from the opposite wall. The commode is situated at the back of the cell, near the end of the aisle. The usable, unobstructed space in the cell amounts to an area approximately seven and one–half feet long and three feet wide, totaling 22.5 square feet. So cramped is such a cell that two standing persons must squeeze by each other to pass, and an average man can stand in the center of the cell and touch both walls with outstretched arms. Barely enough room is present to do bodily exercises, such as push–ups or sit–ups. Thus, inmates assigned to these forty–five square foot TDC cells can do little more than lie or sit on their bunks or the floor, or use the sanitary facilities.

When a total of three inmates are confined to a single TDC cell, as is all too often the case, the third must sleep on a mattress in the aisle. These mattresses, and often their occupants, are constantly stepped on by others in the cell attempting to reach the toilet, sink, or door. A third person will usually sleep lengthwise in the aisle, parallel to the bunks, with his head near either the toilet or the barred door. Inmates testified that they were fearful to sleep in the latter location, because they can be injured when the doors are opened. Occasionally,

four–and sometimes even five–inmates are assigned to one cell. When four inmates are present, two of them must sleep on the floor, across the width of the cell, with their feet under the lower bunk. Since the cells are only five feet wide, these two cannot stretch out fully during the night. With five inmates, three must sleep on the floor, squeezed between the bars in front and the toilet in the rear of the cell. Inmates have been compelled to endure this latter type of confinement for days or even weeks at a time, most of them having been immured in the cells set aside for administrative segregation, TDC's "non–punitive" detention status. There, inmates are ordinarily subjected to unremitting restriction to the cells assigned to them, for the entire period of their confinement in this status, with the exception of the brief times allotted for showering. At one unit, inmates being quarantined for possible exposure to gonorrhea were housed, four to a cell, in an administrative segregation wing for several consecutive weeks.

The dormitories at TDC units provide even less security and privacy than do the cells. TDC dormitories, sometimes called tanks, vary in size, each lodging between ten to 136 persons. A typical dormitory is a large rectangular room containing rows of narrow beds or double–decker bunks, recreation facilities, and a toilet area. None of the men's [8] dormitories have partitions or screens. Because the aisles between the rows of beds are narrow and the beds are situated very close together, dormitory occupants are not easily visible to guards stationed in the halls or at the picket locations, which are outside the tanks.

The population density of inmates confined in dormitories is shocking. At the Central Unit, for example, two rows of double–decker bunks, directly adjacent to

two inmates, but they now house at least four persons each.

**8.** Of the two women's units, Mountain View is the only one with dormitories. However, these living quarters differ markedly from those at the men's units. The crowded, barracks–type arrangement common in the men's dormitories

is not existent at Mountain View. There, each female inmate in a dormitory has a 55 square foot cubicle, partitioned off from other inmates. In fact, Mountain View provides a model for the creative use of dormitory space, similar to what was recommended by the expert witnesses in their suggestions for modifications in TDC's dormitories for men.

each other, run down the middle of the dormitory. The scene was described as resembling one giant bed. Except for his bed, an inmate in this dormitory has no assigned space. Even while asleep, an inmate so confined is within easy and immediate reach of three other inmates (those sleeping at his side, at his head, and at his feet), and he is directly above or below a fourth inmate. In the less crowded dormitories, where single narrow beds are used instead of double–decker bunks, individuals have but little more personal space–their beds and, in addition, their footlockers. In such dormitories, the head of each inmate's bed ordinarily backs up against a wall. Each side of the bed is only a few inches from the sides of those adjacent to it, and its foot is only a few feet away from the bed across the aisle. Under both of these living arrangements a total deprivation of privacy is insured, since every inmate is in full view of dozens of others at all times. Not even the urinals or toilets are screened or partitioned from the rest of the space.

The sanitary and recreational facilities in TDC dormitories are wholly inadequate for the numbers of inmates who use them.[9] Such a paucity of passive recreational area or common space exists in a typical dormitory that the television set is placed on a ledge above the toilets. A few game tables, seating four persons, and a small number of benches placed close together are situated in front of the television set. During popular television programs, the space around the toilet facilities is crowded with inmates, and only one toilet can be used. While this toilet is farthest from the television set, it is, nevertheless, in the midst of the beholders. For this reason, the inmate viewers

sometimes do not allow *any* toilet to be used during well–liked programs.

The critical crowding which has resulted in "triple–celling" has also made its impact felt on the dormitories. Extra beds have been crowded in wherever possible, cutting into the already small recreational space. Inmates without beds sleep on mattresses placed on wall ledges (often above the toilets) or are wedged between the mattresses of two inmates whose bed frames have been pushed together (i. e., mattresses for three inmates are placed on two bed frames).

During the 1976 inspection of TDC facilities by expert witnesses, the space available for each inmate in TDC dormitories ranged from seventeen square feet to sixty square feet. The average was forty square feet. At the time of trial, TDC's population had increased by approximately 5,000 inmates from the 1976 level, and square footage per inmate in the dormitories had generally decreased.[10]

TDC's defense against the extreme overcrowding of inmate living quarters includes two propositions. The first is that inmates spend so little of their time in the cells or dormitory sleeping areas that the high population density of living quarters, in itself, does minimal damage. The second is that TDC's future building plans will alleviate whatever overcrowding exists within a short period of time.

The former proposition fails for several reasons. Initially, inmates do, in fact, remain in their living quarters a great portion of their time. Those who work regularly, and thereby put in the least amount of time in the housing areas, are still in their cells or dormitory sleeping quarters upwards of ten hours a day; many inmates are in the living areas much more frequently.[11] In-

9. In the Central Unit dormitory, for example, the needs of sixty–nine inmates are served by four toilets, four sinks, and a long through–type urinal, nearly all of these fixtures being old and dilapidated. In fact, most of the dormitory facilities are among the oldest buildings in use at TDC. The new Coffield and Beto units contain no dormitories at all, a fact which suggests that TDC now finds them an undesirable form of inmate housing.

10. These square footage calculations include dayroom, toilet, and storage space, as well as sleeping space.

11. Because of a shortage of civilian guards who can be deployed in the agricultural fields to supervise working inmates, the full number of inmates assigned to work in the fields cannot be summoned to labor on any given day. Therefore, at many units, the inmates work on a rotating basis. As many as one–half to three–fourths of the inmate agricultural force will remain idle in the living quarters on a specific day.

mates on cell restriction[12] occupy their "leisure" time in their cells. Unassigned inmates and those on medical lay-in status pass the greater part of their time in the living quarters.[13] Inmates in administrative segregation or solitary confinement are kept within their cells virtually twenty-four hours daily.[14]

Furthermore, virtually all inmates are exposed to, and many are victimized by, the concomitants of unguarded, overcrowded cells and dormitories–the ever–present risk of assaults, rapes and other violence–for every day of their incarceration at TDC. In the present state of conditions at TDC, no amount of outside activities assigned to inmates can shield them from these dangerous potentialities for harm.

Even when they are away from the housing areas, inmates are confronted with the inescapable reality that overcrowding is omnipresent within the prison confines. For example, virtually all cellblocks are occupied at double, and some at even triple, their design capacity; hence, it follows that the adjacent dayrooms, designed for recreational purposes, must serve double and even triple the number of inmates for which they were conceived. Similarly, the inmates' access to the indoor gymnasiums, the outdoor playing fields (which are located at only some of the units), the craft shops, and libraries are ever more limited, because an increasing number of inmates must use them in turns. Consequently these facilities are available on only restricted bases to inmates, sometimes being accessible solely to building tenders or other privileged groups of inmates. Moreover, the dining rooms are nearly always crowded, with inmates waiting in long lines and eating in shifts.

Most of the inmates at TDC have job assignments and spend a significant amount of time working. But the conditions under which the greatest number of inmates work in no way relieve or compensate for the overcrowding of their living quarters. The main part of the inmates labor in uncomfortable surroundings, as components of a fairly large group. To illustrate, in the agricultural jobs, inmates are assigned to squads that must move down the field in unison, performing whatever activity (hoeing, thinning, or harvesting) as may be seasonal. Many other inmates toil in such areas as the laundries or kitchens, or perform construction work. All of these assignments involve physical activity in either hot, steamy indoor facilities or in outdoor settings which are subject to the vagaries of the elements. Giving consideration to these conditions, the expert witnesses testified that, at the end of the day, an inmate who has performed the drudgery accompanying much of the work at TDC has a great need for a relatively quiet, peaceful place, individually assigned to him, so as to achieve a respite from the stresses associated with the prison environment.

TDC officials' contention that future building plans will eventually alleviate the aggravated conditions that now exist is extremely suspect. Originally, TDC officials had expected to eliminate *double*–celling upon the completion of the new Beto Unit, which is currently under construction. An unprecedented surge in inmate population undercut any realistic expectation of achieving that objective, and TDC officials' most optimistic goal is now the elimination of triple–celling. Director Estelle testified that it was TDC's "hope and intention" to get all inmates off the floors of the TDC units by April 1, 1980. However, population figures made available by the defendants in December of 1979, and judicially

---

12. Cell restriction is a minor form of punishment. Inmates on cell restriction may go to work, school, and meals in the usual manner, but they must spend their free time confined in the cells.

13. "Unassigned" inmates include those who are temporarily or permanently without a job assignment. Those on medical lay-in status cannot work because of health reasons.

14. As will be more fully described later in the opinion, administrative segregation is purportedly a "non–punitive" detention, status, imposed for administrative or protective reasons, whereas solitary confinement is imposed as punishment for disciplinary infractions.

noted by the court,[15] show a more rapid population increase than defendants had projected, thus leading to the conclusion that a great many inmates continue to sleep on the floors throughout the TDC system. It appears that, under TDC's own plans, the elimination of triple–celling will not be achieved in the near future and overcrowding will only get worse.

TDC's future plans encompass, for the most part, the construction of large maximum security institutions in rural areas, on lands extensive enough to maintain farming and ranching operations. Such a facility is the Beto Unit. TDC officials plan for it to house 4,000 inmates when completed, which will be several years from now.[16] Legislative authorization has been given TDC to begin site studies and to purchase land for a new prison unit, to be located in southern or western Texas, and a location for large–scale agricultural activity is now being sought. It is conceded by TDC officials that it will be many years before this projected unit will be ready for inmate habitation. Temporary housing facilities are also under construction at some of the existing units; and the remodeling and use of facilities at Gatesville, Texas, which were formerly used by the Texas Youth Council, is also contemplated.

The TDC prison system is uniform by design; the defendants have chosen to confine all inmates in massive, high–security institutions which vary only slightly from each other. Construction of such facilities is extremely expensive. For example, even with most of the labor being performed by unpaid inmates, construction of the Beto Unit is expected to cost $43,000,000.[17] In addition, these large maximum–security institutions take years to build, and simply cannot be constructed fast enough to overtake the soaring prison commitment rates. Despite these facts, TDC has chosen not to utilize other types of institutions. It has no minimum security facilities, no honor farms or work camps, no halfway houses or urban work release centers–in short, practically no alternative levels or styles of custody. Moreover, TDC officials have not indicated that construction or use of any such facilities is even under consideration.

All told, the evidence makes it clear that TDC's construction plans–geared as they are toward huge maximum–security facilities which take years to build–promise little hope in the foreseeable future of significant relief from the overcrowding which permeates Texas prisons.

### 3. *Effects of Overcrowding*

The present extreme levels of overcrowding at TDC are harmful to inmates in a variety of ways, and the resultant injuries are legion.

The constant threat to the inmates' personal safety posed by overcrowded living conditions in both the multiply–inhabited cells and the packed dormitories presents the most obvious harm. Penologists who testified at trial were virtually unanimous in their condemnation of double and triple celling. Director Estelle himself noted the exigent problems associated with double–celling, making reference to the increased opportunity for predatory activities and the enhanced difficulties respecting supervision and control. TDC inmates are routinely subjected to brutality, extortion, and rape at the hands of their cellmates. Some of the most heinous examples have occurred in triple–celling situations, where two–on–one confrontations practically guarantee the capitulation of the abused third cellmate. However, the problems of violence also occur all too frequently in double–celling situations, where one inmate often dominates the other. The evidence made it clear that, even if inmates were doubled up in cells large enough to accommodate two persons, the effects of violence and the climate of fear would remain. This is because of two

---

**15.** See Note 6.

**16.** It is planned by TDC officials that inmates will be gradually moved into the Beto Unit, a few hundred at a time, as sections of the prison are completed.

**17.** This figure, projected by TDC officials, was reported in an affidavit by Eugene Shepard, which was submitted to the court in connection with the defendants' response to plaintiffs' motion for preliminary injunction.

factors: (1) TDC's rudimentary system of inmate classification is totally inadequate properly to assure the peaceful compatibility of cellmates;[18] and (2) TDC's security and supervision capabilities fall far short of being able to protect inmates from potential violence at the hands of cellmates.[19]

Inmates who live in dormitories are exposed to the same threats of violence endemic to the cells. In several ways, the risks dormitory residents encounter may be greater than those faced by inmates confined in cells. Potentially assaultive inmates are present in great numbers in every dormitory, and since the dormitories are practically unsupervised, violent inmates have free access to their fellows. The record indicates that these risks frequently turn into the repulsive actualities of sex malpractices, barbarous cruelties, and extortions, all of which have been shown to be commonplace in the dormitories. Indeed, some of the correctional experts who testified are of the opinion that abusive violence is inherent and largely uncontrollable in the prison dormitory.

A number of highly qualified expert witnesses presented persuasive testimony relating to the incremental negative physical and psychological effects of inmates' continued close confinement in too-intimate proximity with their fellows. Included among the consequences were the spread of disease and the enhancement of stress, tension, anxiety, hostility and depression. Among the distinguishable manifestations of hostility and depression, the experts found, were increased blood pressures, aggressive behavior, and extreme psychological withdrawal. These expert witnesses also concluded that overcrowding at TDC has substantially contributed to increased rates of disciplinary offenses,[20] psychiatric commitments, and suicides. Not surprisingly, they additionally concluded that all of these effects are counter-productive to rehabilitation and are creative of serious behavioral and disciplinary problems.

Finally, as already noted, the overcrowding at TDC translates into a total dearth of personal privacy for its inmates, as well as extreme physical discomfort to them, resulting from packing human beings together, in excessively close proximity, for long periods of time, day in and day out.

The serious harm caused by the confinement of two or more persons in a forty-five or sixty square foot cell are recognized; such overcrowding violates the recommended or required minimum standard of every organization that has promulgated criteria for the design of prisons and jails. Indeed, many of the standards recommended a minimum space of greater than forty-five square feet to house *one* person.[21] Similarly, the deleterious effects of

18. Under the TDC classification system, ninety-five percent of the inmates are denominated maximum security prisoners. The only factors considered in deciding which maximum security institution to assign an inmate to are age and recidivism. No account is taken of the character of an inmate's crime or crimes, the length of his sentence, or the presence of propensities toward violence. Thus, in any given facility, first offenders, youthful inmates, violent and non-violent persons, handicapped offenders, and recidivists may be, and often are, housed in the same dormitories or cells.

19. See the section of this opinion relating to Security and Supervision.

20. Defendants presented the results of a study conducted by one of their witnesses which concluded that the only statistically significant predictor of disciplinary rates is the age of inmates; therefore, they argue that overcrowding has not been proved to be a factor in increasing the rate of disciplinary offenses. While it is clear that age is a significant determinant in relation to the frequency of disciplinary infractions, the results of the defendants' one study do not outweigh the wealth of expert testimony which states that overcrowding *also* has a substantial effect on the rate of violent incidents.

21. (1) The American Correctional Association's Manual of Standards for Adult Correctional Institutions (1977) provides for a minimum of 60 sq. ft. per prisoner for those kept in the cell ten hours or less a day, and 80 sq. ft. per prisoner for those confined ten hours or more in the cell (Section 4142). The Department of Justice, Federal Correctional Policy Task Force, Draft Federal Standards for Corrections (June, 1978), adopts the same standards as the American Correctional Association.

(2) The American Public Health Association Standards for Health Services in Correctional Institutions (1976) provide for 60 sq. ft. per inmate in a cell and 75 sq. ft. in dormitories, although dormitories are discouraged. This standard is based on an epidemiological and medical judgment that provision of less space

overcrowded dormitories are recognized by penologists and correctional facility designers, who generally disfavor dormitories altogether because of the security and privacy problems they pose. It is notable, in this connection, that several experts testified that they had never seen dormitories as crowded as those at TDC. In contrast, if dormitories at TDC were populated according to American Public Health Association (APHA) and American Correctional Association (ACA) standards, which call for seventy–five square feet of living space per inmate, the maximum number of inmates who could be housed in each dormitory would be nineteen instead of the current average of sixty–six to sixty–nine. Furthermore, if requirements for providing thirty–five square feet of dayroom space per inmate were included in calculations for dormitory space, the maximum allowable number of inmates v ould drop to fifteen.[22]

per room is a medical risk that should be taken only in temporary emergency situations.
(3) The National Clearinghouse for Criminal Justice Planning and Architecture (and, through it, the Law Enforcement Assistance Administration) requires 70 sq. ft. of individually designated living area per person.
(4) The National Advisory Commission on Criminal Justice Standards and Goals requires 80 sq. ft. per person.
(5) The Model Sentencing and Corrections Act, approved by the National Conference of Commissioners on Uniform State Law, 1978, requires 70 sq. ft. per prisoner. Section 2–7404(3).
(6) The American Institute of Architects requires 70 sq. ft. per prisoner.
(7) The Building Officials Conference Code of America Building Code requires 70 sq. ft. per person.
(8) The National Sheriff's Association, Handbook on Jail Architecture, requires 70 sq. ft. per prisoner (at p. 63).
(9) Jail Standards, Texas Commission on Jails, Sections 212.05.044 and 217.07.043, provide that a cell for single occupancy (whether new or existing construction) needs 40 sq. ft. of clear floor space, plus the areas dedicated to fixtures (e. g., bunk, toilet and wash basin) and desk and chair. Correctional architect Paul Silver explained that this meant 65 sq. ft., without considering the area for a desk and chair. Sections 217.05.045 and 217.07.044 require that cells for two to eight inmates have 40 sq. ft. of clear floor space for any one inmate, plus 18 sq. ft. clear floor space for each additional inmate.
(10) Military Standards offered in evidence by the defendants show that the U. S. Army and

### 4. Failure to Ameliorate Overcrowded Conditions

It was repeatedly stated by TDC officials that they can do nothing about the number of prisoners sent to TDC by the courts. But TDC officials have, within their power, a number of means for quickly reducing the prison population, none of which they have chosen to exercise to the extent of significantly ameliorating the overcrowding. Complete control over which prisoners earn "good time," and, within statutory limits, how much they earn is in the hands of TDC officials.[23] Likewise, they have the authority, which they occasionally exercise, to restore good time which has been forfeited and to back–date changes in status in such manner as to maximize earned good time. By the use of these means, release dates for inmates can be advanced. If these official prerogatives were exercised in behalf of all inmates, hundreds of persons could be im-

British Army Standard in the early 1950's was 60 sq. ft. per soldier; the then standard for the British Air Force was 60 sq. ft. or larger (depending on climate); and the German standard in World War II was 64.8 sq. ft.

**22.** Dr. Verne Cox, a witness for the plaintiff–intervenor, testified that the Ramsey and Central dormitories exhibited every bad effect of overcrowding. Dormitories like these could be made acceptable, he testified, in either of two ways: privacy partitions could be installed to provide each inmate with a forty–nine square foot cubicle, thus attenuating most of the negative effects of dormitory housing; or the population could be reduced to fourteen per dormitory, providing each inmate with seventy–five square feet of space.

**23.** Under Texas good time laws, inmates who exhibit good behavior while serving their sentences may accelerate completion of their period of confinement. It is TDC policy for prisoners entering prison to be automatically assigned to Class I, in which status they earn twenty extra days for every thirty days served. At the discretion of TDC officials, an inmate may be: (1) promoted to a trusty status, in which he earns thirty days for every thirty days served; (2) demoted to Class II, in which he earns ten days for each thirty served; or (3) demoted to Class III, in which no good time is earned. Earned good time may also be forfeited as a disciplinary measure, the unit wardens having the discretion to restore the good time after a period of good conduct has been served.

mediately discharged from TDC institutions, which would have the effect of removing a significant number of persons from the floors. Moreover, if TDC undertook a continuing practice of liberalizing good time credit awards, the release rate would accelerate, thereby keeping closer pace with the admission rate. These actions would not pose a threat to society, for Director Estelle testified that one–third or more of TDC's inmates could be released immediately with no risk of harm to the public.[24]

TDC officials also have a direct influence over the number of inmates eligible for parole consideration by the Board of Pardons and Paroles. It is the Board's policy to decline to interview inmates in certain categories: (1) those who have less than a specified number of "PIP" points[25] (2) those who have an outstanding forfeiture of good time, and (3) those who are in Class III good time status. TDC officials have the full right and responsibility for determining the composition of each of these groups. They also prepare "institutional adjustment" reports, which the Parole Board relies upon. Thus, although TDC officials do not make actual parole decisions, they make many judgments which affect inmates' chances for parole. A more generous employment of acceleration evaluations and status determinations by these officials would expand the pool of potential parolees.

TDC's failure to take available steps at its disposal to alleviate overcrowding is most clearly demonstrated by its failure to operate more than a token work release program, although it has a statutory mandate to put it into effect. In 1969, the Texas Legislature enacted a statute authorizing the establishment of a work release program for selected TDC inmates.[26] TDC's implementation of this statute has been half–hearted and unimaginative at best. The statute directs TDC to endeavor to place prisoners on a work release status, subject to certain enumerated conditions, none of which would have prevented TDC from making greater use of the program. Several years ago, when TDC had a much lower population, as many as 200 prisoners were on a work release status. The program was then in operation at four separate TDC units. Now, however, TDC officials generally oppose the operation of a work release program. Instead of a substantial percentage of the prison population being in a work release situation, as is the case in other states,[27] TDC permits less than fifty inmates (or two tenths of a percent of its inmate habitancy) to participate. Only fifty beds are set aside for the program participants, and at the time of trial, a third of these were vacant. Supervisors at TDC's industrial operations are not even asked to identify work release candidates, and these overseers know little or nothing about TDC's work release program.

Work release has the great advantage of being far more economical to the taxpayers than full–time incarceration. The Texas work release statute provides that the prisoner earning wages while in a work release status must reimburse the TDC for his maintenance. It also provides that the TDC director can disburse funds for the support of such an inmate's dependents,[28] and even to make restitution to the victim of the inmate's crimes. Community corrections, in general, cost less than one–seventh

24. Director Estelle has testified before the Texas Legislature that as much as forty percent of the male population in TDC does not need to be imprisoned.

25. "PIP" refers to incentive points, which are awarded by unit officials for performance in work, education, and personal improvements programs. TDC officials have the full right and responsibility for determining the number of points awarded to each inmate.

26. Section 6166X–3, V.A.T.S.

27. Florida has 1,800 prisoners on work release; Michigan has 1,527; and Maryland, Oklahoma and Tennessee, 581, 525 and 462, respectively. These figures were obtained in an affidavit attached to defendants' responses to plaintiffs' motion for preliminary injunction.

28. Even TDC's token work release program resulted in net earnings of nearly a quarter million dollars for a small group of participants, which provided substantial contributions to the prisoners' upkeep and to their dependents.

of the amount required for TDC confinement, as Director Estelle testified. It is to be noted that the Texas statute does not require work–release inmates to be confined in existing TDC facilities. Other prison systems have rented, bought, or modified Y.M.C.A. facilities, inner city motels, or halfway houses, as residences for work release participants. By following similar methods, the TDC could quickly acquire or build suitable housing for inmates classified for work release.

### B.

A number of recent cases have found unconstitutional violations which, in whole or in part, were the product of overcrowding comparable to that existing within Texas prisons. *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Gates v. Collier*, 501 F.Supp. 1291 (5th Cir. 1974); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977); *McCray v. Sullivan*, 399 F.Supp. 271 (S.D.Ala.1975); *Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977); *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977), *aff'd* 624 F.2d 1099 (6th Cir. 1980); *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo. 1979); *Capps v. Atiyeh*, 495 F.Supp. 802 (D.Oregon 1980). Many of these cases evaluated the constitutional propriety of overcrowding in light of the related consequences of inadequate security and frequent violence. *Gates v. Collier*, 349 F.Supp. 881, 894 (N.D.Miss.1972), *aff'd* 501 F.2d 1291 (5th Cir. 1974); *Pugh v. Locke*, 406 F.Supp. at 323, 325; *Williams v. Edwards*, 547 F.2d at 1211. While the present opinion contains a separate section on inadequate security, any analysis of overcrowding must keep in mind the intolerably grievous effects upon inmates who live in such close proximity to violent and brutal fellow prisoners.

TDC prisons are strained beyond their limitations, currently housing over 200% of their original design capacity. *Battle v. Anderson* found a constitutional violation where the institution held 191% of capacity.

*Chapman v. Rhodes* found a violation with the prison at 138% of capacity.

Indeed, every known standard for prison living conditions requires more distinct, severable room for individual inmates than is made available in TDC institutions.[29] Although recommended standards alone may not be said to establish constitutional minima, *Bell v. Wolfish*, 441 U.S. 520, 543–44, n.24, 99 S.Ct. 1861, 1875, n.24, 60 L.Ed.2d 447 (1979), many courts have used such standards as one of the factors to analyze the adequacy of an institution's housing facilities. *Battle v. Anderson; Chapman v. Rhodes; Gates v. Collier*, 390 F.Supp. 482 (N.D.Miss.1975), *aff'd* 525 F.2d 965 (5th Cir. 1976); *Williams v. Edwards; Newman v. Alabama*. In *Gates v. Collier*, the district court observed that "generally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate" to ensure a minimum level of decency. 390 F.Supp. at 486. The Fifth Circuit continues to cite the *Gates* standard with approval, *Jones v. Diamond*, 594 F.2d 997, 1012 (5th Cir. 1979), *reh. granted* 602 F.2d 1243 (1979); however, it has warned that a "simple mathematical calculation of total square feet of space divided by a standard of square feet per man may not necessarily be appropriate or practicable." *Williams v. Edwards*, 547 F.2d at 1215. In *Williams*, the Fifth Circuit remanded the district court's determination of prison capacity based on an eighty square feet per inmate standard and ordered a "recomputation of the proper inmate population ... [taking into account] [t]he functions and characteristics of each building ... in arriving at the capacity of each." 547 F.2d at 1215. The *Williams* court noted that the prison's existing cells contained forty–eight square feet, while correctional standards call for a minimum of fifty square feet per inmate. The Fifth Circuit has further cautioned that design standards, without more, do not amount to a *per se* constitutional limitation on the number of prisoners which may be housed in a particular prison facility. *Newman v. Alabama*, 559 F.2d at 288.

---

**29.** See the standards cited in footnote 21.

The *Newman* court affirmed the district court's requirement that inmates in existing facilities, whose conditions the court had evaluated, must be confined in single cells, and remanded for further consideration a requirement that all new prison construction provide sixty square feet of space for each prisoner.

These opinions, read together, provide useful criteria for evaluating whether the amount of individual space in inmate living areas is constitutionally sufficient. It is clear that confinement of inmates in spaces of less than fifty square feet should occasion great concern and careful judicial scrutiny. However, no hard and fast rule is appropriate; in each case, the court must consider all of the existing circumstances surrounding the overcrowding.

Space allocations for TDC inmates are so far below the fifty square foot level that little doubt exists as to their constitutional inadequacy. Inmates double–celled in forty–five foot cells have twenty–two and a half feet apiece; those who are housed three, four, or five to a cell are consigned to much less space. Prisoners living in the dormitories are accorded, on the average, less than forty square feet of space per person.

None of the other conditions of confinement related to overcrowding at TDC alleviate its deleterious effects or mitigate the conclusion that it violates the Constitution. As noted in the factual description of overcrowding, inmates spend a substantial amount of their time in the closely–packed living quarters. Even when away from the housing areas, they get no relief, for other facilities in the prisons are likewise intensively crowded.

The record makes plain the rampant violence associated with overcrowding, and none of the other conditions in TDC alleviate its appalling consequences. Security is so inadequate [30] that inmates in multiply populated cells and packed dormitories cannot be properly supervised or prevented from brutalizing each other. Similarly, there is nothing at TDC which serves to ease the severe psychological harm and physical discomfort which inures from extreme overcrowding and living in the constant presence of countless others.[31] All of the relevant factors being considered, it is clear that the severe overcrowding at TDC contravenes the eighth amendment.

Defendants have steadfastly maintained that crowding cannot be found to violate the eighth amendment, unless there is a showing of "a concrete injury prescribed by the Eighth Amendment that is directly caused by crowded conditions." Defendants argue for an exceedingly strict standard of proof on these points; they criticize plaintiffs' evidence, for its alleged failure to demonstrate with a high degree of specificity and certainty that harms have been caused to the inmates by overcrowding.

It is clear from a reading of cases in which overcrowded conditions have been found unconstitutional that the defendants' characterization of the plaintiffs' burden of proof is erroneous. Detailed, scientifically exact proof of harm has never been required. Courts have reached conclusions concerning the extent of harm from overcrowding based on common sense reasoning

---

**30.** See the section of this opinion describing the inadequate security and supervision.

**31.** Defendants presented a great deal of testimony to the effect that TDC institutions are generally quite clean and well maintained. With several notable exceptions (see the section of this opinion regarding sanitation), this portrait of living quarters is accurate. Unlike many of the prisons described in other cases, TDC prisons cannot be described as filthy or dilapidated. Cleaning materials appear to be widely available and frequently used.

TDC is to be commended for its efforts to insure cleanliness. However, the fact that cells and dormitories are kept relatively clean does not compensate for the fact that they are disgracefully overcrowded. Even under the cleanest conditions, the confinement of two or three persons to forty–five square foot cells is unhumane. In *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977), the court rejected the prisoners' challenges to security, the medical care systems, sanitation and other conditions and characterized the facility in question as "first–class" "from a brick and mortar viewpoint". 434 F.Supp. at 1009. Nevertheless, it concluded that the long–term double–celling of prisoners in sixty–three square foot cells was unconstitutional.

from observable facts, such as population levels, space per inmate, incidence of violence and staffing levels. *See, e. g.,* the facts relied upon in *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd in relevant part sub nom. Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977) (population well over design capacity; sanitation and security impossible to maintain; mattresses on floor and next to windows; inadequate number of toilets; no hot water; foul odors; violation of public health standards; bad effects heightened by dormitory style living); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977) ("terribly overcrowded" living areas; not enough space to segregate dangerous inmates; a large number of stabbings; general lack of security; accumulations of sewage); *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972) *aff'd* 501 F.2d 1291 (5th Cir. 1974) (lack of sufficient guards; high number of assaults; inadequate sewage and water systems; inadequate number of toilets; lack of adequate firefighting equipment; poor medical care).

At trial, testimony was received from dozens of inmates and TDC employees (whose descriptions of the overcrowded conditions did not substantially vary), and also from a large number of extremely well qualified experts, the like and number of which have never been assembled in any other prison case of which this court is aware. This wealth of evidence supports the conclusions here drawn as to the effects of overcrowding. Furthermore, most of the deleterious results of overcrowding found to exist at TDC are discoverable as a matter of common sense and would be apparent to any logical judicious observer. *See Battle v. Anderson,* 447 F.Supp. 516, 521 (E.D. Okla.1977), *aff'd* 564 F.2d 388 (10th Cir. 1977) (Many of the problems "are self evident or intuitive in nature.").

Finally, mention must be made of *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), where the Supreme Court refused to find unconstitutional the housing of two pre–trial detainees in seventy–five square foot cells designed for one person. Although the Court stated that there was no " 'one man, one cell' principle lurking in the Due Process Clause", 404

U.S. at 542, 99 S.Ct. at 1875, the Court specifically reserved judgment on cases presenting different facts. 404 U.S. at 544, n.27, 99 S.Ct. at 1876, n.27. The jail involved was a short term facility from which virtually all inmates were released within sixty days. Detainees generally were locked in their rooms from eleven at night until six in the morning, and for brief periods during the afternoon and evening head counts. During the rest of the day, they were free to move about between their rooms and the common areas. In addition, the *Wolfish* jail was designed according to the most contemporary correctional and architectural standards and complied with all fire safety codes and provisions. Finally, rooms had direct access to sunlight and were equipped with doors, not bars.

The *Wolfish* facility undoubtedly presents quite a different perspective to the prisoners confined there than does the grim prospect faced daily by TDC inmates. First, the floor area of the average cell at TDC is closer to forty–five than sixty–five square feet. Next, a substantial proportion of the inmates are not free to move about; some are unassigned, others in a medical lay–in status, and more are in lockup (administrative segregation). These inmates typically are confined to their cells for a large portion of both their waking and sleeping hours. The movements of the inmates who work are highly regimented, and even these inmates spend an average of ten hours a day in their cells on working days, and much more on weekends. Significantly, many inmates at TDC must endure their overcrowded quarters for months or years on end.

Recognition of the potential hardship caused by overcrowded prison conditions led the *Wolfish* court to state that

confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment....

*Id.* at 542, 99 S.Ct. at 1875. The evidence shows that the overcrowding to which TDC

inmates are presently subjected is of such magnitude as to amount to severe punishment.

This conclusion is fully undergirded by both the facts and the prior case law. It will, therefore, be a part of the relief accorded to the plaintiff class that defendants take immediate action to end overcrowding at all TDC facilities. The relief to be granted will include, *inter alia*, the following: (1) a prompt and expeditious end to triple–celling of inmates; (2) the elimination of routine double–celling of inmates in the forty–five and sixty square foot cells; and (3) alleviation of the intense overcrowding in the dormitories.

## III. SECURITY AND SUPERVISION

### A.

#### 1. *Compendium*

■ All persons in a penal institution are entitled to physical safety. The nature of the safety afforded them is largely dependent upon the persons employed by the institution—their training, their number, their deployment, and the duties assigned to them. When analyzed on these bases, the TDC security staff reveals serious inadequacies. Training is brief and fails to provide new guards the skills needed for the effective, safe performance of their duties. A high turnover rate results in virtually perpetual vacancies in low–level guard positions. More importantly, there are simply too few civilian guards adequately to super-

vise inmate activity. These deficiencies in the security staff have either created or exacerbated many other security and safety problems.[32]

■ In essence, TDC has failed to furnish minimal safeguards for the personal safety of the inmates. Primarily because the civilian security force is insufficient in number and poorly deployed, inmates are constantly in danger of physical assaults from their fellow prisoners. To compensate for the serious understaffing, TDC has institutionalized the use of certain inmates as auxiliary guards, to assist the civilian security forces in controlling the units. This "building tender" system maintains picked inmates in positions of authority over other inmates, despite the mandate of state law to the contrary.[33] Moreover, these chosen inmates often brutalize their fellow prisoners, with the tacit approval or direction of civilian prison personnel. The civilian security officers augment the violence themselves, frequently indulging in acts of brutality against inmates.

#### 2. *Security Staff/Understaffing*

##### a. Background

TDC security officers[34] are primarily white males from rural communities. Some have had military or college training prior to their employment, but this preparation is not a prerequisite for a position. Many guards aspire to careers in law enforcement, and their TDC jobs are simply a means to obtain practical knowledge before

---

**32.** For instance, the dangers of inmate violence posed by overcrowding, as manifested in double and triple celling and packed dormitories, are heightened by the shortage of civilian security guards and the resultant lack of supervision. *See* the section of this opinion relating to overcrowding.

**33.** Tex.Rev.Civ.Stat.Ann. art. 6184K–1 (Vernon's Supp.1980):

Section 1. An inmate in the custody of the Texas Department of Corrections or in any jail in this state may not act in a supervisory or administrative capacity over other inmates.

Section 2. An inmate in the custody of the Texas Department of Corrections or in any jail in this state may not administer disciplinary action over another inmate.

**34.** At TDC institutions, uniformed security officers have the responsibility for maintaining order within the prison, preventing escapes, and insuring the safety of those within the prison. The TDC security staff is composed of a variety of ranking officers (*e. g.*, Building Captain, Field Major, Shift Lieutenant), who serve in specific areas of assignment and whose authority is proportionate to their several ranks. The highest authority at each prison is the warden, who may be assisted by one or more assistant wardens. Ranking security officers supervise and direct the activities of lower level security officers, who are designated as Correctional Officers (CO's). CO's ordinarily advance through grades I, II, and III before attaining higher ranks. Promotions are based upon length of service and periodic employee evaluations.

moving on to more desirable and higher paying positions in this field. A number of TDC employees attend college when not at work, usually at Sam Houston State University. Pursuit of a higher education is encouraged by prison officials, but TDC encounters difficulties in keeping its best educated guards. Also, problems in recruiting and retaining minority employees have repeatedly been manifested.[35] Minority recruital is difficult, because most TDC units are located in isolated rural communities not having significant minority communities and often lacking adequate housing, particularly for families. These same factors hamper recruitment of persons accustomed to life in urban areas. Further, persons who might otherwise be disposed toward a career in TDC are deterred by the inadequate pay for low–level correctional officers.[36]

W. J. Estelle, Jr., Director of TDC, testified that most of the employees with promising futures leave in a relatively short time. Those who remain and are eventually filtered upward into higher ranking positions characteristically have strong personal ties to TDC or to the communities in which they work. Virtually all of TDC's high level employees have, to some extent, come through the ranks; persons from without the system are almost never hired directly for such positions.

A substantial percentage of inmates are from urban areas, chiefly the cities of Dallas and Houston. The combined total of black and Mexican–American inmates constitutes a majority of the TDC inmate population. Both groups are from subcultures radically different from that of the rural whites who typically supervise them. Given the racial, ethnic, cultural and regional differences separating them, mere communication between inmates and guards is not easy. Empathy and understanding, the latent corollaries of truly comprehensible dialogues, are exceedingly difficult to realize.

b. Training

Newly employed security officers attend a TDC training school before assuming positions inside the prisons. To more quickly supply needed manpower, the training program, which formerly lasted four weeks, was reduced to two weeks. Even though the syllabus for the training school includes a comprehensive list of topics, many complicated and important topics are covered in a short period of time.[37]

The ambience of TDC prisons is one of generally felt tension and discord, attributable to such factors as the contrarieties of guards and inmates and the omnipresent overcrowding. Violent clashes frequently

35. A minority recruitment program was required by the consent decree in *Lamar v. Coffield*, Civil Action No. 72–H–1393 (S.D.Texas).

36. Beginning September 1, 1979, pay for a correctional officer at the end of a six–month probationary period increased from $848 to $1,051 a month. TDC witnesses stated that this increment should bring their salaries more in line with those in related fields. Prior to this raise, a TDC *captain* with a wife and two children could qualify for food stamps under a federal program for low income groups. TDC employees were also recently included in the Texas State Peace Officers Retirement System. Other benefits include free medical care for work–related injuries and, for ranking officers, food emoluments in the form of specially priced meats and vegetables from TDC farms.

37. The Officer's Pre–Training School Syllabus, revised in January of 1977, lists numerous topics to be covered in the training sessions. Topics include: history of corrections; history of TDC (since 1829); orientation to TDC (slides of units); organizational structure of TDC; unit organizational structure; effective report writing; contraband and body search; riots: causes, prevention, and control; emergency procedures; compound or building security; field security; motivation and supervision; firearms training and qualifications; federal and state statutes; disciplinary procedures and reports; area and building search; human communication; the criminal justice system; drugs, narcotics, and first aid; the unusual inmate; classification of inmates; probation and parole; officer–inmate relationships; alcoholism; rules and regulations test; employees' benefits, insurance, credit union, ID cards, and group picture; academic testing; fire and safety (two hours); count procedures; security devices; restraining devices; community services; civil rights; Windham school; promotion test; bilingual; on–the–job training. It is obvious from the breadth of the subjects covered that no more than a few hours can be given to most subjects.

erupt among the inmates and between the guards and inmates. Regardless of these conditions, guards are not given any actual physical training or practice in the appropriate uses of limited physical force for the restraint of inmates or the proper utilization of riot batons or mace. At most, trainees view a film which discusses such subjects. Similarly, they receive but little instruction as to verbal, non–physical means of calming these crises. In other institutional settings, the evidence showed, such programs have lessened the frequency of overreaction and physical violence.

When a new training school graduate initially arrives at a unit, he is usually assigned to accompany an experienced guard engaged in the performance of his duties. This serves to familiarize the new guard with the nature and extent of his functions and responsibilities before he undertakes them alone. The time so spent may vary from a day or two to two weeks. All further training is received on the job, until the employee reaches a higher ranking position. Several former correctional officers, who were worthy of belief, testified that the policies and practices they learned on the job differed markedly from those learned at the training school. For example, these officers were taught at training school that all inmates should be treated equally and fairly. At the units, however, they were directed to keep an especially

close watch on "writ writers" [38] and to deal harshly with their infractions, while at the same time awarding special privileges to, and largely ignoring violations by, favored inmates such as "politicians" and "building tenders." [39] Indeed, for the first several months of employment, new correctional officers must unlearn the policies taught at the training school. This casts doubt upon the validity of TDC's formal descriptions of its training programs and procedures and lends credence to allegations that its prisons are run according to unwritten rules which are inconsistent with the officially expressed policies. (*See* Sections V and III A.3.)

### c. Staff Duties and Responsibilities; Understaffing

TDC prisons are severely understaffed, a fact essentially undisputed by TDC officials.[40] The evidence shows that during the years 1973, 1974 and 1977, TDC had the worst staff/inmate ratio of any state prison in the United States. During the summer of 1979, TDC employed approximately one uniformed guard for every 12.45 inmates, one of the most unfavorable, if not the worst, staff/inmate ratios in the nation. The Texas Legislature authorized appropriations for staffing at a ratio of one guard to eleven inmates, beginning September 1, 1979.[41] Nationally, the average guard–to–inmate ratio is one to five.[42]

**38.** "Writ writer" is a term loosely applied to an inmate who makes complaints about prison problems to outsiders, such as the courts, state legislators, or representatives of the news media.

**39.** "Politician" is a term used to describe an inmate, usually a building porter, turnkey, or bookkeeper, who gets along well with, and performs services for, security officers, and who is, in turn, protected by them. A "building tender" is an inmate who is given a specific job involving custodial and supervisory duties in relation to other inmates. The "building tender" system, and its abuses, are discussed in part 3 of this section.

**40.** TDC witnesses generally agreed with statistics introduced by plaintiffs regarding staffing levels. Most of them testified that more staffing was desirable and that its lack caused restrictions upon normal functioning, *e. g.*, the reduction of the number of inmates working in the fields at any one time because of insuffi-

cient field officers. TDC officials contended, however, that the staff shortages do not result in unconstitutional deprivations.

**41.** No evidence is available as to whether this figure has been implemented. One of the factors which would make the implementation difficult is the extremely high turnover rate among TDC employees, particularly in the lowest ranks. Attrition rates among such officers have been as high as seventy percent. The constant turnover of personnel results in almost constant vacancies among the ranks of TDC prison guards.

**42.** These ratios, if improperly understood, can be quite misleading. They do not mean that every five or eleven inmates have a separate guard; they merely indicate the number of total uniformed security officers compared to the total number of inmates in a prison.

Director Estelle recognized that the TDC guard–to–inmate ratio is the lowest in the country. Indeed, in 1976, he characterized a ratio of one to twelve as "extremely dangerous". He and other defense witnesses insisted, nevertheless, that TDC prisons are being safely managed at current staffing levels, contending that TDC's physical design and its management methods require fewer security officers than might be necessary in other systems. TDC officials also asserted that computations of guard–to–inmate ratios should include non–uniformed staff members, although their primary functions are not related to security.

As to the latter claim, it is clear that non–uniformed employees, such as medical personnel, vocational and industrial supervisors, teachers, and food service stewards, are primarily concerned with providing services and programs to inmates and have little to do with security *per se.* Computing their presence would thus be irrelevant to an assessment of security effectiveness at TDC. The national guard–to–inmate average, referred to above, and the comparable statistics from other prison systems do not take account of non–uniformed, non–security prison employees.

The defendants' argument that fewer security officers are required at TDC than in other prison systems must be evaluated by an examination of TDC's actual deployment of its disproportionately underpopulated staff. TDC security officers perform three basic functions: (1) patrolling the security perimeters of the institutions, to prevent or detect escapes, (2) supervising inmates at their work or school assignments, and (3) managing and controlling inmate movement and activities into, out of, and within the main building of each unit (where housing, eating, medical, and recreational facilities are located). Perimeter security guards work in the outside pickets (gun towers) and radio patrol units, hence they rarely come into direct contact with inmates. Most of the security officers who supervise work activities are assigned to the agricultural fields. Because these fields are beyond the prisons' security perimeters, inmates in the agricultural lines are closely supervised by armed officers on horseback. The overall shortage of security staff has meant that fewer inmates are dispatched to the fields on a given day than would be the case otherwise, and those who are not assigned to work on that day remain idle in the housing areas.[43] It is there, in the housing areas–both during the day and at nighttime–, that the understaffing is most acutely felt.

The main buildings of most TDC units consist of cellblock and dormitory wings that intersect perpendicularly with long central halls.[44] Groups of prisoners are moved up and down the halls throughout the day, as they leave for work and school and return for food and recreation. During the day, building security personnel primarily function to coordinate and supervise these movements, and to keep track of unassigned inmates. On each shift, a specified number of security officers work in locked picket stations inside the buildings. These picket guards can observe activities in the halls, but they are forbidden to leave their stations. Many of the remaining guards are at specific posts along the central halls or within the dining rooms or writ rooms, although, if necessary, these guards have authority to go elsewhere in the building. These deployments leave few officers available to supervise the cellblocks and dormitories.

During the day, it is not uncommon for one guard to be responsible for supervising two to four cellblocks[45] or dormitories. Much of his time is occupied with perform-

**43.** Systemwide, approximately 8,000 inmates are assigned to the agricultural lines. At most units, only one–quarter to one–half of the inmates assigned to the line force are able to work at any one time; the others remain in the building, essentially idle.

**44.** This "telephone pole" design exists at all TDC units, except for Central, Coffield and Mountain View. The Central and Coffield units have a radial design, which requires regimented group movement similar to that necessary in "telephone pole" designs. The Mountain View unit is of a modular or campus design.

**45.** A typical TDC cellblock consists of three tiers, with twenty or thirty cells on each tier.

ing searches and shakedowns of inmates entering or leaving the cellblocks or dormitories and attending to the count. He is ordinarily stationed outside the cell area and usually can only see into the first four or five cells. Guards are never stationed inside the dormitories, although the evidence made it clear that activities inside the dormitories cannot adequately be observed from the outside.

Defendants' witnesses repeatedly sought to point out that the housing areas are not full during the day. However, as already noted, on any given work day, a large percentage of inmates in the agricultural lines are idle; this, added to the fact that approximately ten percent of the inmate population is on an unassigned status every work day,[46] shows that the housing areas do, in reality, contain a substantial number of inmates during daytime hours. Also, some inmates are free to return to their living areas before or after meals and in between working hours.

At night, most inmates are locked inside their cells or dormitories. Included among the principal tasks of the nighttime guards are keeping watch, handling such emergencies as may arise, and taking at least three nightly counts of the inmates in their charge. Each nighttime guard is assigned to supervise several hundred inmates, virtually all in doubly or triply occupied cells or cramped dormitories. A single guard will often be responsible for as many as four cellblocks, each of which contains three tiers. As previously noted, no guards are stationed inside the dormitories, and none will enter unless summoned from within. Additional burdens for these guards stem from the fact that movement through the prison halls is suspended for only a few hours during the nighttime. A final lock-up is usually set at 10:00 p. m. Some inmates are awakened as early as 2:00 a. m., and many units begin serving their regular breakfast lines as early as 3:00 or 4:00 a. m.

The resultant movement of prisoners creates even more responsibilities for the sparsely placed guards.[47]

As an inevitable result of these staffing patterns, inmate activities within the housing areas are almost entirely unsupervised by civilian personnel. No security officers keep watch over the dormitory rooms. It is nothing short of impossible for one guard adequately to supervise two, three, or four cellblocks. The defendants themselves noted, in one of their exhibits, that "with only one officer assigned to two or four cellblocks, the majority of inmates can do as they please when the officer is searching and counting those coming in or out." At TDC units, two three-tiered cellblocks typically face each other across an open space. There are no crossover catwalks across these spaces; thus, to move from the second or third tier of one cellblock to the other, an officer must descend the narrow staircases between the tiers on one side, cross over on the ground floor level, and then ascend staircases to the appropriate level on the opposite cellblock. Since inmates cannot be seen from the stairways, this arrangement severely hinders the officers' capability to respond quickly to disturbances or emergencies involving inmates in cells, and also limits their capacity to observe inmate activity in these locations. Indeed, it is extremely difficult for one guard safely to supervise even one cellblock, because inmates on more than one level cannot be observed simultaneously.

This lack of supervision means that aggressive and predatory inmates are free to do as they wish in the living areas, and their victims can be threatened, extorted, beaten, or raped, in the absence of protection from civilian personnel. No guards are present voluntarily to come to the aid of the victims or to prevent the attacks in the first place. Furthermore, inmates who feel threatened cannot necessarily communicate their fears to prison officials. A strong

46. The category of "unassigned" inmates includes those temporarily or permanently without a job assignment, e. g., inmates who are on medical lay-in or who are acutely ill, newly arrived inmates not yet assigned, and inmates who are permanently disabled.

47. Even during lock-up hours, freedom of movement is accorded to certain inmates, such as building tenders and those with night jobs. Hence, the halls are never really quiet.

prison code against informing exists among the inmates. Only an inmate having a special relationship with guards is able to make his straits known to officers without fear of being retaliated against by other inmates. If he remains in the general population, an inmate who violates this code increases his chances of being assaulted.

Simply put, inmates live in a climate of fear and apprehension by reason of the constant threat of violence. Indeed, to escape threatened physical attacks, several inmates have deliberately violated rules in order to be consigned to some form of punitive segregation. Self–mutilation being a disciplinary offense, some have gone to the extent of cutting their arms, legs, or heel tendons to achieve temporary transfers to administrative segregation, solitary confinement, or the hospital.[48]

Numerous examples of the inability of TDC staff to protect inmates' personal safety were graphically presented by credible testimony at trial. Three of the more shocking events, described by two TDC wardens, occurred within a twenty month period at two different institutions. The three incidents, described in the margin,[49] each involved physical torture and sexual abuse of inmates by their cell partners over a period of days. In each case, prison administrators concluded that individual guards had not been at fault in failing to discover these situations sooner, and no disciplinary action was taken against any of them. The wardens sought to characterize these incidents as regrettable, but rare, and not indicative of general security problems. It appears evident, however, that in a properly staffed maximum security institution, these types of prolonged torture would be quickly discovered.

In several cases, the official TDC incident reports of violent incidents include statements to the effect that, because of shortages in personnel, no officers were assigned to the areas where the incidents took place. The record also contains several examples of successful suicides which were not discovered until several hours after they occurred, although an officer was obligated to check the cells where the suicidal inmates were confined at least once every hour.

**48.** Expert witnesses testified that TDC has a large number of suicides, attempted suicides, and self–mutilations. The prison environment at TDC apparently drives an unusually high number of persons to take these despairing, self–destructive actions, which are frequently committed without attracting the attention of guards.

**49.** In March of 1977, a young inmate at the Clemens Unit was confined to a cell already occupied by two older inmates. For the following weeks, his predatory cellmates tortured and preyed upon the youth. A summary of some of the abuses they inflicted on him were as follows: He was forced to clean up the cell by himself, afterwards undergoing beatings, inflicted for no apparent cause. While bound with towels, he was forced to commit unnatural sex acts and to endure blows from fists and a candy can. Still later, burning matches and a lighted cigarette were placed on his unprotected skin. Brandishing a broken glass, the predators threatened to kill him, if he informed on them. To guard further against discovery of their activities, his cellmates followed him to and from the showers and mess hall and physically prevented him from going to the day room. Additionally, they tore up his prescriptions and confiscated his "commissary". When he finally succeeded in reporting his pitiable situation to an officer and was rescued, it was discovered that he had sustained multiple bruises and contusions, multiple second degree burns, a swollen left ankle, and scalp lacerations.

In August 1977, a similar incident occurred, again at the Clemens Unit. In this case, an inmate in a three–man cell was abused over a period of several days. He was burned with cigarettes, his shirt was set afire, and he was wrapped in towels and beaten by his cellmates.

In December of 1978, on the Eastham Unit, a young inmate, sentenced to TDC for a short period of time as "shock probation", was confined in an administrative segregation cell with two inmates who had long histories of violence. Over a period of three days, the young man was repeatedly raped, beaten, and burned by his cellmates, who refused to permit him to eat and forced him to turn his back to the bars whenever an officer passed. Unit officers were alerted to the situation by a building porter. One of the assaulting inmates received a seven year sentence, for his part in these activities. The other inmate who participated in the assaults was merely deprived of his accumulated good time. Three and one–half months after the incident, he was promoted to Class I (the highest good time earning status), and a month and a half after that, all of his good time was restored.

Although granting that assault rates [50] within their prisons are high, TDC officials maintain that the prisons are safe, citing statistics to the effect that escapes are virtually unheard of and homicides are uncommon. TDC's record in these areas is somewhat impressive, although the statistics are subject to varying interpretations.[51] In any case, this does not end the inquiry into safety and security of TDC prisons. The fact that escapes are uncommon has little to do with the conditions of safety *within* the institution. The low escape rate demonstrates that TDC is fulfilling its duty to protect the safety of outside communities; it does not indicate whether TDC is discharging its obligation to defend the security of the confined inmates.

Similarly, while TDC's relatively low homicide rate evinces that inmates do not often succeed in killing one another, that fact is not necessarily inconsistent with the determination that TDC institutions are generally unsafe and that inmates live in fear of harm from other inmates. The comparatively low rate of homicides in TDC is attributable to a number of components, including routine strip searches of individuals, frequent shakedowns of entire cell-blocks to uncover lethal makeshift weapons,[52] and rather strict rules regarding visitation and inspection of incoming mail. However, those factors which decrease the availability of deadly weapons do not necessarily reduce the opportunities for nonhomicidal violence. While inmates may not be subject to murder at excessive rates, that does not relieve their well–founded apprehension of extortion, assault, and rape. Therefore, TDC's low homicide rates do not preclude or modify the finding that TDC institutions are unsafe and charged with a climate of fear.

### 3. *Building Tender System*

A Texas statute expressly prohibits the use of inmates in a supervisory or administrative capacity over other inmates and forbids any inmate to administer disciplinary action to another prisoner.[53] Disregarding this statutory provision, TDC has compensated for its chronic shortages of civilian security personnel by using inmates to perform security functions.[54] TDC officials agreed that a large number of inmates hold jobs in which they assist officers; notwithstanding, they deny that these inmates exercise supervisory authority over other inmates.

---

**50.** Some variance in defendants' position regarding their assault rate is evident. Some defense exhibits suggest that TDC assault rate is low compared to that of other systems, and the defendants' expert witnesses testified that they were provided with TDC statistics suggesting very low assault rates. The plaintiffs challenged the accuracy and completeness of those statistics and pointed to other official TDC records that indicate very high rates. Director Estelle conceded that assaults have increased "dramatically".

**51.** For instance, comparison of TDC escape rates with those of other state prison systems may be uninformative, because many states have multi–security systems. In these states, "walkaways" by inmates, or their late returns from furloughs, work release centers, or minimum security camps, are all counted as escapes. These kind of escapes rarely occur in TDC, since the institutions are practically all of the maximum security type and the work release program is very small. Many TDC escapes are serious, planned, and sometimes violent breakouts that are, in most systems, few in number.

**52.** An exception to this general finding regarding availability of weapons must be made for building tenders and other favored inmates, as noted in part 3 of this section.

**53.** The statute is quoted at note 33.

**54.** The use of building tenders is directly related to the inadequate numbers of civilian staff. In 1974, there were over 800 (4.7%) formally approved building tenders and turnkeys, out of a total inmate population of 17,000. In May of 1979, with understaffing more acute, there were 2,265 (9%) inmates assigned to building services; the inmate population was 25,090. In general, at least one building tender is assigned to every tier of each wing. At most prisons in the TDC system, more turnkeys are on duty than building officers on any given shift, and the number of building tenders far exceeds the number of officers. Defendant Estelle granted that turnkey jobs could not be eliminated without more officers. A unit warden told a defense expert witness that he would not use building tenders for security purposes, if he could have "four officers on every one of those tiers ... but I don't have that many officers."

While these inmates now hold a number of different official job titles, in the past they were generally referred to as building tenders.[55] Most building tenders at a unit are selected by the warden, but the selection must receive the approval of the TDC State Classification Committee.[56] These are the only jobs assigned to inmates in the TDC system which require approval by the Classification Committee. Defense witnesses testified that the approval process is designed to insure that the inmates selected will not abuse their authority. It is evident, however, that the State Classification Committee exercises a very ineffectual check on the wardens' selections for these positions, for under the procedures employed, violent, corrupt and brutal inmates—some particularly notorious—have routinely been approved.[57]

TDC officials testified that the officially approved duties of building tenders, set out in the margin,[58] include only routine tasks that vary according to specific job assignments. However, conclusive evidence shows that,in reality, building tenders are allowed to do a great deal more than merely assist officers at routine tasks. For instance, building tenders are used by TDC officials to gather intelligence concerning the activities, expressions, and attitudes of other inmates.[59] More importantly, they quite often literally serve in the capacity of guards. In the words of one of the defendants' expert witnesses, these inmates do the guards' "dirty work," serving as enforcers of the ranking officers' will in the living areas, and harassing, threatening, and physically punishing inmates perceived as troublemakers.[60]

55. Such inmates are officially called floor men, wing porters, wing tenders, orderlies, turnkeys, key girls, bookkeepers, count boys, field porters, water boys, lead row workers, and tail row workers. The title "building tender" was officially used prior to the enactment of the state statute cited in footnote 33. Although official use of the title was discontinued after the statute went into effect, the supervisory, administrative, and disciplinary duties of these inmates did not change. The term "building tender" is thus used in the generic sense, to refer generally to all inmates who discharge custodial or supervisory functions. The more specific titles mentioned above are used to distinguish activities that cannot be generalized.

56. Bookkeepers, count boys, field porters, water boys, and lead row and tail row workers need not receive such approval.

57. TDC's official computer records reveal that building tenders tend to be serving longer sentences and have been convicted of more violent crimes than inmates in the general population.
 One particular building tender, Butch Ainsworth, was characterized by the former warden of the Eastham Unit as the most violent inmate he has ever known. Several bloodchilling incidents involving inmate Ainsworth were described by TDC officers and inmates. On one occasion, Ainsworth, protesting the transfer of one of his friends to another unit, cut off several of his own fingers and delivered them to a guard.

58. "Floor men", "wing tenders", "porters", and "orderlies" are assigned to clean the common areas of the units, to pass out towels, bed linens, and hot water to other inmates, and to perform similar janitorial tasks. "Turnkeys"

serve as adjuncts to civilian guards, opening doors only at the express directions of the officers. "Bookkeepers" assist ranking officers with their paperwork, which involves filing, typing, and maintaining records of housing and job assignments. "Count boys" maintain the count board, making a record of the movements of inmates into and out of their assigned areas. "Field porters" and "water boys" are required to make water and other necessary supplies available to workers in the agricultural lines. The latter workers are expected to move in unison down the rows. "Lead row" inmates set the pace for each line, while "tail row" inmates watch for slackers in the line.

59. "Building tenders are ... institutional snitches." This hearsay statement, attributed to a former TDC Director, Dr. George J. Beto, by one of the witnesses, accurately capsulizes an important connection between TDC officials and building tenders. The relationship is accorded great significance by both groups, because they severally perceive it as being advantageous to themselves.

60. The attendant circumstances warrant the believability of the testimony of former building tender Jerry Ben Ulmer, an inmate convicted of a number of murders and serving concurrent sentences of life imprisonment—commuted from death sentences. He gave evidence that he was promised certain favors if he would cooperate with some of the officials of Ramsey Unit I. One of his commissioned tasks involved the intimidation of a writ writer regarded as troublesome by the officials. Upon being assigned to the cell of the writ writer by the

Building tenders have unofficially been given such specific powers as issuing orders to other inmates, assisting in taking daily counts of the population, keeping track of inmate movements, escorting inmates to different destinations within the prison, and distributing correspondence and commissary scrip. Some are authorized to be in possession of keys outside the presence of civilian personnel, and others operate the automated opening devices which control access to cell blocks, day rooms, and other parts of the institutions. In the day rooms, building tenders are in complete control; e. g., they enforce order and silence, operate the controls of television sets, and regulate the games that can be played.

The fact that building tenders work closely with civilian security personnel gives them several significant advantages, which they may readily abuse. Often, their greater contact with prison officials permits them the opportunity to arrange or influence job and housing changes, and to sell their influence over such matters to other inmates. Some have access to records concerning inmates' financial resources, and others are authorized to assist in preparing and editing disciplinary reports. Certain building tenders are able to view general inmates' files and use the information to operate extortion, prostitution, and usury schemes. Another common practice of building tenders is to "run stores", that is, to sell to inmates, for exorbitant prices, commissary items in high demand. A free market situation does not prevail in these circumstances; building tenders have the power to punish inmates who refuse to deal with them on the demanded financial or

sexual bases. The building tenders' puissance in this respect extends to causing the loss of privileges (e. g., the right to go to the commissary; favorable job or housing assignments) or even the infliction of physical punishment. Common inmates place themselves in extreme danger in any conflict with building tenders; the decisions of the latter concerning the inmates under their supervision are almost universally upheld by TDC officers. When such conflicts arise, the subordinate inmates are but rarely provided with protection from abuse by TDC officers. In point of fact, at some units, building tenders have and exercise more authority than low–level correctional officers. Several former TDC officers stated that they were taught their duties by building tenders, and learned quickly never to challenge them, particularly if the officer the building tender "worked for" was of high rank.[61]

Of overriding significance is the fact that building tenders are often permitted to carry weapons,[62] which are employed to threaten and discipline other inmates. At some units, building tenders have routinely used such weapons, under the eyes and at the express direction of prison officers. At other units, the attitude toward possession and use of weapons by building tenders is one of deliberately kept ignorance; that is, guards willfully choose not to see that building tenders brutally enforce discipline on subordinate inmates by use of weapons. At still other units, the officials' failure adequately to check building tenders' rampant, callous utilization of arms results from lax supervision of these particular inmates, who are only infrequently subjected to searches and shakedowns.[63] This notorious

---

officials, Ulmer slit the other inmate's throat with a knife–not fatally, as Ulmer had planned it. Ulmer was never disciplined for the act, because a TDC captain characterized the throatcutting as self–mutilation, rather than as an assault.

**61.** The individual building tender derives his authority from his supervising officer's status. Under this arrangement, for example, the building major's turnkey or bookkeeper has more authority than the shift sergeant's. An illuminating example was testified to by Warden David Christian of the Retrieve Unit. He admitted that a Lieutenant on his unit, who was

an employee of many years standing, was transferred from the unit after cursing the warden's head building tender.

**62.** At Eastham, some building tenders were equipped with such items as "free–world" hunting knives, two mop handles taped together, pieces of trace chain, pipes, and "baseball" (small wooden) bats.

**63.** Low level correctional officers performing routine shakedowns on the Ramsey I Unit found weapons on building tenders. The weapons were, in some instances, confiscated by the guards and turned over to ranking officers. Later, the subordinate officers learned that the

ability of building tenders to keep and use weapons is in marked contrast to TDC's generally effective system of curbing the presence of arms and other contraband among the general inmate population, a disparity which supports the conclusion that the lapses of officials toward building tenders are not accidental.

The availability of weapons, as well as the other concomitants of power possessed by building tenders, allows them to engage in acts of marked brutality toward other prisoners. Of the many incidents of building tenders' brutality shown by the evidence, those set out in the margin are merely illustrative.[64]

In return for their assistance to the prison authorities, building tenders enjoy certain special privileges. They have greater mobility and access to facilities than do other inmates. Their cells are unlocked for more hours each day (professedly to perform their janitorial duties), thus enabling them to roam the building or parts of it—or, in certain instances, the institution—at will. The cells set aside to some building tenders are never locked. They may also elect when to eat within the several hours allotted to serving meals, and frequently they have been permitted to get late–night snacks from the kitchen after regular serving hours. Freer access than other inmates to indoor recreational facilities, as well as first priority in their use, is also granted building tenders. In many instances, these favored inmates are also permitted their choice of cell location;[65] or they may opt to have a single cell—even with other cells have one or more inmates sleeping on the floor. Building tenders have also been permitted to keep extra furniture in their cells, to keep pets, and to wear extra clothing, all being privileges not permitted the general inmate population. Low–level correctional officers are often directed by their ranking superiors not to bother to "shake down" building tenders; hence, they are seldom searched. Except for the most obvious, grievous offenses, building tenders ordinarily have actual or implied immunity for most disciplinary action, and a significant punishment for even their serious rule infractions is rare.[66]

weapons were again in the possession of the building tenders from whom they had been taken. These officers thus became aware of the futility of attempting to enforce written rules against the favored inmates.

64. At the Eastham Unit, when an inmate resisted sexual overtures from building tenders Butch Ainsworth and Charlie Robertson, they decided to apply force. A former building tender, a witness to the incident, credibly testified as follows:

> They wrapped a wet blanket around him first; plugged an extension cord into a socket. The ends of the extension cord were insulated, and they stuck this energized electric cord to the wet blanket.
> This wasn't getting the results that they wanted, so they unwrapped [the] inmate . . ., made him stand up on the commode in Ainsworth's cell and then placed the electric wires to his body and into the water.
> This caused [the] inmate . . . to scream from extreme pain, to begin to tremble, even to cry, and to submit to the homosexual act.

Besides sexually abusing the inmate, Ainsworth and Robertson confiscated his "commissary", as was routine with them.

At the Clemens Unit, building tenders on a particular row subjected young, weak inmates to unwilling acts of sexual malpractice, also forcing the youthful inmates to give up items they had bought at the unit commissary. The matter came to the Warden's attention only after the building tenders violently attacked an inmate suspected of "snitching" on them. As soon as his condition stabilized, the injured inmate was transferred to Huntsville in an ambulance.

At the Ramsey Unit, an inmate was dragged from his cell and repeatedly hit by two officers and four inmates.' Following this, his head was shaved, and he was thrust into his cell. When another inmate agreed to write an affidavit describing the incident, Warden Christian came to his cell and suggested that the inmate desist from helping his friend. He refused. Fifteen minutes later, three building tenders came into the second inmate's cell, armed with pieces of broomstick which had been cut into two or three foot lengths and taped together. After repeatedly striking the inmate with these objects, the building tenders directed him to discontinue participation in the other inmate's proposed lawsuit.

65. Defendants repeatedly denied that building tenders are afforded special privileges. However, Warden David Christian stated that a choice of cell assignments was one of the privileges accorded building tenders in the units he had supervised.

66. For example, in official reports of fights, building tenders are almost invariably found

Expert witnesses for all parties have detailed some of the harms involved in the building tender system. According to their testimony, giving one group of inmates authority over others is an invitation for resentment, misunderstandings, physical confrontations, and clashes between the two inmate classes.[67] Their opinions were supported by numerous TDC incident reports revealing the enmity, rancor, and bitterness of spirit emanating from the inmates' indignation at receiving orders from building tenders.[68] Frictions and tensions respecting building tenders are compounded at most units by the fact that they function with extended authority and are afforded the numerous privileges detailed above.

The overwhelming weight of the evidence demonstrates that abuses of authority are inherent in the building tender system, and that TDC officials are directly responsible for that system's continuation. The prison officials' arguments that abuses by building tenders are infrequent deviations, not in anywise sanctioned by them, contravene the clear implications of the testimony of their own witnesses. The very existence of the

State Classification Committee approval process for sensitive jobs represents a recognition by defendants that close observation and study of the inmate appointees is a necessary accompaniment to the appointments. Clearly, any screening which has occurred has been grossly deficient; hence, partial blame for the abuses of building tenders appointed through this process lies with the approving officials. Similar culpability attaches to other high–level TDC officials, all of whom allow the building tender system, with its systemic abuses, to be perpetuated. This conclusion might be undercut if the record revealed that building tenders are frequently and systematically disciplined for abuses of their positions, but all evidence points to a contrary conclusion. As noted before, building tenders involved in serious incidents, documented in defendants' official records, have retained their jobs after receiving either minimal disciplinary action or none at all.

In short, TDC officials have not adequately controlled the unlawfully maintained building tender system, and they have directly and indirectly permitted its abuses to be visited on the inmates of Texas prisons.[69]

---

not to be aggressors. Even if an incident report shows a building tender to be at fault, no disciplinary action is taken against him in most instances. When disciplinary measures are deemed essential, disproportionately light sentences are ordinarily administered to building tenders.

**67.** Although all expert witnesses agreed that inmates should not have authority over other inmates, penologists who testified for the defendants were in favor of giving inmates responsibilities and using them to assist officers.

The defendants maintain that, while building tenders assume certain responsibilities, they do not systematically exercise *authority* over other inmates. Nothing in the record convincingly supports this assertion. Indeed, the unanimity of expert opinion, and defendants' own characterizations of the inmate population as violent, manipulative people, suggests the contrary. It is evident that permitting inmates to participate in the distribution or allocation of a commodity or service in high demand by others (*e. g.*, water in the field, cell assignments, towels, or television programs), necessarily leads to exercise of authority, unless an officer is directly involved and the inmate is a mere mechanical assistant. Furthermore, the evidence referred to above makes it plain that building

tenders maintain excessive and abusive control over other prisoners.

**68.** TDC employees testified about numerous fights which began when inmates were aggrieved by receiving orders from building tenders. It is not without significance that, of the relatively few homicides which TDC reported for the years 1974 to 1979, a substantial percentage named building tenders as the victims.

**69.** The abuses of building tenders could only be prevented by constant supervision of their activities by civilian officers. The low ratio of civilian staff to inmates has precluded this possibility. Of course, the legislature's failure to appropriate funds sufficient to increase significantly the security staff does not absolve the defendants of liability for any unconstitutional shortcomings in the area of security. *See New-man v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206, 1212–1213 (5th Cir. 1977); *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291, 1319–1320 (5th Cir. 1974). Yet it appears that TDC officials in recent years have not even made serious efforts to persuade the legislature to allow for adequate levels of security staffing. Prior to the 1978 budget request, TDC officials had twice requested security staff positions to provide an overall officer–to–inmate ratio of one to six. In

### 4. Staff Brutality

Brutality by security officers is widespread in TDC prisons, the frequent use of physical force being one of the means employed by the overtaxed and sparsely placed security officers to keep control of the inmate population. Thus, inmates must live not only in fear of their fellow inmates, but of their keepers as well. Physical punishment is meted out by officers in a variety of situations and in a number of forms. The record is replete with credible evidence of inmates being unreasonably and unmercifully beaten with fists and clubs, kicked, and maced by the officers whose ostensible duty includes protecting them from harm. Many of the injuries so inflicted have required extensive medical care.

Indeed, the frequency of prison guard violence makes it apparent that brutality against inmates is nothing short of routine in the Texas prisons. Many of the incidents testified to by plaintiffs' witnesses were unrefuted by the defendants. As to other incidents, the defendants conceded that rough actions were involved, but contended that the force exercised by the officers was not excessive. As noted later in this section, the evidence strongly imports that the force employed by guards was, in fact, intolerably excessive on many occasions.

TDC officers habitually utilize physical force in a number of situations: (1) The administration of summary punishment, in the form of physical abuse, is a part of the standard procedures employed to control and supervise inmates. (2) Officers capriciously brutalize such inmates as writ writers, whose activities, although not in violation of any institutional rules, are insupportable to a great many TDC officials. (3) Security officers frequently respond with excessive force to violence or resistance by inmates, retaliating against the inmates by teaming up with other staff members or building tenders to inflict brutal beatings on them. Many of these beatings occur long after the situation which may have legitimately necessitated physical force has been eliminated. (4) Officers often meet what they perceive as major disturbances—attempts at escape and any concerted action or refusal to act by groups of inmates—with displays of force whose primary purpose and effect are clearly punitive rather than remedial. Each of these four situations shall be discussed in more detail.

As to the first, examples of the uses of physical punishment by TDC officers to assist in the day–to–day management of the prisons are numerous. A frequent practice of officers is to push and kick inmates whom they are escorting up and down stairs, and generally to use some form of physical prodding to keep inmates moving. In the agricultural fields, such practices are also common, and some have proved quite dangerous.[70] A separate problem is the frequent use of summary physical punishment, either before or in lieu of formal disciplinary charges, directed against inmates accused of disobeying rules or orders.[71] One of the more subtle forms of such punishment is the common practice of requiring inmates to "stand on the wall". This procedure involves the inmate's standing in one place in the hallway for long periods of time, sometimes in an awkward or humiliat-

---

the 1978 budget request, however, they made application for only enough positions to maintain a one–to–ten ratio, a level which they had previously termed inadequate. This implies that TDC officials have chosen to accept and bear with the building tender system.

**70.** Horses have been used to herd inmates much like cattle, with the result that various inmates have been stepped on by horses. In one such instance, an inmate sustained a broken ankle. In another incident, an inmate was beaten so severely by an officer using the bridle reins of a horse that he was taken to Huntsville Unit Hospital. The captain who attacked the inmate initially reported the incident as a con-

frontation between inmates. When the captain's involvement was subsequently discovered, he was reprimanded for falsifying the report but not for having assaulted the inmate.

**71.** An illustrative example of one such use of force was described by a former security officer. The guard, who had been working at TDC for only a short period of time, took an inmate to a superior officer, a sergeant, with the intention of reporting a disciplinary charge against the inmate for use of profanity. Without further ado, the sergeant proceeded to kick and hit the inmate. The correctional officer, believing the inmate had suffered enough, made the decision not to file charges against him.

ing position, e. g., having his nose and feet touching the wall. Several witnesses, including former officers, reported that inmates have been forced to "stand on the wall" for long periods of time, sometimes overnight or for several days running. Ordinarily, these inmates are not allowed to sit down, and they may be physically abused by officers, if it is discovered that they moved from their place "on the wall" without permission. In some cases, inmates who were too tired to stand at an assigned place were handcuffed to a bar or rail in an upright position.[72]

The second situation involves the physical brutality often used by TDC officers against inmates who activities, while allowed by law and official TDC policy, are intolerable to a large number of TDC officials. The inmates most frequently singled out for abusive treatment are the writ writers. A few examples of the totally unwarranted and retaliatory violence employed against them are set out in the margin.[73]

■ TDC officers frequently utilize excessive physical force against inmates who have allegedly attacked or threatened an officer or who have physically resisted efforts by officers to control their movements. It is unquestionably true that prison security officers are occasionally subjected to attacks from inmates. In such situations, quick and forceful physical responses by officers are essential to bring the attacking inmates under control and to protect the personal safety of the threatened officer and others. There is nothing objectionable about the use of physical force, *per se*, in such situations. It does not follow, however, that *any* degree of force is appropriate. The evidence revealed that, on many occasions, officers overreacted to the situations at hand or resorted to extreme amounts of physical force.[74]

Even more disquieting then evidence of individual officers' excessive responses to inmates' aggression were the numerous incidents of needless, savage physical brutality against inmates who were already subdued or who had not participate in whatever confrontation had occurred. In these situations, the initial provocation by an inmate was used by the officers as an excuse for the administration of a severe beating.[75]

---

**72.** The preponderance of the evidence shows that a certain inmate, obviously psychologically disturbed and in need of medical attention, "stood on the wall" for several days. For a part of this time, he was handcuffed to the back gate of the unit, and to machinery in the agricultural fields as well. After a few days of this treatment, the inmate died. A federal grand jury which heard testimony concerning this incident did not, however, return an indictment.

**73.** Plaintiff David Ruiz was beaten on the head and his foot was stamped on by officers, while he was confined to a solitary cell. TDC medical records confirm that he suffered injuries. Also, both Ruiz and another writ writer were maced by Warden David Christian of the Retrieve Unit, at a time when they wee securely locked in their cells. Indeed, the warden admitted to this himself. Another writ writer was beaten three times by guards and officers, because of his legal activities. After one of these beatings, he was hospitalized for a month and sustained a permanent injury. Plaintiff L. D. Hilliard was attacked by four officers and two inmates, while undergoing solitary confinement. On this occasion, he was hit with fists and a billy club, the six–on–one attack having been "provoked" by Hilliard's refusal to pick up his clothes after a strip search.

**74.** One particular incident occurred in the fields, where a mentally disturbed inmate began running around angrily, swinging a five gallon bucket. A field sergeant on horseback fired his pistol in the direction of the inmate when he refused to drop the bucket; luckily, no one was hit. The officer, who knew of the inmate's mental condition, was not disciplined or reprimanded for his use of firearms under these circumstances.

**75.** One such incident, described by a former officer, occurred at the Ramsey I Unit in March 1978. Several officers were escorting three inmates to administrative segregation, one at a time. One of the inmates swung his fist at an escorting officer; he was thereupon severely beaten by two of the officers. The other two inmates were also beaten, each in turn, even though neither of them had made any provocative move against the officers. The former employee, who witnessed the beatings, reported the incident to high TDC officials, who told him that the officers involved in the beatings would be discharged. Both officers were still employed in December 1978, and the reporting officer, a seven year TDC veteran, resigned because of the lack of official response to the incident. TDC produced no incident report regarding this event and presented no evidence with reference to the beatings.

Correctional officers often react excessively, and resort to unnecessary physical violence, in response to potentially serious security disruptions, such as group disturbances and escape attempts. It is not to be doubted that firm and speedy responses to potentially riotous conditions are necessary; however, the record discloses that TDC officials have not been content with merely quelling such disturbances. TDC's official reports and eyewitness testimony established that, in various instances, unnecessary punitive physical force was used against rebellious inmates after the crucial situations had been brought fully under control.[76]

The examples listed in these footnotes are merely illustrative of the numerous similar accounts in the record. Many inmate accounts of such beatings–which, not surprisingly, are infrequently memorialized in official incident reports–are corroborated by TDC medical records. Fairly serious injuries to inmates are revealed by these chronicles, along with only minor harms, if any, to the officers alleged to have been assaulted by the inmates.

76. At the Retrieve Unit in June 1973, Warden Taylor ordered his officers to use baseball bats, rubber hoses, and axe handles to beat ten inmates who had refused to work. Another series of assaults followed in the wake of a disturbance at the Darrington Unit on March 2, 1975. After the inmates there had been returned to their cells, they were ordered to strip themselves of their clothes. Those who had caused the disturbance were escorted by officers, one at a time, to the captain's office. A security officer who was stationed in the hall outside the office heard slapping noises coming from the office. He observed that inmates who left the office were bent over and appeared to be in pain. All of these inmates were consigned to solitary confinement, being escorted by officers who kicked them as they went, causing a few to stumble and fall.

In June 1978, at the Ferguson Unit, complaints about the food led to a series of confrontations between inmates and prison officials. During the afternoon of June 4, 1978, inmates throughout the building made a great deal of noise. After the inmates had been locked in their cells at night, inmates in one cellblock became exceedingly clamorous, meanwhile throwing objects from their cells. With the approval of defendant Estelle, tear gas and pepper fog were sprayed on inmates confined in three of the cellblocks, in an attempt to quiet them. When the noise from one cellblock continued, the inmates from that particular location were removed from their cells, required to strip, and then forced to run down a corridor to the gymnasium. Director Estelle, who was present in the corridor, testified that it was lined with guards, many of who were equipped with riot batons and gas masks. A former officer who was standing near Estelle testified that he, the officer, saw one inmate pushed to the floor and another hit and kicked by TDC major. Estelle denied having seen any physical force used on the inmates.

On the next day, another group of inmates at the Ferguson Unit refused to return to work after lunch. The inmates were taken to the dayroom, where they were forced to lie on the floor. As the inmates lay quietly, causing no disturbance, the Warden asked if they desired to return to work. Hearing no responses, the Warden armed his security officers with riot batons and mace, and instructed them to begin administering mace to the inmates, in an effort to make them resume work. The inmates were, at this point, still lying on the floor. After the irritating chemical agents were sprayed, the inmates unspokenly agreed to recommence work. According to the Warden's report, their exit from the dayroom bordered on a stampede:

The inmates arose from the floor as a group and rushed to the door, pushing, shoving and trampling each other until they reached the hallway and proceeded to run down the hall, tripping and stepping on several inmates until they ran into the hall barricade at the turn out door.

During the rush, four inmates received minor injuries. In reviewing this incident, correctional experts expressed astonishment that mace was used on a group of inmates who were passively lying on the floor. One expert witness characterized the incident as a clear case of overreaction, in which unnecessary violence was used.

Defendants have no written policy governing the use of chemical agents. It was reported by numerous TDC employees that the chemicals are kept locked in the pickets and may not be used without the approval of a ranking officer. However, it is unmistakable that this unwritten policy has been violated on some units, and that some ranking officers have themselves used, or authorized the use of, mace and other chemical agents in inappropriate circumstances. Warden Christian admitted to having maced two inmate writ writers while they were locked in their cells. Warden McCarthy testified that the use of tear gas and pepper fog on inmates locked in their cells at the Ferguson Unit on the night of June 4, 1978, was authorized and approved by Director Estelle, who was present on the unit at the time. A credible inmate witness gave uncontradicted testimony that a TDC night captain would occasionally mace all the inmates in administrative segregation on the Eastham Unit.

Similar abuses have occurred when inmates attempted to escape. Not content with re–capture, TDC officers inflicted their own brand of punishment on these inmates. Several witnesses testified to an incident involving an inmate who was shot and slightly wounded as he attempted to break loose from the Eastham Unit. To avoid the dogs who were tracking him, the inmate climbed a tree. When the pursuing officers and dogs caught up with him, the inmate was ordered to climb down and fight the dogs. The "fight" continued for several minutes before the dogs were restrained. Afterwards, the inmate was beaten with the dog sergeant's bullwhip. A TDC physician who subsequently treated the inmate testified that his various lacerations were characteristic of dog bites and bullwhip welts.

The defendants have attempted to characterize the staff brutality at TDC as a mere collection of isolated and aberrant acts which are not characteristic of the institutions at large. Unfortunately, the evidence belies this assertion. The record in this case makes it perspicuous that violence by security officers is routine and is not restricted to dangerous situations. Nor is the brutality the sole province of a few low–level security officers; many vicious incidents of abuse implicate high–ranking TDC officials.[77] Furthermore, TDC's systemic operations encourage staff brutality in two significant ways. First, TDC officials rarely investigate reports of violence and brutality involving civilian staff, and commonly fail to take corrective disciplinary action against officers whom they know to have brutalized inmates.[78] Second, TDC's training program for guards fails to instruct the officers in the proper and reasonable use of limited physical force to quell inmate disturbances.[79] Both of these have the practical effect of allowing and even encouraging security officers to indulge in excessive physical violence in the performance of their duties.

■ State law [80] and formal TDC rules

---

**77.** See n.73 and n.76. The violent propensities of Warden David Christian of the Retrieve Unit were repeatedly underscored by the evidence. One inmate stated that violence follows Warden Christian "like a shadow", an observation that is borne out by the record. A high percentage of the reported incidents of brutality by officers and building tenders occurred at units under Warden Christian's supervision. When he was transferred to the Retrieve Unit, he brought with him certain particularly notorious inmate building tenders from his previous unit. Also, several credible accounts of brutal treatment to writ writers were testified to, incidents in which Warden Christian was directly involved.

**78.** Incident reports monotonously reiterate that only the force necessary to subdue an inmate was used, and TDC officials rarely do any investigation beyond mere acceptance of this boilerplate assertion. The evidence reveals that it has been in only a very few incidents involving low–ranking personnel that TDC officers have been disciplined or reprimanded for using excessive and unnecessary force against inmates; numerous other incidents of brutality involving both low and high–ranking TDC employees have gone unpunished.

**79.** The inadequacies of TDC's overall security training program are discussed earlier in this security section of the opinion.

**80.** State law prohibits physical abuse of prison inmates. Tex.Penal Code Ann. § 39.021 (Vernon Supp.1980):

§ 39.021. Violations of the Civil Rights of A Prisoner

(a) A peace officer or a jailer or guard employed at ... the Texas Department of Corrections commits an offense if he:

(1) intentionally subjects a person in his custody to bodily injury knowing his conduct is unlawful;

(2) willfully denies or impedes a person in his custody in the exercise or enjoyment of any right, privilege, or immunity knowing his conduct is unlawful.

(b) An offense under this section is a felony of the third degree. An offense under this section is a felony of the second degree if serious bodily injury occurs or a felony of the first degree if death occurs.

(c) This section shall not preclude prosecution for any other offense set out in this code.

(d) The Attorney General of Texas shall have concurrent jurisdiction with law enforcement agencies to investigate violations of this statute involving serious bodily injury or death.

Similar prohibitions against prison abuse have existed since at least as early as 1942. There is no evidence that any TDC guard has ever been prosecuted under this statute or its predecessor. In addition, Tex.Rev.Civ.Stat.Ann., art. 6166z4 (Vernon's) provides:

Any sergeant, guard or other officer or employee of the prison system of this State, who

prohibit physical brutality against inmates. That, however, does not absolve the defendants of responsibility for the actual existence of routine and unnecessary violence on the part of the TDC civilian staff. High-level TDC officials have allowed this violence to fester within TDC's walls far too long, and have contributed to its perpetuation and exacerbation through their individual conduct and their direction of system-wide institutional operations.

### B.

■ State officials have a duty to protect inmates from violence and the reasonable fear of violence.

While occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment, *Penn v. Oliver*, 351 F.Supp. 1292 (E.D.Va.1972), confinement in a prison where violence and terror reign is actionable. A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates, and he need not wait until he is actually assaulted to obtain relief.

*Woodhous v. Commonwealth*, 487 F.2d 889, 890 (4th Cir. 1973). Thus, a number of cases have found inadequate security to constitute or contribute to the existence of a constitutional violation. *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), *affirming* 349 F.Supp. 881 (N.D.Miss.1972); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976), *aff'd sub nom Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977); *Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971); *Alberti v. Sheriff of Harris County*, 406 F.Supp. 649 (S.D.Tex. 1975); *Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980).

■ The evidence makes it clear that the climate in TDC is one of fear and trepidation, engendered by the occurrence of frequent physical and sexual assaults, intimidation, bribery, and rule by threats and violence. A number of defendants' practices have allowed this deplorable situation to develop. The defendants have failed to employ sufficient numbers of security officers to provide any systematic supervision of inmate activities, particularly in the extremely overcrowded housing areas.[81] This has produced practically unlimited opportunities for undetected assaults upon inmates by their cell or dormitory mates. Compounding the resultant sense of insecurity is the fact that the only order existent in the inmates' living quarters is enforced through the abusive building tender system which TDC has fostered. Finally, TDC staff members have committed widespread, pervasive, and unwarranted acts of brutality upon many of the system's inmates. All of these factors combine to create a situation of inadequate security which clearly transgresses the boundaries of the eighth amendment.

An unsafe prison environment resulting from the lack of adequate security staffing and reliance upon inmates as guards has been repeatedly condemned as unconstitutional by the courts. *See Williams v. Edwards*, 547 F.2d at 1211. In *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972), the conditions at the Mississippi State Penitentiary at Parchman were described as follows:

[T]he civilian guards assigned to the camps are insufficient in number to maintain control over the inmates. The one civilian watchman who is assigned to each camp is prohibited by penitentiary rules from entering the cages .... [P]enitentiary employees have no control over inmates after the lights are turned out

shall inflict any punishment upon a prisoner not authorized by the rules of the prison system, shall be guilty of an assault, and upon conviction thereof, shall be punished as prescribed by law.

**81.** That the shortage in security personnel may be due to inadequate funding by the legislature

is no excuse for the maintenance of conditions which violate the Constitution. *See Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206, 1212–1213 (5th Cir. 1977); *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291, 1319–1320 (5th Cir. 1974).

and "there is no way that anyone can guard the safety of an inmate in the Parchman situation" because of the dormitory type system and the lack of free world personnel to guard and protect inmates.

349 F.Supp. at 889. Parchman utilized a system of armed trusties to compensate for insufficient civilian guards:

The primary duties of guarding other inmates are performed by trusties who are selected by the sergeants without the use of objective criteria or uniform standards. * * * Inmates have, on many occasions, suffered injuries and abuses as a result of the failure to select, train, supervise, and maintain an adequate custodial staff .... The evidence indicates that the use of trusties who exercise authority over fellow inmates has established intolerable patterns of physical mistreatment.

*Id.* The district court in *Gates* held that the lack of adequate protection from assaults and the assignment of custodial responsibility to untrained, incompetent inmates violated the eighth amendment. 349 F.Supp. at 894. Affirming, the Fifth Circuit stated:

It is the obligation of penitentiary officials to insure that inmates are not subjected to any punishment beyond that which is necessary for the orderly administration of Parchman .... The infliction of these physical injuries is no less tolerable because accomplished by the inmates with the assistance and acquiescence of the prison authorities, then [sic] if perpetrated by the prison superintendent alone.

501 F.2d at 1309.

*Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976), aff'd, *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), found a constitutional violation in the Alabama prisons, where such a dearth of civilian staff existed that guards rarely entered the cell blocks at night. Accordingly, the maintenance of the order was left to inmate "cell flunkies" and opportunities for violence, blackmail, bribery, and extortion were the inevitable result.

In *Alberti v. Sheriff of Harris County*, 406 F.Supp. 649 (S.D.Tex.1975), the county jail was found to be inadequately staffed when the guard to prisoner ratio was one to thirty. Inmate "goon squads" had developed, because of insufficient and inadequately trained staff, resulting in violent attacks by inmates upon other inmates, including homosexual assaults and rapes.

The use of custodial inmates was addressed in the landmark case of *Holt v. Sarver*, 309 F.Supp. 362, 373 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971), where the court noted that the practice is "universally condemned by penologists ... [because] it breeds fear and hatred."

By virtue of their positions of authority and the functions they perform trusties can make or break [other inmates]. They can make prison life tolerable or they can make it unbearably hard. They can and do sell favors, easy jobs, and coveted positions; they can and do extort money from inmates on any and all pretexts. They operate rackets within the prison, involving among other things the forcing of inmates to buy from them things like coffee at exorbitant prices. They lend money to [inmates] and then use force or threats of force to collect the debts.

309 F.Supp. at 375.

■ Indeed, the potential for abuse in a building tender system has been recognized by the Texas legislature, which outlawed the placement of any inmate in a supervisory or administrative capacity over other inmates and the administration of disciplinary action by any inmate to other inmates. Tex.Rev.Civ.Stat.Ann. art. 6184k–1 (Vernon Supp.1980). As the evidence makes apparent, both this Texas statute and the federal Constitution have been violated by the building tender system as operated at TDC.

■ The widespread staff brutality at TDC is also in contravention of the Constitution. Brutalities similar to those found in the Texas prisons have, in other cases, been deemed cruel and unusual. In *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), the record contained numerous examples of unwarranted physical punishments akin to

those which occur in TDC institutions. The Fifth Circuit found the existence of such widespread and unnecessary corporal punishment to run afoul of the eighth amendment, and stated that the district court was "unquestionably" correct in enjoining prison authorities from permitting the further use of certain methods of punishment. 501 F.2d 1306.

Similarly, in *Morales v. Turman*, 364 F.Supp. 173 (E.D.Tex.1973), 383 F.Supp. 53 (1974), *rev'd*, 535 F.2d 864 (5th Cir. 1976), *rev'd*, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368, *remanded* 562 F.2d 933 (5th Cir. 1977), it was found that the repeated and unwarranted hitting, slapping, kicking and punching of juveniles detained in state youth homes was punishment of a cruel and unusual nature.

The Court of Appeals for the Second Circuit has held that retaliatory brutalities "wholly beyond any force needed to maintain order" are far in excess of "what our society will tolerate on the part of officers of the law in the custody of defenseless prisoners" and are, therefore, in violation of the eighth amendment. *Inmates of Attica Correctional Facility v. Rockefeller*, 453 F.2d 12, 22–23 (2d Cir. 1971).[82]

Courts have also condemned the unnecessary use of tear gas and chemical agents as violative of the eighth amendment. *Battle v. Anderson*, 376 F.Supp. 402 (E.D.Okl. 1974); *aff'd* 564 F.2d 388 (10th Cir. 1977); *Landman v. Royster*, 333 F.Supp. 621, 649 (E.D.Va.1971); *Morales v. Turman*, 364

F.Supp. at 173–74). In *Battle*, the court said:

> [T]he use of chemical agents must never exceed that reasonably required to effect the legitimate ends of penitentiary officials. Accordingly, the use of chemical agents . . . on the rationale that the actual situation is one which could develop into—although it has not yet become—one in which the use of such agents is permitted, constitutes the excessive use of physical force and is prohibited.

376 F.Supp. at 433. As the evidence in the instant case has shown, tear gas has been unnecessarily employed on a number of occasions to brutalize TDC inmates.[83]

Unwarranted staff brutality at TDC violates not only the eighth amendment, but the fourteenth amendment as well, inasmuch as it constitutes punishment devoid of the benefits of due process of law. *Hamilton v. Chaffin*, 506 F.2d 904, 909 (5th Cir. 1975); *United States v. Stokes*, 506 F.2d 771, 775 (5th Cir. 1975); *Tolbert v. Bragan*, 451 F.2d 1020 (5th Cir. 1971); *Bruce v. Wade*, 537 F.2d 850 (5th Cir. 1976).

In their attempts to remedy prisons and jails determined to be unconstitutionally unsafe, the courts have fashioned broad relief in the areas of screening, hiring, training and utilizing prison personnel. In *Williams v. Edwards*, the Fifth Circuit affirmed the district court's order that two guards be present at all times in the open dormitories, stating that:

> from the situation in *Clemmons v. Greggs*, 509 F.2d 1338 (5th Cir. 1975), *cert. denied* 423 U.S. 946, 96 S.Ct. 360, 46 L.Ed.2d 280 (1975). There, the Court found that a single instance of overreaction in the use of tear gas in an Alabama prison, which violated express prison policy and for which the responsible employees were punished, did not amount to cruel and unusual punishment. In TDC, the improper use of tear gas is much more widespread. No standard policies and guidelines for the proper use of chemical agents exist in written form, and in most of the instances of unwarranted use, the chemicals were administered by high ranking prison officials for deliberately punitive purposes. Those employees have never been disciplined or reprimanded for their activities.

**82.** The Court found that for several days after New York's Attica prison riot had been quelled in 1971, prison employees retaliated against the inmate population by subjecting them to "beatings, physical abuse, torture, running of gauntlets, and similar cruelty." 453 F.2d at 22. The Court also found that "night–time harassment, threats, racial slurs and similar misconduct" continued for at least several weeks after the riot, and that danger of further harassment and unjust retaliation remained. *Id.* at 23. Those findings are similar to this court's findings that continued undue physical abuse of inmates, in retaliation for minor uprisings, has occurred .long after the danger posed by the uprisings has been eliminated.

**83.** The evidence regarding the uses of chemical agents in the TDC system differs markedly

The number of prison guards necessary to assure a constitutional level of inmate safety must bear some reasonable relationship to the total number of inmates. A proper ratio should be established by reference to the various kinds of facilities at the prison, taking into account the capacity and purpose of each, thereby determining the number of guards required to provide security in each; or by proof showing usual adequate ratios established at other institutions where the level of prison violence is acceptable; by proof of learned studies, or by other proof acceptable to the District Judge.

547 F.2d at 1213.

In *Gates v. Collier*, the district court ordered, *inter alia*, that adequate protection be provided to inmates confined in barracks, "including the assignment of additional employees to the cages and means for controlling the acquisition and possession of weapons by inmates." 349 F.Supp. at 897–98. It was further ordered that defendants produce a plan for "the rapid elimination of the trusty system as presently existing at Parchman and conversion of a system of civilian guards." Further, it was required that the plan include "the means of hiring, training, and financing" additional civilian guards. 349 F.Supp. at 898. Three civilian guards were to be assigned to each barrack during night hours, and floor–walkers and other inmates with custodial responsibilities were to be relieved of such responsibilities. The existing trusty system was to be dismantled in phases, with the trusties to be replaced by civilian guards. Moreover, lack of funds was not to excuse delay. 349 F.Supp. at 903.

In affirming this order, the Fifth Circuit stated:

> Not only do we agree that the totality of the present practices fosters cruel and unusual punishment, but we also conclude that none of the above measures ordered require burdensome implementation or is beyond the remedial jurisdiction of the district court.

*Gates v. Collier*, 501 F.2d at 1309–1310 (5th Cir. 1974).

In *Pugh v. Locke*, the district court ordered that, except for isolation units, one guard be inside and one outside each living unit at all times. "As to isolation units, guards must be stationed at all times so as to have visual and voice contact with the isolated prisoners." The order further stated: "At no time shall prisoners be used to guard other prisoners, nor shall prisoners be placed in positions of authority over other inmates." 406 F.Supp. at 333.

The supervision of inmates by inmate "corridor bosses" in the Dallas County Jail was enjoined by the district court in *Taylor v. Sterrett*, 344 F.Supp. 411, 422–23 (N.D. Tex.1972), *aff'd in relevant part*, 499 F.2d 367 (5th Cir. 1974), *cert. denied* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975). There, it was ordered that enough jail guards be provided to maintain security without the assistance of inmates, and the use of "inmates as corridor bosses to enforce rules and preserve discipline" was prohibited. 344 F.Supp. at 423.

In *Alberti v. Sheriff of Harris County*, 406 F.Supp. at 691, the defendant sheriff was required to develop a comprehensive selection and in–service training plan for security officers, including psychological evaluations that would disclose personality defects rendering individuals unsuitable for work as jailers.

In addition to the instances noted above, courts mandated the hiring of additional security guards and the promulgation of specific requirements for the selection of training of personnel in *Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975), *aff'd* 563 F.2d 741 (5th Cir. 1977); *Hamilton v. Landrieu*, 351 F.Supp. 549 (E.D.La.1972); and *Jones v. Wittenberg*, 330 F.Supp. 707 (N.D. Ohio 1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).

In *Holt v. Sarver*, the district court held that trusties should be under the full control and adequate supervision of civilian personnel and ordered an overhaul of the trusty system, saying that the trusties must be "stripped of their authority over the lives and living conditions of other convicts." 309 F.Supp. at 384.

■ It is clear from the applicable law that this court has the authority, indeed the duty, to take the steps necessary to remedy the unconstitutional climate of fear and violence that permeates TDC institutions. This will require, *inter alia*, a significant increase in the quantity of civilian guards, improvements in selections and training procedures for security officials, the complete elimination of the building tender system, and the cessation of staff brutality toward prison inmates.

## IV. HEALTH CARE

Plaintiffs and plaintiff–intervenor assert that TDC provides constitutionally insufficient health care for inmates incarcerated at all eighteen of the units. Within the term "health care", they include medical and psychiatric therapy, and special treatment for handicapped inmates. These three areas will be discussed separately.

### *Medical Care*

#### A.

##### 1. *Compendium*

Medical care for TDC's overcrowded inmate population is provided almost exclusively at facilities which are operated by TDC employees and designed specifically for the care of inmate patients. Three basic levels of care are available. (1) Each unit has a small infirmary, which is managed primarily by medical assistants and inmates, with some degree of supervision by a physician. Unit medical personnel provide routine services, such as administration of medications. All inmate medical complaints are first evaluated by members of the staff, who determine whether to treat the inmates on the unit or to refer them elsewhere. (2) Relatively serious, but not critical, illnesses and injuries are referred to the Huntsville Unit Hospital (HUH), which is staffed by TDC doctors, medical assistants, and inmates. (3) Extremely serious medical conditions requiring intensive care or sophisticated surgery or treatment are referred to John Sealy Hospital ("John Sealy"), a part of a state medical school facility in Galveston. Some inmates are also taken to John Sealy for treatment on an outpatient basis. TDC inmates being treated at John Sealy are confined in a "discrete wing" of the hospital, where primary treatment is provided by regular hospital physicians. TDC medical support personnel and guards are also assigned to this unit of the hospital. A new, more complete hospital is currently being built exclusively for TDC inmates at the John Sealy facility. Also, TDC has a facility known as the Diagnostic Unit at Huntsville, where all new inmates are taken for initial processing and an evaluative medical examination before being transferred to a particular unit.

Major problems pervade all aspects of the medical care provided by TDC to its inmates. The personnel providing routine medical care are often unqualified; they are also wholly insufficient in numbers and deficiently supervised. The meager medical facilities, inadequately equipped and poorly maintained, do not meet state licensing requirements. Medical procedures are unsound and faulty at all levels of care. Initial processing, sick call methods, and transfer practices are all unnecessarily cumbersome, inefficient, and life–threatening. Proper medical treatment and practice is often sacrificed to exaggerated concerns about security. Medical records are so poorly maintained, and the entries made therein are so incomplete and inaccurate, as to be either useless or harmful in the day–to–day provision of medical care and in the review of care previously provided. Finally, the entire medical care "system" is marked by an absence of any organizational structure, plan, or written procedures for the delivery of medical care or for the instruction, supervision, and review of the personnel putatively providing it. These factors combine to produce a system that persistently and predictably fails adequately to provide for the legitimate medical needs of the prison population.

##### 2. *Staffing and Personnel*

###### a. Physicians

The number of physicians providing medical care for TDC inmates is woefully inadequate. In 1974, the report of the Tex-

as legislature's Joint Committee on Prison Reform noted that, to meet the American Correctional Association standards for its then 17,000 inmates, TDC needed nineteen full–time physicians. TDC has never begun to approach this figure. During most of 1974, TDC employed only one full–time physician for the entire system. On several occasions since then, only two or three full–time doctors were actually present in the system. Some improvement has occurred in recent years; at the time of trial, with an inmate population of over 26,000, TDC employed the equivalent of 12.6 full–time physicians. These physicians were apportioned between the HUH, the Diagnostic Unit, and the seventeen unit infirmaries. ·A total of twenty positions for physicians were authorized for the budget year beginning September 1, 1979, but TDC experienced difficulty in finding physicians to take the jobs. Even if these vacancies were all filled, the physician staffs at HUH and the Diagnostic Unit would still be grossly insufficient,[84] and some units would continue to lack a full–time doctor. Correctional medical experts for both the plaintiff–intervenor and the defendants testified to an immediate, imperative necessity for more physicians, to meet adequately the authentic medical needs of TDC's inmate population.

In consequence of the shortage of doctors, inmate patients are consistently treated by lay personnel. Important medical decisions relating to inmate patients are routinely left in the hands of non–physicians. Even at HUH (which primarily treats inmates for whom sufficient appropriate treatment cannot be provided at the unit level), patients frequently have been admitted, "treated", and discharged without ever being seen by a doctor. At the unit level, where medical supervision is

even more sparse, medical assistants and inmate helpers are regularly entrusted to make crucial decisions concerning the screening, treatment, referral, and medication of inmate patients reporting infirmities.

The scarcity of physicians in the TDC medical system causes those who are employed to suffer constantly from the frustrations accompanying overwork. In the TDC prison environment, this form of malaise has been the source of a callous indifference on the part of some physicians to the legitimate needs of the inmate patients.[85] In any case, the evidence made clear that even the most dedicated physicians have encountered disheartening difficulties in rendering adequate treatment under the conditions that exist in TDC.

Recruitment and retention of doctors in the TDC system has proven extremely difficult. Physicians, generally in high demand throughout the free community, understandably have little incentive to work in prison surroundings, especially when it is obvious that their lot will be overwork and lack of adequate facilities, equipment, and auxiliary staff. The fact that most TDC units are located in relatively small rural communities further limits TDC's success in recruiting qualified physicians. In the face of such difficulties, Dr. Ralph Gray, TDC's medical director, has, on several occasions, employed doctors who were not licensed to practice in the general community. These included foreign–trained doctors who had not yet passed the necessary examinations to permit them to practice in Texas, and also recent medical school graduates who were awaiting examination results before beginning residencies. Several of the li-

---

84. Four or five of TDC's 12.6 doctors were assigned to HUH, full time, in May 1979. Thus 7.6 to 8.6 were left to provide treatment for the more than 26,000 inmates at the seventeen unit infirmaries, for an approximate ratio of one doctor to 2,900 inmates at the unit level. Dr. Gray and all medical experts recommended a doctor/inmate ratio of about one to 750 on the units. The Federal Bureau of Prisons' minimum staffing pattern provides for one doctor for every 500 inmates housed on a unit. On a systemwide basis, TDC had one doctor for

1,984 inmates in 1979. If all the newly authorized physician positions are filled, the ratio will decrease to one to 1,016 in 1980–81. By contrast, the California prison system had a doctor-to-inmate ratio of one to 560 in 1967, which had decreased to one to 400 by 1976.

85. There was evidence presented of doctors in the hospital refusing to treat, or summarily treating and then abandoning, seriously ill inmates who subsequently died.

censed physicians he succeeded in employing lacked relevant medical experience.[86]

## b. Nurses

An acutely grim and unwarranted lack of licensed nurses obtains in the TDC medical care system. At the time of trial, TDC was running the Huntsville Hospital with no registered nurses (RN's). The only RN's in the entire TDC system work in the women's units. This situation results, in part, from TDC's present policy of refusing to consider hiring female nurses to work at the male units.[87] Since male nurses comprise only one percent of all RN's in the nation, this decision limits severely the pool from which TDC can attract applicants. In spite of the recruitment difficulties imposed by the all–male policy, TDC was able to employ five male RN's and several male licensed vocational nurses (LVN's) at HUH during the years 1975–77. Howe ver, these nurses, who were apparently competent, well–trained, and conscientious,[88] found conditions at HUH intolerable. By the end of 1977, all had relinquished their employment. One group, which resigned *en masse*, stated that they were prompted to take this action by the inadequacy of the physician staff, the absence of any formal procedures, and TDC's lack of commitment toward improving the level of care. The nurses in question, trained to observe appropriate limitations of their roles and aware of the need to defer certain decisions to physicians, experienced particular difficulty in dealing with the hospital administrator and the medical assistants (MA's). These functionaries did not share similar perceptions concerning the legitimate reach of the nurse's position, preferring instead that nurses and MA's perform tasks properly entrusted only to physicians. Rather than attempting to correct the unsolved practical and ethical problems which caused the loss of these sorely needed nurses, TDC administrators effectively decided to function altogether without licensed nurses and ceased to request budget authorizations for RN and LVN positions.[89]

TDC's failure even to attempt to employ RN's and LVN's in its hospital and unit infirmaries vividly demonstrates its virtual abdication of responsibility for the provision of adequate health care for its inmates. In the free world, HUH certainly would not be permitted to function as a hospital without the presence of RN's around–the–clock.[90]

## c. Medical Assistants

Medical assistants (MA's) perform the vast bulk of medical care provided by civilians at TDC. TDC attempts to employ persons with military or civilian experience as medical technicians for these positions; however, neither this experience nor any character of state licensure or certification is absolutely required. Thus, of the MA's working at TDC at the time of the inspections by expert witnesses in 1976 and 1978, only one or two had medically related licenses of any kind. Some of the persons employed by TDC as MA's had no prior training as medical technicians nor any experience with direct patient care; the previous experience of others had ended many years before they went to work for TDC. TDC itself provides MA's with no medical

**86.** For example, prior to his being employed by TDC, the unit physician for the 4,000 man Coffield Unit had practiced psychiatry exclusively for twenty–five years.

**87.** This policy was implemented after several TDC employees, including some women, were held hostage by inmates in 1974. Although women are regularly employed in non–medical capacities throughout the TDC system, and in spite of the fact that one female nurse practiced at HUH after 1974 with no reported difficulties, TDC officials insist that their general ban on female nurses is a necessary security measure.

**88.** Former nurses testified that they made repeated efforts to upgrade the quality of care at HUH. For example, RN Ronald Goforth and RN Lewis MacDonald, who worked at HUH for several years, conducted a training program for inmate nurses. While Dr. Gray approved of these efforts, TDC did nothing positive to encourage the endeavor, nor was the practice institutionalized after these nurses left.

**89.** Similarly, there are no budget slots for LVN's as such. A few medical assistants have LVN licenses.

**90.** In point of fact, even during its peak employment of RN's, no TDC medical facility had enough licensed nurses to qualify as a hospital.

training or instruction, since these individuals are expected to learn their trade on the job. Even if an MA desired to improve and expand his knowledge on a voluntary and independent basis, the lack of supervision by physicians and the absence of basic medical reference texts at the units would make this effort virtually impossible.

Although most MA's are neither licensed, certified, nor trained to accomplish auxiliary health care functions at TDC facilities, they routinely perform procedures that properly should be undertaken only by a registered nurse or a physician. Nearly all initial screening decisions are made by MA's. They make the determination as to whether an inmate receives any treatment at all; if so, what medication to prescribe; when to hold the inmate for examination by a physician; and when to refer the inmate patient to HUH or John Sealy.[91] Thus, the typical inmate's access to health care is regulated from the outset by persons who would be qualified to perform only orderly-type functions at a free world hospital. Furthermore, at the units, MA's conduct sick call, diagnose ailments, prescribe and dispense medicine, and watch over inmates in solitary confinement. As previously alluded to, an almost total absence of supervision over the activities of the MA's by qualified medical personnel compounds the problems. TDC has no policy or procedure for regularly investigating the MA's performance of their duties, either through observation and supervision by physicians or by examinations of medical records. This lack of oversight permits MA's constantly to make decisions and to take actions far beyond their capabilities.

Like physicians, MA's at TDC are subject to unremitting demands for treatment. The consequent frustrations and tensions they experience results in insensitive, case-hardened sentiments toward the complaints of inmates. Further aggravating these difficulties is the fact that TDC has never employed a sufficient number of MA's to perform the duties demanded of them. The lack of doctors forces MA's to carry the brunt of the workload at the units, and the too-few MA's who are employed cannot adequately accomplish the immense, unending workload which is entailed. Even were TDC to employ the number of doctors necessary to serve its inmates, the sparse number of MA's presently employed would be insufficient to fulfill a proper supporting role.

During the pendency of this suit, the number of MA's assigned to the units steadily increased. If TDC is able to fill the new positions allocated in the 1980–1981 budget, it will have the equivalent of 93.5 full-time medical assistants on the units in future years; but even this number does not suffice to provide commensurate staff support. Obviously, then, the much smaller number of MA's who were employed before the determination of this suit was grossly inadequate.

Through fiscal year 1979, TDC made no provision for MA's to be on duty at its infirmaries on a twenty-four-hour basis, and only inmate nurses have been present at these facilities during the night. Both witnesses for the defendants and the plaintiffs agreed that the presence of civilian medical personnel at the infirmaries is essential at all times, since the evils inherent in a situation where inmates are responsible for the provision of medical care—detailed below—are magnified when they are the only medical personnel on duty. Moreover, the medical crises of inmates which arise during night hours are often of an emergency nature, junctures which demand immediate and skilled medical treatment by qualified personnel. Assuming that TDC

**91.** Defendants' repeated attempts to show parallels between the duties and responsibilities of TDC's medical assistants and "Corpsmen" (U.S. Army Medical Corps personnel) were unpersuasive. The only Corpsmen who are authorized and trained to perform doctors' duties are those who work in triage units under wartime or other emergency conditions–a type and sphere of duty completely inapposite to that in which TDC's medical assistants perform. Testimony by an Army medical administrator made it clear that, except in the types of situations noted above, Army medical facilities are staffed in much higher numbers than is TDC, with licensed and trained personnel, including doctors, RN's, physician's assistants, and highly trained medical technicians.

can employ 93.5 medical assistants in 1980–1981, it is conceivable that it could provide for medical assistants to be on duty, night and day, at each unit,[92] but only at the expense of leaving many units with only one MA constantly on duty. Even if every unit had a full–time physician, the unit infirmaries, nevertheless, could not properly serve their prisoner populations with only one day–shift MA for medical support.[93]

d. Inmates

Inmates form the backbone of the TDC medical system. Disagreement existed among the doctors and other experts who testified as to whether inmates should be completely prohibited from participating in the delivery of health care or whether they should be merely restricted from participating in direct patient services. There is no dispute, however, that inmates must be properly qualified ar d supervised in whatever job they are assigned, and that use of inmates creates special difficulties in a medical care system. Inmate "nurses" at TDC do not have the requisite and appropriate qualifications, training, or supervision to work in the infirmaries or hospitals, and their use necessarily creates deplorable obstacles to effective treatment of inmate patients. .

An inmate assigned to work in TDC's medical departments is not required to have any specific qualifications. Once assigned to the medical department an inmate is provided little formal training of any kind,[94] it being expected that he will learn his tasks by following and observing an experienced inmate nurse. Thus, even if such an inmate's duties were restricted to orderly work, his training would be inadequate. The evidence revealed, however, that such inmates regularly perform a wide variety of medical functions, and consistently perform procedures for which they are not qualified. These procedures have included administering intravenous injections to inmates, performing Pap tests, dispensing drugs without the supervision of an RN or physician, suturing lacerations, and providing other emergency care.[95] Testimony has shown that inmate nurses often perform x–ray photography, conduct and interpret eye examinations, administer oral anesthesia, lance boils, and insert sutures. A few inmate nurses have regularly engaged in setting and casting broken bones, and one sutured heel tendons and performed a finger–tip amputation.

Inmate nurses have also been instructed or permitted to make entries in their patients' charts. Deliberate falsifications in the charts are often made by these inmates; e. g., patients' liquid inputs and outputs have been improperly charted; spurious

92. Several witnesses testified that the services of 5.2 persons are required to fill one position for twenty–four hours, seven days a week. With 93.5 MA's, it would be possible for TDC to have one MA on duty at all times at each of the seventeen infirmaries, with a surplus of approximately five persons (i. e., one more position could be staffed around the clock).

93. Since TDC has never adequately staffed the units with physicians, the actual problem is even more acute. In the opinion of Dr. Richard Della Penna, an expert for the plaintiff–intervenor, a unit with 1,000 inmates should employ about eleven appropriately trained and qualified medical assistants (six for the day shift, five for the night shift) and a clerk in its infirmary. Dr. Frank Rundle, also an expert witness for the United States, recommended an even higher staffing level. The Federal Bureau of Prisons minimum staffing pattern meets or exceeds Dr. Della Penna's recommendation. In the United States Army, a clinic serving a population of 2,200, without any in–patient beds, typically employs three doctors and seventeen support staff.

94. TDC witnesses claimed that inmate nurses occasionally attend lectures on some aspects of medical care, but there was no evidence that there exists any structured basic training course which is routinely available to all inmate nurses.

95. As previously noted, at most of the units, no MA's are on duty during late night hours. Any emergencies that develop during those hours must thus be initially dealt with by inmate nurses. They must provide first aid, and then determine whether the condition is serious enough to warrant notifying the MA or doctor who is on call. Moreover, even when the infirmaries are staffed by an MA, inmate nurses are often sent out to render care to emergency patients and, afterwards, to bring the patients to the infirmary. At HUH, inmate nurses are responsible for the bulk of all care to patients on the weekends.

temperature readings have been inserted; and fictitious administrations of medication have been shown (some entries having been registered up to twenty–four hours before the medicines were supposedly dispensed).

The defendants made no attempt to show that the inmate nurses are qualified by law, education, or training to perform these duties. While they admitted that they relied heavily on inmate personnel in the treatment and care of sick or injured inmate patients, the defendants asserted that efforts had been made recently to limit their roles. These efforts have been unavailing, and the harms and dangers of using unqualified inmate nurses remain. An attempt was made by defendants' attorneys to elicit statements from plaintiffs' witnesses that the inmates generally do adequate jobs. The evidence appears to be to the contrary.[96] However, even if defendants' claim were true, allowing patently unqualified persons to have controlling influence over the lives and health of captive patients, who must accept whatever medical care is offered, is plainly unjustified.

While inmate nurses all too often improperly undertake treatment functions for which they are unqualified, the record reveals the irony that they have been reluctant to perform certain basic custodial duties. Grievous neglect of the personal care of patients at the HUH has resulted. Examples are numerous: on many occasions, routine preoperative enemas and urinalyses were not performed on time; urine bags were allowed to overflow (particularly on Monday morning, when no RN had been in the hospital all weekend); urine collections for urinalyses were either not accomplished or the specimens were not refrigera-

ted, thus making them useless; intravenous solutions were allowed to run dry; bandages were not changed on time; incontinent inmates were allowed to lie in their own feces or urine for long periods; and inadequate hygienic care was administered to invalided patients generally. Decubitus ulcers (bedsores) were frequent among bed–ridden patients, as a result of the inattentive nursing. These open lesions are particularly troublesome at TDC, although they may usually be prevented simply by a systematic regimen of washing and turning the bedfast inmates.

In addition to improper medical treatment, other abuses are inherent in the use of inmates to provide direct patient care. In particular, TDC's reliance upon inmate nurses places such inmates in positions of actual or potential authority over other inmates. These inmates, who distribute medicines, administer tests, process laboratory results, have access to medical records, and make appointments for consultations or treatment by physicians–all without the supervision of civilian personnel–are in a position to accept bribes in return for favors. The evidence showed that this abuse has been common and prevalent at TDC.

e. Dental Personnel

TDC lacks sufficient dental staff to provide suitable dental care to its inmates; as a result, only emergency care is provided. Inmates have little chance of receiving regular dental examinations or routine teeth fillings, and it is only when serious gum disease or tooth decay have progressed to the point where an extraction is necessary that an inmate is likely to receive care.

**96.** In fact, the evidence showed that inmate nurses often make mistakes which increase their patients' pain and suffering, e. g., when an inmate nurse treated another inmate's broken finger during the evening hours, he X–rayed and pinned the inmate's finger, but the pin missed the break. When an X–ray revealed the results of this procedure to Dr. Gray, the inmate was sent to John Sealy for plastic surgery. On another occasion, an inmate nurse was instructed to remove half of the stitches in an abdominal incision. Instead of removing alternate sutures in the incision, as was intended, he extracted the upper half of the sutures.

In another incident, an inmate nurse was stopped just he was preparing to put drops of SSKI (potassium iodine) into the eyes of a patient. SSKI is an expectorant, designed to be mixed with water and used orally for rinsing. On still another occasion, an inmate nurse was discovered as he was preparing to inject intravenously a preparation of penicillin, which, because it was designed to be injected intramuscularly, was not pure enough for safe injection into the blood stream. In several instances, inmate nurses' unskilled attempts to insert catheters have caused the patients to bleed freely.

Even then, the dental treatment is slow, *e. g.*, several inmates testified that they had to wait several months for a set of dentures after all their teeth had been removed.

TDC's Chief of Dental Services, Dr. James Tarver, estimated that TDC needs one dentist for every thousand prisoners, if anything is to be accomplished other than responding to the inmates' dental crises (*e. g.*, relieving excruciating pain by pulling their aching or abscessed teeth). Other expert witnesses for the defendants also found dental care at TDC to be markedly deficient, estimating that one full–time dentist should be provided for every 750 prisoners (thirty–three for a population of 25,000), along with appropriate numbers of chairside and laboratory assistants. In 1979, TDC had the equivalent of 7.6 full–time dentists, one for every 3,289 prisoners. The 1980–1981 budget provides for seventeen positions for dentists. Although this increase constitutes an improvement, nonetheless, it does not provide for a sufficient aggregate of these posts adequately to serve the TDC population. Moreover, it was not demonstrated that TDC had succeeded in filling all of these openings.

Because of the lack of trained professional staff, TDC uses inmates to do work that should properly be performed only by licensed dental technicians or dentists. These inmates, without adequate qualifications or training, have been responsible for evaluating incoming inmates' dental needs, a flagrantly improper practice, which has resulted in extensive suffering for those inmate patients whose dental problems have not been properly diagnosed or treated.

### 3. *Facilities*

#### a. Unit Infirmaries

Each TDC unit has its own infirmary, supposedly equipped in such manner as to enable the unit medical staff to cope with the everyday minor ailments of inmates, to diagnose and determine the appropriate level of treatment for more serious medical problems, to render critical emergency care, and to arrange for the expeditious transportation of emergency cases to a hospital. The results of TDC's severe overcrowding are also found here. Too many inmates are assigned to each unit for the infirmaries to serve these purposes effectively, since the exiguity of the examining rooms, office spaces, and beds in these facilities fall far short of meeting the demands placed upon them.[97] At least as late as the 1978 re–inspections by the expert witnesses who testified, suitable emergency equipment, laboratory equipment, and physical therapy facilities were still wanting.[98]

The lack of reliable emergency transportation from the units to HUH, John Sealy, or community hospitals has been manifested repeatedly. On many occasions, breakdowns of ambulance equipment and related difficulties have resulted in inordinate delays in the transfer of emergency patients to hospitals.[99] To some extent, improved

**97.** Adequate bed space in infirmaries is essential, in light of the overcrowded conditions at HUH, and because of the impracticability of sending to a hospital every inmate who should be placed in an infirmary.

**98.** In their budget requests to the Texas legislature, the defendants have stated that some of the unit infirmaries are antiquated and overcrowded, and that they are inadequate for the demands being placed upon them.

**99.** One inmate described a painful and frustrating experience with TDC ambulances, in connection with an industrial accident he suffered at the Wynne Unit. At some time prior to 8:00 a. m., splinters of steel were accidentally imbedded in his eyes. After the inmate waited in the unit infirmary for fifteen to twenty minutes, without being seen by a physician, the ambu-

lance arrived and took him away, along with two security officers. Soon after its departure, the ambulance ran dry of gasoline. One of the two security officers walked back to the Wynne Unit and returned with a gasoline can. The nozzle of the can could not reach the gasoline tank of the ambulance, so as to fill it, hence the officer left again on foot. He returned with a station wagon, and the inmate eventually arrived at HUH, after his two mile trip, at 10:10 a. m. There, he waited in the hall for approximately one and one half hours, without pain medication, before being seen by a doctor. It was decided by the physician to transfer the inmate to John Sealy. He arrived there at 3:00 or 4:00 p. m., subsequently being operated on several times.

equipment has been obtained, but a reliable alternative arrangement for ambulance service in the event of an ambulance breakdown is not available at every unit. Furthermore, most TDC ambulances are deficient of certain necessary equipment and competently trained para–medical personnel to operate them.

b. Huntsville Unit Hospital

It is highly questionable whether TDC's "hospital" at Huntsville can be accurately labeled as such. HUH violates state hospital licensing requirements, and lost its Texas Hospital Association (THA) accreditation many years ago. It is obvious, then, that THA would not permit a comparable facility serving free world patients to operate in Texas. Notwithstanding the full, definite and longstanding knowledge of its gross inadequacies by TDC's highest officials, HUH has been used as the system's primary health care facility for many years. Antiquated, poorly designed, unacceptably equipped, and deficiently maintained, HUH is, in addition, extremely overcrowded. In 1974, reports by the Texas Joint Committee on Prison Reform were extremely critical of the conditions at HUH and made extensive recommendations for improvements. The THA, found, *inter alia*, that sanitary, safety, and privacy concerns necessitate extensive renovations and repairs of HUH. Its report added that, simply by better effort and organization of existent staff, substantial improvements in the housekeeping category could be achieved. Nevertheless, the evidence showed that by mid–1978 TDC had effected or begun only the most minimal changes at HUH. Many of the conditions criticized in 1974 and thereafter still exist, e. g., lack of proper aseptic techniques in the isolation area, generally unsanitary conditions and inadequate cleaning methods, and shortcomings in the medical records and charts. Moreover, TDC apparently ignored the THA report in other respects: no evidence was found that the restroom facilities had been developed, that any efforts had been made to upgrade the electrical or plumbing equipment, or that the nurse's station had been moved to afford better observation of patients. The primary accomplishments of TDC in the five year period since these reports were issued has been the improvement of surgical room facilities and the painting of the hospital.

Witnesses from both sides generally agreed that the facility was old, in disrepair, inadequately staffed, insufficiently organized and lacking in the most basic emergency equipment.[100] The most shocking deficiency is the continued absence of adequate firefighting equipment or safe means of exit from the hospital in case of a fire. With chilling indifference, TDC officials routinely permit seriously ill or injured inmates, a substantial number of whom are bedridden, to be placed in this facility that, since 1974, has been known to violate fire safety standards.[101]

---

**100.** Only one emergency "crash cart" is furnished for the entire hospital, and it has not always been available at the emergency room. It would be necessary to have the cart carried down the stairs, should an emergency arise at a time when the elevator is out of order–a not unheard of situation. No cart is available on the fifth floor, where stress testing is done. On several occasions, medical personnel attempting to respond to emergency situations have discovered that the cart lacked crucial supplies.

**101.** The hospital is so structured that it has only one means of ingress and egress–the front door–and only one stairway and one elevator, which are located next to each other. There are no fire exits in the hospital. Thus, fires at certain locations in the hospital could totally block avenues of escape from it. Moreover, the frequent breakdowns of the elevators pose a serious fire evacuation problem, especially for non–ambulatory and dialysis patients. In the event of elevator failure, patients must be strapped to stretchers and hand–carried down the stairs. In its 1974 report, the THA made specific recommendations for the construction of an emergency tower about five feet away from the hospital building, to which inmates from each hospital floor could cross over in case of an emergency. When questioned about this recommendation, the former hospital administrator testified that, because TDC hoped to secure a new hospital, no fire safety programs or improvements had been implemented. These hopes for the future do not, of course, protect inmates currently housed in a facility which, in addition to lacking fire exits, has faulty wiring and poor housekeeping, and in which persons are permitted to smoke.

In light of the overall deficiencies at HUH, Dr. Richard Della Penna and Dr. Kenneth Babcock, expert medical witnesses for the plaintiff–intervenor, recommended that the facility be immediately downgraded to an infirmary.

### c. John Sealy Hospital

John Sealy Hospital ("John Sealy") is a part of the University of Texas Medical Branch at Galveston. It is unquestionably a high–quality medical care facility. Indeed, it has a nationwide reputation for excellence. In the past, however, some difficulties attended its use for the treatment of TDC inmates. When TDC first began to send its seriously ill patients to John Sealy, they were placed throughout the hospital in regular hospital beds. It was believed by TDC security personnel that these placements necessitated the assignment of individual security guards for every patient–inmate. Even with this rigid surveillance, which sorely taxed TDC's low staff resources, TDC officials felt that adequate security could not be provided. Hence, inmates considered to be high security risks were not permitted to go to John Sealy under any circumstances. In 1978, a "discrete" wing of the hospital was opened, which has beds reserved exclusively for TDC inmates. The inmates in this wing are treated primarily by the regular hospital staff. Housing the inmates together has the advantage of making it easier for TDC to provide security.

At present, plans are being prepared and funds have been appropriated for the construction of an entire hospital for TDC inmates, to be staffed by physicians and medical students from John Sealy. It is contemplated that the TDC facility will be used as a teaching hospital for the University of Texas Medical Branch at Galveston. All health care personnel employed in this institution will be from John Sealy and will be fully licensed, and a high staff–to–patient ratio is projected. It is also planned that TDC will provide security officers, together with a small contingent of inmates, all of whom will be assigned to the performance of housekeeping functions.

### 4. Interference Occasioned by Security and Work Concerns

TDC officials are extremely conscious of security and discipline among the inmate work force, and many of the practices challenged by plaintiffs are said to be justified by these concerns. However, many TDC health professionals and security personnel testified that alleged security and work disciplinary measures often intrude upon the medical decisions made by doctors and adversely affect the treatment which inmate patients receive. As to this issue, the evidence clearly revealed that many of TDC's practices attributed to such concerns are, in fact, unnecessary, unduly burdensome on inmates, and evince a deliberate indifference to inmates' medical needs.

### a. Diagnostic Unit Procedures

Each new TDC inmate is first taken to the system's Diagnostic Unit at Huntsville, for initial processing and an evaluative medical examination, before being transferred to a particular unit. It has been a longstanding practice at the Diagnostic Unit to confiscate all medicines which inmates may bring with them from the free world. It is only *after* the medicine is confiscated, however, that TDC staff members communicate with the free world doctors whom the respective inmates may have listed as references, to determine if the medicine is, in actuality, legally prescribed and medically necessary. This process may take anywhere from a few hours to a week. Once the prescription is verified, the prescribed medication is issued to the particular inmate from TDC drug stocks. This policy was altered somewhat in 1974, following the death from epileptic seizures of an inmate whose anticonvulsant medicine had been confiscated pending verification. Under the modified policy, inmates with heart conditions, epilepsy, and diabetes are directed to notify Diagnostic Center officials immediately of their conditions, in order that prescribed medication may be verified promptly.

Although this procedure represents an improvement over the previous policy, it still permits much unnecessary suffering by

some inmates, and to that extent it is deficient. Expert witnesses for all parties were critical of an inquiry limited to only three conditions, since numerous other acute and chronic conditions (such as asthma or high blood pressure) also need prompt attention. However, under the existing policy, even inmates with observable conditions requiring immediate medical attention (e. g., gangrene) have been forced to wait several days for a routine examination before receiving treatment.

Despite the death of the epileptic inmate mentioned above, Diagnostic Center officials have since denied certain inmates needed anti–seizure medicines pending absolute confirmation of the condition. On at least two occasions, such inmates "proved" their conditions by having seizures. Similarly, asthmatic inmates must surrender and be deprived of their medicines, until a physical examination is conducted. When these inmates have protested that the medicines are urgently needed, they have been told that abstention from the drugs for a few days would allow them to more clearly exhibit the proper symptoms of their illness to an examining physician. Medical assistants who testified appeared totally indifferent to the fact that these practices result in acute distress, discomfort, and suffering by the affected inmates, and, moreover, carry with them a high potential of danger to the inmates. These witnesses merely asserted

that if an inmate's condition becomes critical before his medical examination (i. e., if he has an attack), medication will be given. Practices such as these, particularly in consideration of TDC's inadequate supervision of inmates, are dangerous to the extreme and cannot be justified· as necessary for security. Whatever may be the drug control problems that exist at the Diagnostic Unit, it is irrefutably evident that they must be solved by some measure less drastic than confiscating all medicines and requiring inmates to go without them for several days after arrival.[102]

Another disturbing intrusion of non–medical concerns into the initial medical processing of inmates is the inept and inappropriate manner in which medical classifications for work assignments are determined. The entire operation of the work classification system is characterized by indifference to inmates' medical incapacities and a lack of any earnest consideration of their individual weaknesses and disabilities.

The primary purpose of the initial medical examination of an inmate is to determine his appropriate work classification.[103] Five classifications are employed, ranging from Class I (most fit) to Class V (least fit), which are designed to indicate various levels of physical fitness and, therefore, differing capacities to perform work. The standards for placement in the various classifications are fairly simple.[104] Examining

---

**102.** A much more humane and logical approach would be immediately to issue, from TDC drug stocks, new prescriptions for the medications inmates bring with them. Should later checking of free world records indicate that an individual inmate's medication is not necessary, the prescription could be discontinued. This simple practice could eliminate many of the problems described in the text at a minimum risk to the patients.

**103.** These examinations are quite brief and perfunctory. There was evidence that some examining physicians looked only for conditions which would justify placing an inmate in a particular class. For example, if an inmate had a condition which clearly qualified him for inclusion in Class III, the doctor may have omitted to examine him for other conditions, which properly should also be noted on his medical records.

**104.** The TDC rulebook contains the following descriptions of the medical classifications to which inmates are assigned:

*Class I–Unrestricted Work.* This group generally is composed of men under 40 years of age who have no disease or physical defect which prevents their assignment of any work.

*Class II–Restricted Work.* This group generally includes men between 40 and 50 years old, youth (17 years of age or younger), small men (120 pounds or less), and inmates who are obese. Men who have mild structural defects which cause slight impairment, men with old fractures or other injuries which have healed, and men with mild degrees of myopia (near–sightedness) are placed in this group if the condition will not be aggravated by work. Also, poorly developed men are sometimes placed in this classification.

*Class III–Light Work with Men of Like Class.* This group generally includes men in their early fifties who are in good condition and

physicians at the Diagnostic Unit typically make an initial classification which is based upon their visual observations of the inmates, not waiting until free world medical records are received before making these decisions. As a result, a large degree of guesswork is involved, and inaccurate categorizations are frequently made.[105] Once inmates are so grouped, they are transported to the units to begin work.

Relying solely on the medical classification, unit officials assign inmates to jobs, without having any specific information about an inmate's medical status except for his classification number. As a result of this system, inmates are frequently assigned to jobs which are incompatible with their condition of health or bodily impairments. For example, inmates with asthma have been assigned to work in environments such as the laundry or the textile mill, where humidity and dust aggravate their conditions; and inmates with severe allergies have been assigned to work in fields containing crops to which they are disagreeably sensitive or allergic. Inmates who have been inappropriately assigned must petition TDC physicians for an express exemption from assignment to a particular type of job, as hereafter explained. The recommendations of physicians in these respects may or may not be followed by TDC officials.[106]

Work classifications are also inaccurate, because of TDC's definition of the types of work appropriate for each class of inmates. By way of example, Class III inmates are assigned to work in the garden squads, a job which requires outdoor work in the large vegetable gardens at each unit. Some of the garden squads perform work substantially equal to that performed by inmates assigned to the regular agricultural field lines. Strenuous manual labor is involved in performing both garden and field work, and garden squad members are required to keep up with others in the group. The agricultural field force is composed

have no significant physical abnormalities. Younger men who have some physical defects which limit appreciably their ability to do farm work, the condition not being aggravated by that work, are in this group. Men with a high degree of myopia, correctable with glasses; men with a history of epilepsy, but whose seizures are infrequent and whose epilepsy is being well controlled with anticonvulsant drugs; men *with a history of tuberculosis which has been inactive for at least 5 years*; men with history of and infrequent attacks of asthma; and men with mild arthritic problems.
*Class IV–Light Work–No Line Assignment.* This group generally includes men past 60 years of age and younger men who have physical abnormalities which, in the opinion of the examining physician, make them unfit for field work. This would include men who have lost an arm, a leg, or three or more fingers; men who are suffering from deafness or severe impairment of vision; men with atrophy of one or more of the extremities; men with severe hypertension, heart disorders, severe epilepsy, and/or any other diseases which make them unsuitable for farm labor.
*Class V–Huntsville Unit.* This group generally includes all seriously ill men. Those who regularly require medical attention which cannot be provided on other units.

**105.** For example, a medical assistant at the Diagnostic Unit sought to place an inmate diagnosed as having gangrenous toes in Class I.

Another inmate, who had an artificial eye, asthma, and an atrophied left leg–and who had been assigned to Class III on a previous incarceration–was placed in Class II and assigned to work in the agricultural fields. After spending two years in and out of solitary confinement for refusal to work at this assignment, he was finally reclassified.

**106.** Many TDC officers are suspicious of any inmate claiming a medical limitation and resent a doctor's directions seeking to exempt him from specific jobs. This is evidenced by their delays in making requested job changes or by their actions in altering an inmate's assignment in such manner as to place him in another work assignment that is equally inappropriate. Physicians have no power to enforce their directions concerning specific job assignments. One particularly acute example of TDC officials' general callousness and limited compliance with medical directions involved an inmate recovering from knee surgery. His treating physician at John Sealy noted that the inmate should be located on the first floor while at work, so that he would not be required to climb many stairs. Unit officials complied with this explicit direction, but they refused to move the inmate from his housing assignment on the fourth floor. This necessitated that he climb three flights of stairs several times a day. They noted that the doctor's instructions related only to the inmate's work assignment.

only of inmates in Class I or II, who are supposedly basically healthy, whereas the Class III inmates in the garden squad may suffer from asthma, mild arthritic problems, and inactive tuberculosis. No rationale for requiring Class III inmates to perform the equivalent of field work was offered by TDC.[107] Indications were present in the evidence, however, that assignments to the most unpleasant or strenuous job within a given classification are sometimes employed as a punishment for seeking a work classification change.

The procedure for changing a medical classification is complicated. Inmates submit requests for such changes to unit health personnel, who then schedule an evaluation by a physician. The examining doctor submits a recommendation to Dr. Gray, TDC's medical director, who must approve all changes. These processes consume a large part of the physicians' workday and further reduce the periods which they can devote to medical care.

TDC witnesses testified that they intend gradually to convert the medical classification system to a more precise silhouette or profile system, similar to that used by the United States Army. Under such a system, the examining physician indicates specific areas of the body that are impaired, rather than making non–specific overall classifications. While this process may provide some improvement in the initial classification determination, no indication was present from the evidence that the deficiencies already noted would be eliminated under this system, i. e., classification of inmates prior to receipt of medical records, lack of coordination between examining doctors and officials responsible for assigning work, physicians' want of authority to order changes, and inappropriate placement of certain jobs in a particular classification.

b. Unit Medical Procedures

At TDC units, all aspects of medical care are compromised by security and disciplinary considerations. Security officers, building tenders, and other non–medical personnel frequently hinder inmates' access to medical treatment, interfere with prescribed therapy, and countermand orders of medical officers. Additionally, many medical employees are instilled with a perception that they are expected to perform more as security officers than as health care professionals.

Although sick call procedures vary somewhat among TDC units, the particular arrangement generally adopted is invariably unwieldy and tortuous. Inmates desiring nonemergency medical treatment must request permission to attend sick call. At some units, such requests must be made, in writing, the night preceding the morning sick call; thus, an inmate must predict the extent of his illness or incapacity several hours in advance or, if he is suffering during the night, ordinarily must endure the suffering until the morning. At other units, inmates desiring to report for sick call are assembled very early every morning.[108] Under either method, security officers or building tenders are in charge of releasing inmates for the purpose of attending sick call. The security officers can, and frequently do, refuse to honor the requests of some inmates to report for sick call. In other instances, an inmate is permitted to attend sick call but is later punished for exercising the right, if, in the guard's untutored opinion, the complaint was not valid or substantive.

Requests for permission to seek treatment at the infirmary outside regular sick call hours are also appraised by untrained security officers, who often refuse consent. When leave is not granted, an inmate is forced to wait for a scheduled sick call or

**107.** A further irony of this situation is that the Class III garden squads, which tend to work within the units' secured perimeters, are likely to be worked more frequently than the field squads composed of the healthiest inmates because the lack of supervisory personnel has required that substantial numbers of the field

forces be laid in every day. Thus, many Class III inmates have had to work more hours than the Class I and II inmates.

**108.** Sick calls are conducted early in the morning, in order that inmates with minor ailments may go to their work assignments on time.

until a convenient break in the work day, before he may receive any evaluation of his complaints by medical personnel. During the late night hours, when no medical assistants are on duty, security officers (with the assistance of inmate nurses) make the determination as to whether an alleged emergency medical condition is serious enough to justify calling off–duty MA's or physicians. Officers make these judgments without any guidance from written policies, standing operating procedures, or instructions for the screening of emergency first aid complaints. Thus, at the outset, an inmate's access to medical care can be, and with disturbing frequency is, blocked by medically untrained officers.

A widely–held perception among TDC employees is that inmates claiming to have medical conditions are actually malingerers attempting to escape their work assignments. This supposition also often acts as a barrier to prompt medical treatment for inmates; furthermore, it frequently leads TDC officials to hinder ongoing treatment. At each unit, the warden has ultimate authority over virtually all matters, including job restrictions, lay–ins (time off from work), and therapy ordered by medical personnel.[109] Often suspicious that inmates are exaggerating their complaints in order to avoid labor, and fearful that doctors may be overindulgent, the wardens and other prison officials frequently ignore, cancel, or prematurely terminate lay–ins ordered by medical personnel. As a result of these actions, inmates thus unwisely forced to return to work have occasionally suffered serious complications or re–injury.[110] Inmates have also been required to perform tasks which medical personnel had previously determined were not suitable, taking into account the inmates' medical conditions.[111] While the imprecise work classification system [112] unquestionably contributes to these problems, the evidence also reflects that work supervisors and prison guards many times have forced inmates to perform work which, as they had been specifically informed, was beyond the several inmates' medically determined capabilities. This hardened disregard of numerous inmates' medical limitations has often inflicted upon them uncalled–for and distressing pain and

**109.** TDC's medical director, Dr. Gray, stated that "every warden has a little kingdom, which is his unit . . . . The final decision belongs to the medical department but it doesn't always work that way." Mr. Anderson, the current HUH administrator, stated in numerous letters, "[W]e at the hospital cannot dictate policies as they are to be applied on the units; each individual unit is under the control of its warden."

**110.** For example, the medical lay–in of an inmate recovering from hernia surgery was prematurely cancelled by a medical assistant, and the inmate was sent to work in the agricultural fields. The field work traumatized the surgery site to such an extent that one of the inmate's testicles atrophied, necessitating its surgical removal. Another inmate, suffering from a severely deformed back (for which he wore a brace and carried a cane) was assigned to work in the mattress factory, where, subsequently, he severely fractured his wrists. He was sent back to work the day the cast was removed, without a medical lay–in, and re–fractured the wrist one week later.

**111.** Examples follow:
(1) After a long delay in receiving proper diagnoses and treatment for a complicated back problem, an inmate assigned to a unit was operated on at John Sealy Hospital. His John Sealy physician ordered "no strenuous or heavy lifting for four to six months", and the inmate was reclassified to Class IV. He re–injured his back six months later while on his job assignment. The work designated for him to perform at that time required that he push bricks up a steel ramp. Dr. Gray agreed that the inmate should not have been assigned to this task, even though it was classified a Class IV job.
(2) At the Eastham Unit, one inmate with steel fragments in his eye (which required that he wear an eye patch) and another who was on crutches (because of a gunshot wound) were forced to work in the agricultural fields. Similarly, plaintiff David Ruiz was ordered to work in the field while he was wearing a cast on his foot, and could barely walk; in order to work, he removed the cast even though his foot had not healed.
(3) Another inmate was sent to John Sealy Hospital with internal bleeding. He was returned to the Huntsville Unit, along with an order from a John Sealy physician that he was not to do heavy lifting. Notwithstanding the physician's order, he was directed to lift an oven on his job, resulting in his being returned to John Sealy with chest pains.

**112.** See text accompanying nn. 103–105.

suffering. The policy, well established, which permits non–medical employees to ignore or countermand physicians' orders,[113] further demonstrates the blind–walled indifference of many TDC officials to the medical needs of the inmates.

Security considerations are also used as an excuse for denying the use of medically prescribed physical aids. To illustrate, asthmatic inmates are not permitted to keep personal inhalers with them, because the inhalers are perceived by guards to pose potential security risks.[114] As a result, an inmate who needs an inhaler must request one from the guards; hence, when an asthmatic inmate is locked in his cell at night, his life may hinge on his ability, in the middle of an acute asthma attack, to attract the attention of, and receive immediate aid from, building tenders or guards. TDC's shortage of security personnel, especially pronounced at night, offers no guarantee that such assistance can be provided quickly enough. TDC officials have also deprived inmates of the use of braces, canes, and similar devices at certain times, and have refused to permit, or have unreasonably delayed approval of, the use of special personal effects for inmates with a medical need for such items.[115] In short, defendants have frequently refused to countenance forms of prescribed medical treatment which necessitate variations from TDC's highly structured and overly–regimented procedures. Their failure to permit individualized treatment of inmates is yet another indication of defendants' willingness to sacrifice inmates' constitutionally protected rights in the interests of security and work.

Medical personnel are sometimes similarly influenced by non–medical considerations. The record is replete with examples.[116] MA's typically share the concept of many security officers that inmates with medical complaints likely qualify as malingerers.[117] Several medical assistants began their TDC employment as guards and later moved into medical positions, and all have been heavily infused with TDC's emphasis on work and security.[118] Since the

---

**113.** Dr. Luke Nigliazzo, a physician employed by TDC, testified that security personnel interfered with changes ordered by himself and other physicians, with the consequence that the inmates remained in inappropriate jobs. Dr. Gray testified that the only method at his disposal for removing inmates from unsuitable jobs was to re–classify them to Class IV, which he was reluctant to do. He stated, "I don't have any control over job assignments." Dr. Gray responded to a request by the Retrieve Unit physician that an inmate be given a job change by saying, "[T]hat was a nice courteous request, but it was at the pleasure of the warden."

**114.** Plaintiffs' medical expert recognized that inhalers might jeopardize security and would need to be controlled, but not through blanket denials of their use. TDC's absolute prohibition of these items is typical of its inflexibility in dealing with alleged risks to security.

**115.** In one such case, a severely asthmatic inmate had to wait for over a year before TDC officials allowed him to use a non–allergenic blanket which TDC physicians had prescribed. Although this was purely a medical matter, it proceeded through channels all the way to Director Estelle for resolution. In another case, a foam pillow–which this court had ordered TDC to provide for an inmate with severely ulcerated buttocks–was confiscated by security officers, who postulated that it might contain a gun, bomb, or other contraband.

**116.** A former inmate bookkeeper at the Eastham Unit testified that, after an inmate was injured and sent bleeding to the infirmary, it was necessary that an officer go in search for the medical assistant. The medical assistant delayed in treating the inmate, saying that he did not care how long the inmate bled.

Evidence was also presented which revealed the violent tendencies of some medical assistants and of certain inmates assigned to work at unit infirmaries. Dr. Gray acknowledged that inmate workers and medical assistants had abused patients.

**117.** A former inmate nurse testified that the Ferguson medical assistant summarily diagnosed about half the inmates who came into the infirmary as having "trickitis" (*i. e.*, they were malingering). If an inmate insisted upon seeing a physician, he would be locked up in a hospital cell until the physician make his weekly–or less frequent–visit.

**118.** A memorandum, entitled "Ferguson Unit, Security Officers–Hospital, Job Analysis", is very revealing in its delineation of the priorities of the medical department: "Security is of primary importance, ... use the least costly substances that will obtain the maximum effect in the minimum amount of time, ... keep as many inmates at as many jobs as many days as possible."

poorly trained MA's lack adequate and systematized supervision by physicians, it is thus entirely natural that they would tend to place an enhanced emphasis on the attitudinal structures prevalent among non-medical TDC officials at the units. Moreover, because unit wardens prepare performance ratings for the medical assistants, it is easy to infer that MA's must submit to the wardens' conceptions of appropriate medical care, if they wish to retain their employment.

Inmates who have been removed from the general population for security reasons find it especially difficult to obtain medical treatment. Those inmates in solitary confinement, administrative segregation, or hospital lock–up are not permitted to attend sick call; they must wait for medical officers to make their rounds. As will be discussed in the section of this opinion relating to discipline, TDC rules requiring medical surveillance of inmates in solitary confinement and administrative segregation, and policies restricting the placement of inmates with certain medical problems in solitary confinement, are frequently ignored. Even more ironically, inmates placed in "hospital lock–up" [119] have been denied medication, scheduled medical appointments, and other needed medical treatment.

Most severe is the treatment of inmates on death row. As Dr. Gray testified:

> For some reason or other, people on Death Row are considered different from other people. They're handled different. Security are afraid of them and all this

sort of thing. I don't understand it. They're just people to me, but they do get different handling, and I guess it's a rule of security, which I don't understand.

The record confirms Dr. Gray's insight. In one instance, a death row inmate with a serious stab wound in his lung was returned to his cell rather than being kept at the infirmary under close observation, because retaining him in the infirmary required too much paper work.[120] When the inmate's lung collapsed during the night, he was directed to pack and carry his belongings to the ambulance which transported him to HUH. Because of his security status, he was kept in a hospital cell where access to emergency medical treatment was very limited. Furthermore, since they are viewed as extreme security risks, death row inmates, in several instances, have been denied important surgery and post–operative treatments.

In order to be treated at a free–world community hospital, an inmate must be granted a medical reprieve, which, in itself, is a complicated process.[121] At least partially as a result of this policy, inmates–even those suffering from serious emergency conditions–are rarely treated at nearby community hospitals. Instead, they are taken to HUH or John Sealy, regardless of the fact that these facilities are a substantial distance from the TDC units.

c. HUH Hospital procedures.

At the Huntsville Unit Hospital, an area on the first floor is referred to as the "cell-block area." Contained within this area are

---

119. Generally, "hospital lockup" refers to the space reserved for a unit infirmary's beds. Inmates with fairly serious medical conditions are supposedly kept in these areas for medical observation. However, there was evidence that, on several units, the infirmaries are used to house inmates posing administrative and disciplinary difficulties. Conditions in the infirmaries are often punitive, and patients are not visited by doctors.

At some units, not only are medical areas used to confine inmates difficult to deal with on the administrative and disciplinary levels, but, conversely, administrative and disciplinary areas are employed to house inmates with medical ailments. Dr. Gray testified that he was aware that, on some units, some of the cells set aside for administrative segregation were used for

medical lock–up, saying, "I hope it's not being done much anymore, but I don't know for certain."

120. When presented with this inmate's medical record, Dr. Gray stated: "This is an error of one of my physicians .... Dr. Kim should realize there's no likelihood [that taking vital signs] will be done if he sends him back to the wing .... They should have brought their little special guard and brought him in to me. My doctor made an error, a gross error, but no harm came of it."

121. The TDC medical department must recommend the reprieve, and it must be approved by the TDC Bureau of Classification.

ten cells which are ostensibly used to house inmates classified as diabetics and self-mutilators, as well as inmates afforded "protection" and those undergoing discipline. The other cellblock area, referred to as "seven-row," contains nine cells and is located below the second floor of the hospital.[122] Seven-row is generally used for isolation cases; however, it is also a common practice to house death row inmates at this location, regardless of the character of their medical conditions. Entry to these cells can only be gained by a key, which is kept by a security officer posted near the front door of the hospital, a location far distant from the cells.

Without the approval of a physician, inmate patients may be moved from their wards to one of the hospital cellblocks at the direction of a medical assistant, a security officer, or the administrator. Numerous instances where inmates with serious medical conditions were assigned to the cellblock areas for punitive rather than medical reasons were referred to in testimony, the transfers being responses to the inmates' complaints about the quality of the medical care they had received.

122. These cells are actually located on the first floor, but the only access to them is via a staircase which descends from the second floor. Thus, to reach the patients held in these cells, medical personnel must go to the second floor, then down a flight of stairs, to this cellblock area. In light of this configuration, the failure to station an attendant on this wing at all times necessarily results in ineffective oversight of the patients confined to this dungeon-like area.

123. A former nurse testified that he had found it necessary to hunt for the person in possession of the key several times. One emergency situation he recounted involved an epileptic having a seizure in the cellblock. On that occasion, it took seven to eight minutes to get access to the patient, because the guard on duty refused to relinquish the necessary key to an inmate sent for it.

124. This low level of supervision is clearly inadequate for an area used to house suicide risks. One inmate, admitted to HUH because of injuries from a previous suicide attempt, was placed in seven-row for medical observation. He subsequently hung himself; his body was not discovered for several hours.

Former hospital employees testified that it was difficult to render appropriate care to inmates confined to the cells on seven-row. The inconvenience occasioned in obtaining the key to open the cells results in the performance of many medical services through the cell bars, such as "I-V" (intravenous) changes, bandage changes, administration of medications, and blood pressure readings. This type of procedure most frequently occurred in the treatment of death-row inmates, because it is a TDC policy that their cells may be opened only if two guards are present. On more than one occasion, the remote location of the cell door keys with reference to the cells in this area has caused serious delays in the rendering of emergency care to inmates confined there.[123] In addition, the seven-row area is not watched over adequately; at night, it is supervised by the same inmate who covers the entire second floor.[124]

Civilian guards and medical assistants at HUH are affected by the same overemphasis on security which is so manifest in the unit infirmaries, and inmates suffer from the consequent insensitivity to their medical needs.[125] Some security officers at HUH

125. See nn.114, 117 and accompanying text. One MA at HUH ordered that a patient's self-inflicted lacerations be sutured without anesthesia, as punishment for the act of self-mutilation.

Particularly notorious among HUH personnel is a certain medical assistant who became the hospital administrator in 1973, and was named Dr. Gray's administrative assistant shortly before trial. The record reveals that this individual has wielded a tremendous amount of power over all phases of hospital operation, despite the fact that his medical training is minimal and his compassion and sensitivity to inmate problems is practically non-existent. As hospital administrator, this MA had the power, which he frequently exercised, to admit or refuse to admit patients, to release patients who had never been seen by a physician, to punish patients for voicing complaints about their treatment, and, to a large extent, to determine when patients would be treated. Moreover, in both his previous jobs and his present one, he evaluated virtually all cases, determining which matters should be called to Dr. Gray's attention. In addition to the foregoing, the record contains numerous credible reports, from inmates and former nurses, that this particular MA frequently and unjustifiably verbally and physically abused inmates at HUH.

have specifically countermanded medical decisions and otherwise seriously interfered with medical care.[126]

## 5. Medical Records

Properly kept medical records serve many purposes: legal documentation of treatment is afforded; audits of the quality of treatment provided by particular doctors or by the institution as a whole may be accomplished; determination of the various needs of the institution are disclosed; and the major illnesses occurring there may be identified. Also, a physician who has had no previous involvement with the patient may examine a properly kept chart and, from the information contained on it, carry on with the care and treatment of the patient. However, the poor quality of TDC medical records renders it impossible to fulfill these objectives.

The typical record entry at TDC facilities consists of the complaint registered by the inmate and any medication which may be prescribed. No diagnosis by a physician is recorded. When inmates are admitted to HUH, no nurses' entries are made on their charts to indicate the care provided, nor are there admission and discharge summaries. Further lacking are entries to indicate whether a particular test or procedure was, in fact, completed as ordered.

Additional serious shortcomings in the manner in which record entries are performed became clear from the evidence. Among these is the practice of signing an order with a physician's name, followed by the name of an MA, nurse, or inmate nurse. From this kind of entry, it is impossible to determine whether the doctor gave the order orally to the co-signer or whether the patient was ever actually seen by a physician.[127]

In some cases, the entries reflect a want of the most fundamental medical expertise, making it easily deducible that no physician participated in making them. Indeed, entries in TDC medical records are frequently made or transcribed by inmates, and numerous inmate workers have been given access to them. These practices not only result in inaccurate records, but also represent an invasion of the privacy of the inmate–patients concerned. The expert witnesses, therefore, recommended that immediate steps be taken to remove all inmates from positions in which they have access to medical records.

One additional inadequacy was presented. When an inmate is seen in the emergency room or at sick call on his unit, a diagnosis and evaluation are entered on his unit sick call record. At the time the inmate is admitted to the hospital, a separate in–patient record is made for him, which reflects that

When the MA testified, he admitted, *inter alia*, that he had angrily and summarily ordered inmates seeking treatment out of his office, had filed disciplinary charges for lying and agitation against an inmate who wrote to a warden complaining that the MA had cut off his medication, and had transferred a paraplegic inmate into a cell not large enough to accommodate his wheel chair after the inmate requested a transfer to a ward where he could have easy access to a toilet. In light of all of this, it is interesting to note that, in 1976, the MA in question was named TDC's outstanding employee of the year.

126. In one incident, a number of security officers grappled with a catheterized ward patient who had recently returned from John Sealy. The inmate had risen from his bed after "lights out", to empty his urine bag (as he had been instructed by the John Sealy doctors) and to get a drink of water. Upon being observed by security officers, he was peremptorily ordered back to his bed. When the inmate protested, a

scuffle ensued between him and the security officers. The inmate's catheter was traumatically jerked loose in the struggle, causing him a great deal of pain and bleeding. He also suffered a cut lip and two injured fingers in the encounter.

127. Dr. Della Penna referred to the record of an inmate who died on transient row in 1977. He stated that, from the medical record, it is impossible to determine when, if at all, this inmate was actually seen by a physician, although obvious evidence of major neurological problems was present.

For example, Dr. Nigliazzo testified that he was asked, but refused, to countersign the admission order on an inmate's medical record at the end of the inmate's stay at HUH. Notwithstanding the fact that Dr. Nigliazzo had never seen or treated the inmate, his name appeared on the record.

the inmate is to be admitted and that further orders will be written on the floor. The in-patient record accompanies the inmate patient while he is in the hospital; but the original sick call record, which details the diagnosis pertaining to him and the reason for his admission, is not kept with it. Consequently, medical personnel examining the in-patient record are not apprised of the patient's condition.

· In view of these many deficiencies, it came as no surprise when the expert medical witnesses testified that patients could not be adequately treated by use of the records kept at TDC. Although TDC has had notice of the inadequacy of its medical records system for years, it has failed to implement necessary changes. While defense witnesses testified that some efforts have been initiated to organize HUH records and to standardize the record-keeping process, there was no indication from the evidence that these efforts have significantly affected the numerous deficiencies involved. Furthermore, TDC has apparently formulated no plans for improvement of the records maintained at the several unit infirmaries.

### 6. *Pharmaceutical Services*

The control, prescription, dispensation, and administration [128] of medications are important aspects of any medical care delivery system. In TDC, the medication needs of the inmates are served by a hospital pharmacy at HUH and by thirteen separate pharmacies (referred to as "pill rooms") on the various units. A central pharmaceutical supply facility is located at the Walls Unit. TDC dispenses hundreds of thousands of doses of medicine every year, ranging from simple, over-the-counter remedies (e. g., aspirin) to narcotics and other controlled drugs.[129] The evidence disclosed that serious deficiencies are prevalent in the pharmaceutical practices and procedures at TDC, which jeopardize the inmates' health and safety.

The inherently structured nature of confinement in a penal institution, as well as the need to prevent the development of a drug market within its confines, militate against inmates' freedom to purchase non-prescription medications or to administer prescribed medicines to themselves. Hence, each time an inmate desires or needs a medicament at TDC, he must obtain and present a prescription or order for that medicine (referred to as a "pill pass") to an authorized person in the pill room; moreover, he may submit the prescription only during the hours in which the medication line ("pill line") is open. When the pill pass is presented, the person dispensing the medications examines and interprets it, selects the appropriate medicine, and delivers it to the particular inmate. It is required that the inmate be watched by a TDC employee, to insure that the drug is actually taken. The back of the inmate's pill pass is stamped each time he receives a dose of medicine. At HUH, the procedure is similar to that in free-world hospitals: inmate patients are given individual doses of medications by hospital personnel, based upon orders written on their several charts. As will be detailed below, practices involving medicaments at the units and at HUH are deficient in a number of respects.

The most serious defect in TDC's pharmaceutical services is attributable to the inadequate number of qualified professional

---

**128.** There is a distinction between dispensation and administration of medications. Dispensation refers to the activity, performed by a pharmacist in the general community, of interpreting a prescription written by a doctor, obtaining the correct quantity of the medication from bulk stock, relabelling the medication with instructions for its usage, and delivering it to the patient. Administration refers to the actual act of taking a single dose of medication.

**129.** Three basic categories of drugs are dispensed at TDC. The first includes over-the-counter medications, the type of drugs which persons in the general community may buy without a prescription. The second category is comprised of dangerous drugs, those required by law to be dispensed only pursuant to prescriptions by physicians. The third category consists of controlled substances. These are drugs categorized under the Controlled Substances Act as having the most potential for abuse.

staff. This exiguity contributes to and amplifies all other deficiencies. Although TDC has operated a pharmacy since 1934, it first hired a full–time pharmacist in October of 1976. Beginning September 1, 1979, a second full–time pharmacist was scheduled to begin work. These are the only persons employed by TDC with special training in pharmaceutical services.

The medical experts testified that pharmacists perform a crucial function within a health care system. The pharmacists' knowledge of the properties, side effects, and appropriate dosages of the various medications enable them to supervise and verify drug prescriptions for accuracy, and to inform the prescribing doctors of any perceived irregularities in, or contraindications to a prescription. This function is particularly important, the expert witnesses testified, where the medical treatment of individuals is performed by a number of different persons, most of whom have no knowledge of a patient's medication history. In TDC, the major prescription function of physicians concerns approval *vel non* of prescriptions written by inadequately trained, unlicensed medical assistants or inmates.[130] A high volume of patients and medications makes thorough consideration of each inmate's individual history and medication record impractical. A compelling necessity is manifested, therefore, for an adequate number of trained pharmacists to oversee the pharmaceutical services at each TDC unit and at HUH, since it is glaringly apparent that two pharmacists cannot effectively supervise the entire TDC drug dispensation program. Indeed, several medical experts who testified recommended that TDC employ a registered pharmacist at every unit dispensary.

The shortage of pharmaceutical professionals has led to the use of medical assistants, security officers, and even inmates to staff the pill rooms. These persons regularly perform duties that, in a free–world pharmacy, could only be handled by a licensed pharmacist. Unit medical assistants do not possess the necessary pharmaceutical training and lack the requisite qualifications to operate a pharmacy without the supervision of a trained, licensed pharmacist. The security officers who are on duty in many of the unit pill rooms have even less training and are more unqualified to handle medicines; furthermore, their deployment as pharmaceutical assistants depletes the already meager ranks of personnel performing true security functions. Even more egregious is the use of inmates to dispense medications, a practice universally condemned by the expert witnesses who testified. TDC claims to have taken steps to eliminate inmates from functioning in the pill room; but at the time of trial, this objective has not been achieved.

The major risk associated with use of unqualified personnel in the unit pharmacies is ascribable to the likelihood of errors, both in the interpretation of prescriptions and in the process of dispensation. The utilization of such personnel makes it verisimilar—indeed, ineluctable—that various inmate patients will receive incorrect medications, from which grave medical consequences will ensue. Expert witnesses testified that several persons whose task it was to dispense prescribed medications to inmates in the pill line could not identify the pills they were handling, and haphazard labelling procedures exacerbate the possibility of such mistakes. Deplorable harms to inmates have also been occasioned by errors in recording or transcribing prescriptions.[131] Moreover, unqualified personnel often sub-

---

**130.** An exigent problem which permeates the entire TDC health care system is the routine prescription of controlled or dangerous drugs by persons who are not physicians. As previously noted, the lack of medical doctors in TDC results in a system where most care is provided by medical assistants and inmates, who commonly prescribe medication for patients without prior approval by a doctor.

**131.** For example, one inmate's prescription for a powerful narcotic accidentally was changed; originally, it was to be administered "as necessary", but this was changed to an order for administration of the drug four times daily. The prescription, thus altered, was routinely renewed for several months, and the inmate became totally addicted to the narcotic.

stitute an inappropriate drug for the one prescribed, either because the unit pharmacy does not stock the prescribed drug [132] or temporarily runs out of it. [133]

Another evident deficiency in the unit pharmacies is the lack of systematized recordkeeping. Although some improvements and attempts at uniformity were instituted after the inspections made by the expert witnesses appointed by this court, unit pharmacies still fail to maintain records which memorialize the administration of each dose of medication to inmates. The only existent pharmaceutical record which relates to any individual inmate is the inmate's copy of his pill pass. Since these records remain with the inmates rather than in the pharmacy, unit medical personnel have no way of determining whether given inmates have reported to the pill line and received their prescribed medications. This information can be extremely important in the treatment of specific cases, particularly where drugs which alter behavior have been prescribed. Furthermore, complete records of the dispensation of medications provide valuable information about overall medical practices at the institution.

An additional matter causing perturbation to the expert witnesses were unit pharmaceutical operations, where the tendency of TDC personnel to overmedicate inmates manifested itself most obviously. On a number of occasions, they testified, inmates were given larger doses of medication than were warranted, particularly in instances involving such powerful and potentially dangerous drugs as Thorazine. [134] Additionally, medical personnel have shaken off importunate inmates voicing medical complaints, by prescribing for the latter medically uncalled–for drugs. The expert witnesses testified that this practice has negative implications for the quality of medical care, in that it functions as a substitute for careful diagnosis and evaluation of inmate complaints, results in inappropriate treatment for serious conditions, and increases the possibilities of drug abuse among the inmate population. Indeed, among the drugs routinely dispensed at TDC have been large quantities of behavior–altering drugs with a high potential for abuse. [135] While the defendants claimed that dispensation of such drugs has, in recent times, been severely curtailed, indications were present in

**132.** On a fairly regular basis, interruptions in treatment have occurred because physicians at John Sealy have prescribed drugs not routinely kept in TDC drug stocks. In such situations, TDC personnel usually substitute what is considered by them to be a comparable medication. Many times such substitutions are not identical, either in strength or effect, to the prescribed drug.

**133.** In one case, unit medical personnel made the decision to substitute one pain reliever for another which an inmate had been taking, because the prescribed drug was temporarily out of stock. The fact that the newly prescribed drug was contraindicated as a substitute was clearly noted in *Physicians Desk Reference,* which is the basic reference book concerning prescription medicines and their effects. However, neither the unit medical personnel who changed the prescription, nor the "pill room" personnel who filled it, possessed enough knowledge of pharmacology to discover the mistake. The medicated inmate experienced severe physical discomfort for several days, as a result of this substitution.

**134.** Security concerns attend the use of oral doses of Thorazine. Therefore, the medication is administered at TDC, via an injection. Several expert witnesses, including TDC's Director of Mental Health Services, Dr. Jose Garcia, stated that the maximum safe dosage of this medicine is 50 milligrams. Dr. Garcia issued strict directives to this effect. Nonetheless, TDC medical records revealed that dosages as large as 100 milligrams were still being given to some inmates without the careful observation for side effects which is required for even the lower dosages.

**135.** DEA inspectors audited the usage of eighteen selected controlled drugs within the TDC system. They discovered that, over a fifteen month period, 172,574 dosage units of these drugs were sent from TDC medical supply to unit "pill rooms." On the Wynne Unit alone, 35,229 Valium milligrams were dispensed during the audit period. The unit had a population of approximately 1,900 inmates during that time period. Large quantities of Librium and Darvon were also being dispensed through TDC.

the evidence that the unsound practices continue, to some extent.[136]

Pharmaceutical procedures at the Huntsville Unit Hospital were also unacceptable to the medical expert witnesses in several important respects. The responsibility for administering individual doses of medication to inmate patients has been left to inmate nurses or non—medically trained security officers known as "pill bosses" or "shot bosses". This practice is medically hazardous, the medical experts testified, as the potential for diversion or inaccurate administration of medications by these unqualified persons is extremely high. The record reveals many cases where inmate patients have never received prescribed medications, either because the inmate nurses and security officers neglected, or else deliberately failed, to administer them.[137] The fact that the administration of drugs is frequently not recorded in the inmate's hospital record aggravates the deficiencies already noted, because it is almost impossible for medical personnel to determine if medication orders have been carried out promptly and accurately.

During the pendency of this civil action and pursuant to this court's order, TDC's pharmaceutical facilities were inspected by officers of the Federal Drug Enforcement Administration. The inspectors discovered numerous areas in which TDC failed to comply with regulations pertaining to the handling of controlled drugs. Many of these violations have been remedied pursuant to an agreement between DEA and TDC officials, which was formulated nearly one year prior to the trial. However, TDC had failed to comply fully with three of the more important components of the agreement at the time of trial: (1) systemwide written procedures establishing guidelines for the use and handling of controlled drugs had not been formulated; (2) the number of persons with access to the drug room had not been limited to the extent contemplated by the agreement; and (3) procedures to assure that all prescriptions for controlled drugs were countersigned by a doctor had not been implemented.

Thus, for many years, TDC has operated an enormous pharmaceutical operation in violation of many state and federal regulations[138] and virtually without professional staff. The Texas Department of Public Safety, which has the responsibility for inspecting the pharmaceutical operations at TDC, has never conducted such an inspection. Recent efforts directed toward improvement, particularly with respect to ordering, stocking, disposal, and reporting procedures, should ameliorate some of the serious deficiencies which have been referred to. Nevertheless, the shortage of pharmaceutical professionals, insufficiently trained staff, incomplete recordkeeping, inadequate drug control procedures, and imprecise methods of drug dispensation will still prevail, unless further remedial steps are taken.

### 7. *Organization*

The indifference of TDC towards the health care needs of its more than 26,000 inmates is manifested by the almost complete lack of a rational, ordered and comprehensive plan for their care and treatment. The absence of written and predictable processes pervades all aspects of health care at TDC. No plans or procedures have been formulated which specify the treat-

---

**136.** For example, although Thorazine is not the most appropriate drug to control disturbed persons, and despite Dr. Garcia's orders restricting its use, the record evinces several examples of continued reliance upon this drug by unit medical personnel, often in improper dosages and absent the necessary blood pressure checks.

**137.** A review by the Drug Enforcement Administration inspector of twenty randomly selected medical records at HUH in March 1978 disclosed that approximately half the patients had not received medications which had been pre-scribed for them. There was also testimony that several inmates underwent surgery without the benefit of prescribed pre—operative painkilling medications, because inmates working in surgery deliberately diverted the medications for their own use. The same thing has happened, on occasion, with post—operative painkilling medications.

**138.** 21 U.S.C. §§ 801–829; Tex.Rev.Civ.Stat. Ann. art. 4476–15 (Vernon's 1976).

ment to be provided when individual inmates seek care or which define the proper role and optional utilization of the unit infirmaries, HUH, or John Sealy. The failure to establish standing procedures, questionable in any hospital context, is a particularly glaring omission at TDC, where heavy reliance is placed on minimally trained civilian and inmate personnel.

The defendants did not produce any written job descriptions, standing operating procedures, standing treatment orders, or disaster or emergency plans. Whether an inmate is treated, and the type and quality of treatment he may ultimately receive, are largely a matter of circumstance and chance. The want of efficiently organized and uniform procedures inevitably results in frequent delays and denial of necessary medical care to inmates, causing them altogether needless pain, suffering, and anxiety. For example, under the current haphazard referral practices, inmates are: (1) transported to HUH for conditions that properly should be treated at the sending unit; (2) prematurely returned to their home units from the hospital transient row; (3) left at their units when their conditions warrant hospital attention; and (4) detoured and processed through HUH when referred to John Sealy.

Furthermore, the omission to institute suitable written procedures and rules, acting together with the totally inadequate medical records, effectively prevents regular and thorough review of the care provided at TDC. Under present conditions, TDC undertakes no regular review of its medical or personnel records, or of the quality of its medical practitioners. The inevitable result—improper, inadequate, and negligent care of inmates—remains undetected and uncorrected, and unqualified personnel continue to practice, unrestrained by systematic checks of review.

### B.

The eighth amendment establishes a state's obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103, 97

S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). This duty is a direct consequence of the state's legitimate power to deprive a person of his freedom for a violation of its penal laws. An inmate is denied the freedom to care for himself, as he otherwise might. "[He] must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.*

In *Estelle v. Gamble*, the Supreme Court defined the standard for eighth amendment review of prisoners' complaints concerning their medical treatment. There, the Court held that an individual inmate's charge that he had not been properly or adequately treated by prison doctors failed to state a claim against the treating medical personnel under the provisions of 42 U.S.C. § 1983:

> [Not] every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.

> \* \* \* \* \* \*

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.

429 U.S. at 105–06, 97 S.Ct. at 291–92. To state a cognizable claim, the Court said, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106, 97 S.Ct. at 292. The required indifference could be manifested, it said, "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." 429 U.S. at 104–05, 97 S.Ct. at 291 (footnotes omitted).

A number of courts have found eighth amendment violations based on *Estelle's* deliberate indifference standard. In several cases, individual allegations of severe mistreatment, or of callous failure or refusal to render treatment, have been held to meet the standard: *Hurst v. Phelps*, 579 F.2d 940 (5th Cir. 1978) (allegations that prison offi-

cials refused to transport inmate to medical appointments because of safety risk); *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979) (jury finding of deliberate indifference, supported by evidence that jail officials were informed that inmate had medical problems and observed inmate's bizarre behavior for twelve hours preceding his death, but failed to make any effort to treat the inmate or to have him examined by a doctor); *West v. Keve*, 571 F.2d 158 (3rd Cir. 1978) (allegations of denial of recommended post–operative treatment or denial of access to physician capable of evaluating need for post–operative treatment); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir. 1978), *cert. denied*, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980) (allegations of deliberate eleven hour delay in treatment of broken arm).

Although the record in the instant case includes extensive evidence of improper medical treatment of individual inmates, the plaintiffs, as a class, are challenging the *system* of health care provided by the Texas Department of Corrections to its inmates. Several courts have expounded upon the types of evidence necessary to prove deliberate indifference on a systemwide basis. *Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Todaro v. Ward*, 565 F.2d 48 (2d Cir. 1977); *Bishop v. Stoneman*, 508 F.2d 1224 (2d Cir. 1974); *Laaman v. Helgemoe*, 437 F.Supp. 269 (D.N.H.1977); *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977); *Lightfoot v. Walker*, 486 F.Supp. 504 (S.D. Ill.1980).

In *Newman v. Alabama*, 503 F.2d 1320, 1330–32 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975), the Fifth Circuit affirmed far–reaching injunctive relief ordered by the district court to remedy inadequacies in the Alabama Penal System's medical care system for prisoners. The Circuit Court agreed that infirmities of unconstitutional magnitude were posed by the following deficiencies: use of inmates and unlicensed medical technical assistants to provide medical treatment; the limited availability of qualified personnel; nonattention to ill or injured inmates; delays in receiving treatment attributable to personnel shortages; ill–conceived regular and emergency referral procedures; shortages in drug supplies; unavailability of eyeglasses and prosthetic devices; employment of obsolete medical equipment and techniques; disorganized lines of therapeutic responsibility which resulted in failure to administer prescribed treatment; and unhygienic conditions. 503 F.2d at 1330–31. It concluded that evidence of systemic medical deficiencies, combined with countless examples of improper treatment in individual cases, indicated "callous indifference to the welfare of inmate–patients." 503 F.2d at 1332. Although *Newman* was decided prior to *Estelle v. Gamble*, the Fifth Circuit decision was cited by the Supreme Court as representing basic conformity with the deliberate indifference standard, as pronounced in *Estelle*. 429 U.S. 97, 106, n.14, 97 S.Ct. 285, 292 n.14, 50 L.Ed.2d 251.

*Williams v. Edwards*, 547 F.2d 1206, 1215–1218 (5th Cir. 1977), decided after the Supreme Court's opinion in *Estelle*, affirmed a district court's finding of systemwide eighth amendment violations. The trial court's decision was based on a number of medical care inadequacies, including the following: use of inmates to provide medical treatment; shortage of qualified physicians and other medical personnel; failure to employ any registered nurses; haphazard administration and dispensation of drugs and medication; poor dental program; inadequate surgery facilities; lengthy delays in providing needed surgery for inmate patients; shoddy recordkeeping; unwarranted access by inmates and security personnel to medical records; and the frequent difficulty of treating certain inmate patients, who were locked up in remote hospital cells, the keys to which hospital aides had no ready access.

These and other cases make it clear that systemwide deliberate indifference can be demonstrated by at least two methods: (1) by a showing of a pattern of individual incidents involving inadequate medical care; or (2) by pointing to systemic deficiencies in the delivery of medical care which make unnecessary suffering inevitable.

The first part of these modes of proof was alluded to by the Fifth Circuit in a case challenging the conditions of confinement, including the absence of adequate medical care, at the El Paso County Jail. It was noted that while "isolated incidents of negligence might not constitute sufficient basis for Section 1983 jurisdiction, patterns of negligence may." *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977). This theme was more fully explicated in *Newman*, where the court said:

> [T]he record is replete with countless examples of inmates who were subjected to incalculable discomfort and pain as a result of the lack of medical care or inadequacy in the treatment administered. These examples fortify the conclusion that deficiencies were not isolated and bespeak of callous indifference to the welfare of inmate–patients. Moreover, these examples also belie any suggestion that suffering resulted merely from legitimate discrepancies of opinion as to the proper treatment to be rendered.

503 F.2d at 1332. A similar holding comes from the Second Circuit case of *Todaro v. Ward*, 565 F.2d 48, 52 (2nd Cir. 1977):

> [W]hile a single instance of medical care denied or delayed, viewed in isolation, may appear to be the product of mere negligence, repeated examples of such treatment bespeak a deliberate indifference by prison authorities to the agony engendered by haphazard and ill–conceived procedures. Indeed, it is well–settled in this circuit that "a series of incidents closely related in time ... may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners." *Bishop v. Stoneman*,

508 F.2d 1224 (2d Cir. 1974). *See Newman v. Alabama* . . . .

The second means of establishing a constitutional violation, as above noted, requires proof that the prison system is so plagued by inadequate facilities, equipment, staffing, and referral procedures as predictably to cause needless harm and suffering. As was said in *Todaro*: "When systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers." 565 F.2d at 52. In *Newman*, the Fifth Circuit supported its finding of a constitutional infirmity by noting that the systemwide shortcomings in medical services "are of such a nature as to render large-scale improvident treatment inevitable." 503 F.2d at 1332.

In sum, isolated incidents of medical malpractice, carelessness, or indifference to inmate medical needs by guards or administrators, or occasional mistakes in processing or classifying an inmate patient, do not give rise to claims of constitutional proportion. However, a pattern of such occurrences extending over a period of time or the existence of systemic deficiencies which will inevitably lead to unnecessary pain and distress constitute proof of deliberate indifference to the medical needs of inmates.

The record in the instant case is replete with examples of such deliberate indifference, manifested by improper handling of individual cases and by failure to correct persistent, systematic deficiencies. These faults, well known to the defendants, have resulted in a medical system so inadequate for the inmates' needs that their sufferings are inevitably increased and prolonged. The individual examples, many of which are previously described or alluded to in this section, are not, as characterized by the defendants, merely a few isolated incidents or "horror stories". Instead, they establish a continuous pattern of harmful, inadequate medical treatment, which mani-

fests itself frequently and injuriously in the lives of inmate-patients.

When the multitude of individual cases are considered together, they vividly portray the results of the systemic defects in TDC's medical care system. These deficiencies, set out in detail earlier in this section, include, *inter alia* : the total inadequacy of the prison hospital and gross deficiencies in other facilities; the critical insufficiency in the number of physicians and other licensed medical support personnel; the indefensible reliance upon untrained inmates to perform skilled medical tasks; the unjustified interference by officials with legitimate medical treatment of inmates, in the name of exaggerated security and work-related concerns; the high imprudent failure to keep an accurate system of medical records; and the crucial omission to adopt proper referral procedures, so as to establish an efficiently operable overall medical care structure. The evidence makes clear that these shortcomings, imbedded as they are in the fabric of TDC's medical system, inevitably lead to uncalled-for anguish and inexpedient medical treatment to inmates on a large scale.

Defense witnesses have admitted the existence of many of the unfortunate deficiencies in the medical care system, responding merely with the assertion that the situation is gradually improving. Such assurances, however well-intentioned, do not diminish the fact that the defendants have known of the shortcomings for many years and have failed to correct them, thereby depriving the inmates in their custody of minimally adequate medical care. Belated efforts to improve the situation, made during the trial of this case, have not eliminated these inadequacies or absolved the defendants' liability for them.

 Finally, the defendants also seem to have misconstrued the plaintiffs' burden of proof concerning the question of deliberate indifference to medical needs. They repeatedly sought to ascertain whether individual inmates who testified about their individual medical treatment had suffered any permanently disabling injuries that could be linked, beyond a doubt, to inadequacies in the medical service. This is not a pertinent inquiry. "That plaintiffs could prove no deaths or permanent disabilities resulting from the specific instances of failure does not alter this Court's view of the case. The Court reiterates that it need not postpone acting until a catastrophe occurs." *Todaro v. Ward*, 431 F.Supp. 1129, 1152 (S.D.N.Y.1977), aff'd., 565 F.2d 48 (2d Cir. 1977). As stated by the court in *Palmigiano v. Garrahy*, 443 F.Supp. 956, 973 (D.R.I. 1977), "the Court would be remiss in its duty were it to wait until an inmate bleeds to death, or suffers a heart attack ... before it acts." The plaintiffs have presented adequate evidence to link a number of serious injuries, as well as countless examples of unnecessary pain, to deficiencies in the TDC medical system. They have sufficiently carried their burden of proof.

On the basis of the evidence presented, and the applicable law, it becomes clear that TDC's medical care system fails to comply with the eighth amendment to the constitution.[139] To remedy these egregious circumstances, TDC will be required to increase staffing for all medical personnel, to restrict the use of inmates to perform medical and pharmacological functions, to improve unit infirmary facilities, and either to substantially renovate HUH or downgrade it to an infirmary. In addition, it will be mandated that TDC establish diagnostic and sick call procedures which eliminate non-medical interferences with the provision of medical care, as well as medically sound procedures for making job assignments. Finally, the deficiencies in pharmaceutical operations, record-keeping and overall organization of medical care delivery services, noted herein, must be remedied.

---

**139.** In contrast to the rest of TDC's medical facilities, conditions at the John Sealy Hospital

do meet the requirements of the constitution.

*Psychiatric Care*

A.

### 1. *Compendium*

TDC's program for the care and treatment of inmates with mental disorders [140] can be characterized as rudimentary at best. Although a very large number of inmates have some character of mental disorder, few resources have been devoted by TDC to the provision of mental health services. Professional treatment personnel are virtually non–existent on the units. "Treatment" there consists almost exclusively of the administration of medications, usually psychotropic drugs, to establish control over disturbed inmates. Other options, such as counseling, group therapy, individual psychotherapy, or assignment to constructive, therapeutic activities are rarely, if ever, available on the units. Essentially, an inmate with a mental disorder is ignored by unit officers until his condition becomes serious. When this occurs, he is medicated excessively. If his condition becomes acute, he is deposited at TDC's Treatment Center, a facility exclusively for inmates with mental disorders. Located at the Huntsville Unit, the Treatment Center has only limited professional staffing, and inmates who are sent there are the recipients of little more than medication and what amounts to warehousing.

### 2. *Psychiatric Screening of Inmates*

TDC lacks any systematic procedures for determining the state of its prison population's mental health. As a result, the number of inmates with mental disorders can only be estimated. According to the consensus of the expert opinions expressed at trial, approximately 17,000 (sixty–eight percent) of TDC's population of 25,000 need treatment for mental disorders.[141] This percentage appears to be quite high; however, as the expert witnesses explained, prisons confine an unusually large number of persons with mental disorders. (An individual inmate's disorder often manifests itself by the same anti–social behavior which caused his imprisonment in the first instance.) In addition to the many inmates who arrive at TDC harboring mental disorders, a large number develop these maladies during their incarceration in the Texas prisons.

The medical staff has apprized TDC officials that a great many inmates suffer from mental disorders, yet little has been done to identify or treat the inmates so afflicted. A variety of tests are administered to incoming inmates to determine intelligence, educational achievement, and psychological stability. Nonetheless, these tests have not been adequate to screen or diagnose mentally disturbed inmates. The Minnesota Multi–phasic Personalty Inventory (MMPI) is the sole test administered to measure personality abnormalities; however, it cannot be understood by persons with less than a sixth grade reading ability, and it is therefore, useless in evaluating the large number of TDC inmates who read at lower

---

**140.** The term "mental disorders", as used here, includes organic functional psychoses, neuroses, personality disorders, alcoholism, drug dependence, behavior disorders, and mental retardation. The special problems faced by mentally retarded inmates will be discussed in the section of this opinion relating to special needs inmates.

**141.** Expert witnesses in the field of psychiatry described the mentally disordered population in a variety of terms, but basically agreed that at least five percent of the inmate population suffer from serious mental disorders, and another fifty to sixty percent are in need of some psychiatric treatment. Dr. Jose Garcia, TDC's Chief of Mental Health Services, estimated that

ten percent of the inmates have neuroses, twenty percent have psychoses, and seventy percent have personality disorders–the composition of these categories, in some instances, overlapping somewhat. Dr. Edward Kaufman estimated that five percent of the inmate population are acutely psychotic or suicidal, five percent need psychiatric treatment because of low intelligence levels, and fifty to fifty–five percent have histories of drug or alcohol abuse and dependence. Dr. Frank Rundle estimated that five percent of the inmate population have severe mental disorders and another fifteen to twenty–five percent have neurotic and personality disorders serious enough to require occasional treatment.

levels.[142] Other tests are administered which measure general employment aptitudes and educational achievement levels, but they are not designed for use by persons whose dominant language is other than English. It follows that those inmates who primarily speak Spanish cannot be effectively tested. Furthermore, Dr. Jose Garcia, Chief of Mental Health Services at TDC, testified that all of the tests were culturally and racially biased.

An additional difficulty with TDC's diagnostic tests is the lack of properly qualified and trained personnel who can supervise or evaluate them. A member of TDC's Classification Committee admitted that the Committee does not consider the MMPI test results, because only a handful of TDC personnel know now to analyze them. Thus, test results are simply filed on magnetic tape. The information filed in this manner is not readily available, and it is not systematically incorporated into treatment plans or classification profiles for individual inmates. Furthermore, it is not passed on to those TDC employees who may be dealing with and making decisions about particular inmates. For all practical purposes, then, the information is lost in the files.

In the relatively few situations where the testing process succeeds in identifying inmates with mental disorders requiring diagnosis and treatment, the tests are used by the Diagnostic Unit psychologist to prepare psychological evaluations. The psychological evaluations received in evidence as exemplars were described by expert witnesses as being extremely short and sketchy and lacking in meaningful histories and observations. They included improper or logically inconsistent diagnoses as well, according to the witnesses, and did not provide useful treatment recommendations.[143]

At no point does TDC provide systematic development of treatment plans for those few inmates whose need for assistance with mental disorders is recognized. Regular follow—ups of individuals who are discovered to have mental disorders simply do not occur.

3. *Psychological and Psychiatric Care at the Unit Level*

For inmates at TDC units, psychotherapy is extremely difficult to obtain, since virtually no professional staff is on hand to provide care. At present, TDC employs at each unit one person designated as a psychologist (with the exception of the Coffield Unit, which has two). In the recent past, even fewer psychologists were available, and some units were without one. These psychologists, who form the backbone of TDC's mental health treatment staff, would not be allowed to practice legally in the free world, since their training and experience is inadequate for state licensure or certification. They are theoretically supervised on the units by part—time psychiatrists. However, the psychiatrists spend an average of less than one day each month at the several units. For that reason, they have little time to supervise the psychologists technically under their superintendence or to provide treatment to the inmates with mental disorders. Instead, their primary activities consist of approving and renewing prescriptions of psychotropic medications for these inmates. The bulk of the treatment in the individual units, therefore, falls upon the inadequately trained, poorly supervised, and sparsely placed psychologists. Most of the psychologists' time is expended in interviews with inmates who have requested to

142. The average TDC inmate reads at a fifth to sixth grade level, and a substantial number read at an even lower plane.

143. In one of the evaluations, the psychologist recommended that an individual with an extremely disturbed background, who had previously exhibited difficulty adjusting to conditions in a county jail, be considered for protection from sexual abuse. The evaluation noted that, "in the event that [the inmate] comes to

the attention of the unit psychologist, he may be able to benefit from firm, directive counseling." It is clear that the patient's future treatment depended upon whether he independently came to the attention of the unit psychologist. In the opinion of Dr. Kaufman, the inmate should initially have been immediately referred to the unit psychologist for counseling, rather than waiting until the inmate got into some type of trouble.

see them or with inmates who have been referred to them by unit officials. The usual result of the interviews is the psychologists' prescription of psychotropic medications for the affected inmates or the relegation of the latter to administrative segregation, hospital lockup, or solitary confinement. No facilities for more sophisticated treatment exist on the units, and very little oversight of these inmates—even those with demonstrated neuroses or psychoses—occurs.

The record also reveals that several inmates on the units who were diagnosed as schizophrenic or as having some form of acute psychosis spent long periods of time in segregation without receiving treatment for their conditions. Medical records relating to these inmates disclosed that some had been confined for as long as five months without being seen by a member of the psychiatric staff.

Inasmuch as inmates with pronounced mental disorders have often suffered from the failure of unit psychologists to attempt appropriate treatment, it is of little surprise that inmates with less acute disorders have likewise been the frequent victims of medical inattention. Those who may have come to the attention of the unit psychologists, usually by reason of chance events, were treated, in the main, with frequent doses of controlled, behavior–altering drugs.[144] If the prescribed drugs did not successfully cure or eliminate the disorders, the inmate was provided no additional treatment. One inmate with a long history of mental disorders described treatment on his unit:

Well, [I received] several different responses. I was told that the psychologist didn't have time to waste on me, that he had given me every drug he knew of, and if I wanted to be crazy, just go ahead and be crazy.

With constructive psychotherapy virtually non–existent on the units, a large number of inmates resort to self–mutilations and suicide attempts, as dramatic cries for help. TDC officials have often characterized these actions as attempts to "manipulate the system" and have punished the suicide–prone inmates, rather than making provision for mental health professionals to counsel with or otherwise supervise them. Many of the successful suicides at TDC units were, in fact, accomplished after various suicidal gestures made by inmates were ignored or punished. Indeed, TDC has no program whatever for the identification, treatment, or supervision of inmates with suicidal tendencies.

Many inmates enter TDC with histories of drug and alcohol abuse. The expert witnesses were of the collective opinion that treatment of some description is crucial to these inmates' successful return to society. However, the evidence shows that, although a few alcohol and drug programs exist at some of the TDC units, many inmates in need of the programs are never given the opportunity to participate in them.

### 4. TDC Treatment Center

Male [145] inmates with mental disorders which cannot be dealt with at the units are transferred to TDC's Treatment Center, a

---

144. The problems associated with the use of such medications, in situations where the patients are not carefully supervised, were described by expert witnesses for all parties. Thorazine, a particularly dangerous medication, is injected intra–muscularly to sedate mentally disturbed inmates. Dr. Kaufman found that the typical TDC dosage of Thorazine was double the maximum that he would recommend or prescribe. He further explained that Thorazine can cause serious, sometimes fatal, drops in blood pressure, and that frequent blood pressure tests must be taken of inmates injected with the drug. Dr. Garcia, TDC's Chief of Mental Health Services, agreed with Dr. Kaufman's observations on these points.

Dr. Garcia also testified that he had issued specific directives to his staff in an effort to eliminate the abuse of Thorazine and other dangerous drugs. However, the evidence makes clear that, despite these efforts, the improper distribution and use of addictive drugs is widespread at TDC. See the discussion in this opinion of TDC's pharmaceutical services.

145. Female inmates exhibiting psychotic symptoms are kept in hospital cells or isolation cells on the Goree Unit or transferred to Rusk State Hospital, a state facility for persons with serious mental disorders.

section of the Huntsville Unit described by the defendants, in 1978, as "an overcrowded, totally inadequate cellblock". This facility must accommodate TDC's most seriously disturbed inmates, except for the few who are transferred to Rusk State Hospital, a state–owned facility for mentally disturbed persons. The latter institution has demonstrated an increasing reluctance to accept patients from TDC.[146] The defendants, in their 1980–81 budget request to the Texas legislature, stated that, "[c]ontinuing to treat these patients at Huntsville or Goree [the women's unit] in the present manner is felt to be self–defeating of any treatment regimen that may be planned." The evidence reveals that this pronouncement is all too accurate.

As currently operated, the Treatment Center is little more than a warehouse for inmates with serious mental disorders. These inmate–patients are housed in a regular cellblock under conditions approximating those in administrative segregation at regular TDC units.[147] Approximately one quarter of the Treatment Center inmates are in an "on tag" status, that is, confined to their cells for 23½ hours a day. All inmates first entering the Center are kept in this status for a diagnostic and adjustment period of approximately two weeks. Other inmates may be classified as an "on tag" for one of several reasons: (1) at their own request; (2) because of medical conditions or homosexuality; or (3) as punishment for certain types of behavior. Inmates who are "on tag" leave their cells only for showers, three times a week, and for occasional recreation. Most of their time is spent sleeping in their cells, and their meals are also eaten there. Psychiat-

ric interviews also occur while the inmates are so confined, members of the treatment staff conferring with their inmate–patients through the barred doors of the cells.

When inmate–patients are removed from "on tag" to an "off tag" category, they are afforded more freedom of movement, i. e., they are permitted to eat in the Huntsville Unit dining room on a separate shift (after other inmates have eaten), and are allowed to while away a portion of each day in the dayroom, where they may watch television and play games. Some of the "off tag" inmates perform janitorial functions; like building tenders in other TDC units, they assist in supervising other inmates.[148]

Treatment for "off tag" patients consists almost exclusively of medication, with infrequent re–evaluations of the need to continue such medicinal therapy. Former Treatment Center patients testified that most inmates walk around in a drugged state, unable to control themselves or to engage in constructive activity. After making an inspection of the Treatment Center, one expert witness testified that he encountered only one inmate in an "off tag" status who was making any productive use of his time, and that even this inmate was suffering from the irreversible effects of overmedication.

Other forms of treatment at the Treatment Center include recreational therapy and individual counseling. As to the former, a program of exercise was conducted daily in the summer of 1979.[149] Generally, however, facilities for recreation at the Treatment Center are extremely limited; indeed, the dayroom area is actually the hall in front of the cells. Accommodations

**146.** The desirability of continued reliance upon the Rusk State Hospital for treatment of the most acutely ill patients is questionable. Some of defendants' witnesses stated that no difficulties were associated with continued use of that institution; others appeared uncertain that the option of transfer to Rusk State Hospital was realistically available. Apparently, no guidelines or definite procedures exist for determining which inmates are sent to the Rusk facility.

**147.** See the section of this opinion discussing the conditions in Administrative Segregation.

**148.** See the discussion relating to building tenders in the section of this opinion concerning Security and Supervision.

**149.** These exercise sessions are characterized as strictly voluntary. Also available on a voluntary basis are classes, conducted twice a week, and daily remedial education classes for illiterate patients.

for group counseling, individual counseling, and occupational therapy are also quite deficient.

With respect to counseling of these inmates, it was shown by the evidence that individual, one–to–one therapy sessions occur very infrequently. Over a two month period in late 1978 and early 1979, TDC records revealed only forty–two of these sessions at the Treatment Center. Given the patient population of sixty inmates, these figures suggest that patients receive individual therapy less than once every two months. Many of these attempts at counseling are conducted in the cellblock areas, with the therapist and the inmate conversing through the cell bars, a milieu characterized by both defendants' own employees and plaintiffs' expert witnesses as inappropriate for effective mental health treatment.

In the past, Treatment Center psychologists conducted group therapy sessions for some patients. This practice was discontinued by TDC's former Chief of Mental Health Services, because he believed the sessions served no beneficial purpose. As of the summer of 1979, group therapy had yet to be resumed. Psychiatric experts testified that group therapy is an appropriate, therapeutic form of treatment for persons with mental disorders, and they expressed surprise that a facility such as the Treatment Center lacked such a program. With few other options available, many "off tag" patients choose to remain most of the day in their cells, and are permitted to do so. Expert opinion was to the effect that it is not advisable or therapeutic for mentally disturbed persons to pass the greater part of their time in sleep or to be otherwise dormant in the cells.

The dearth of proper and adequate staffing constitutes the primary reason for the lack of appropriate treatment at the Treatment Center. The Center employs a fairly large number of security personnel (seventeen security guards to supervise approximately sixty inmates, a ratio of 1:4), thereby insuring that these inmates are much more closely supervised than the general TDC population. In 1978, the treatment staff of the Center included two part–time psychiatrists, one full–time psychologist, one full–time sociologist, one part–time sociologist, and three full–time medical assistants. This staffing is grossly inadequate, merely providing sustenation and medication and not treatment as such. As Dr. Edward Kaufman, one of the plaintiff–intervenor's mental health experts, stated:

> Well, at that level of care you're just talking about bare maintenance. You're not really going to be able to do any treatment. The only thing you'll be able to do is give people medications and then come back and evaluate them every couple of months and change their medications, but that's not psychiatric treatment.

The evidence indicates that the Treatment Center needs a total of approximately seventeen to twenty–two persons on its treatment staff,[150] as well as additional facilities in the form of group therapy rooms and occupational and recreational therapy areas, in order to provide adequate and effective treatment for the inmate–patients in its custody.

### 5. Treatment Staff in General

TDC has never employed an adequate staff of mental health professionals. As recently as 1974–1975, TDC had no psychiatrists on its payroll whatever; psychiatric services during those years were provided by visiting psychiatrists from Baylor Medical School. The equivalent of more than one full–time psychiatrist was employed by

---

**150.** Dr. Kaufman recommended that the Treatment Center be staffed with the equivalent of one and a half full–time psychiatrists, one person with a Master's degree in social work, two psychologists with doctoral degrees, one occupational/recreational therapist, five registered nurses, two or three licensed practical nurses, and ten psychiatric technicians. Dr. Garcia was in basic agreement with these recommendations, although he stated a preference to physicians' assistants instead of nurses, and felt that five psychiatric technicians and only one doctoral–level psychologist would be sufficient. He also was of the opinion that two sociologists should be on the Treatment Center staff.

TDC, for the first time in 1977.[151] TDC's Chief of Mental Health Services, Dr. Garcia, testified that, in August 1979, TDC employed four psychiatrists, only one of whom worked full–time. Dr. Garcia himself works only twenty–five hours per week at TDC, and this time must be divided between, first, his supervisory responsibilities and, second, the rendering of treatment services at the Treatment Center and also at four other units. The third psychiatrist, employed by TDC for only eight days a month, was responsible for the care of inmates at eleven outlying units. The fourth served as a consultant at the Mountain View Unit.

Dr. Garcia also testified that TDC has budget allocations for two more full–time psychiatrists, beginning September 1, 1979. One of the positions had been filled as of August 1979, and recruitment for the other position was continuing.[152] Assuming all the authorized positions have been filled and that no new vacancies have occurred, TDC now employs the equivalent of five full–time psychiatrists to provide treatment for over 26,000 inmates, approximately 17,000 of whom likely suffer from mental disorders of some type. In contrast, defendants' expert witnesses reported that the California Department of Corrections, with a population slightly smaller that TDC's, employed thirty psychiatrists in the summer of 1979. In 1975–1976, when TDC had no full–time psychiatrists, California had twenty–one. Dr. Garcia testified that six to eight full–time psychiatrists are needed. Dr. Kaufman, a witness for the plaintiffs, and Dr. Robert Brutsche, one of the defendants' expert witnesses, recommended a ratio of one psychiatrist for every five hundred general population inmates.

In addition to psychiatrists, TDC employs persons which it designates as psychologists. This title indicates only the job description for pay purposes; it does not signify that the persons holding the positions are licensed or certified as psychologists. As already mentioned, at the time of trial, none of the psychologists employed by TDC were licensed or certified. Most had a Master of Arts degree in Psychology; one had a degree in Sociology. Dr. Garcia testified that he had directed all TDC psychologists to take the necessary steps to obtain certification or licensure by spring of 1981, and that he had instituted requirements for their continuing education.

The number of psychologists employed by TDC has increased greatly in recent years. In August 1979, seventeen were employed for the entire TDC system. In addition, one psychologist with a doctoral degree had been hired to supervise the unit psychologists and to perform duties at the Treatment Center. Dr. Garcia testified that a ratio of one psychologist for every one thousand general population inmates would be desirable. Dr. Kaufman was of the opinion that for each 500 general population inmates on the units, one psychologist with a doctoral degree and another with a master's degree is required, both being supplemented by a support staff.

No registered nurses, licensed psychiatric nurses, physicians' assistants, or psychiatric technicians are employed by TDC to give support to the psychiatric treatment staff. Except for the Treatment Center, which employs three medical assistants and the equivalent of one and one–half full–time sociologists, no support personnel are assigned exclusively to the care of mentally disturbed inmates.

The expert witnesses testified that the lack of adequate numbers of professional treatment personnel has resulted in psychiatric records which are poor in quality and haphazardly compiled and, further, that the confidentiality of information in those records is often unnecessarily compromised.

---

151. A defense exhibit revealed full–time equivalencies for psychiatrists employed by TDC during the pendency of this action to have been as follows: 1973–.23; 1974–.00; 1975–.00; 1976–.46; 1977–1.30; 1978–1.77.

152. Dr. Garcia also testified that recruitment of psychiatrists for employment in TDC was extremely difficult, for the reason that the overall pool of psychiatrists is small, and because psychiatrists generally prefer not to work in prisons.

In summary, although recent increases in personnel have occurred, TDC does not yet employ an adequate number of mental health professionals and support staff to provide minimally necessary mental health services to the inmate population.

### 6. TDC's Defenses

■ As justification for its failure to provide therapy for most of its mentally disturbed inmates, TDC's officials advance the defense that a majority have personality disorder rather than neuroses or psychoses, and that personality disorders are usually difficult to treat. Since no accurate assessment of the prison population's mental health has been conducted, it is impossible to determine what proportion of inmates "merely" suffer from personality disorders. Moreover, the difficulty of treating personality disorders does not, by itself, justify a decision not to attempt any treatment. TDC also alleges that inmates with personality disorders have no real desire to change or improve themselves and hence cannot be successfully treated. Thus, even sincere requests for treatment are, again, perceived as attempts by inmates to "manipulate the system", and are virtually ignored. The fact that some inmates are hostile to treatment efforts does not justify the TDC policy of refusing to treat those with sincere motives, who could possibly benefit from treatment.

### B.

General eighth amendment principles and standards relating to the provision of minimally adequate medical care have been discussed in the medical care section of this opinion. Included within those eighth amendment protections is the right of mentally disturbed inmates to receive appropriate psychiatric treatment.

Many courts have recognized that adequate medical treatment includes treatment for mental as well as physical disorders. *Laaman v. Helgemoe*, 437 F.Supp. 269, 313 (D.N.H.1977); *Barnes v. Government of Virgin Islands*, 415 F.Supp. 1218, 1227–28 (D.V.I.1976); *Battle v. Anderson*, 376

F.Supp. 402, 415 (E.D.Okla.1974); *Costello v. Wainwright*, 387 F.Supp. 324, 325–26 (M.D.Fla.1973); *Pugh v. Locke*, 406 F.Supp. 318, 331–32 (M.D.Ala.1976); *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977); *Finney v. Hutto*, 410 F.Supp. 251, 258 (E.D.Ark.1976), *aff'd*, 548 F.2d 740 (8th Cir. 1977), *aff'd* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Collins v. Schoonfield*, 344 F.Supp. 257, 277 (D.Md.1972). In *Newman v. Alabama*, 503 F.2d 1320, 1324 (5th Cir. 1974), inadequate assistance to mentally ill inmates was cited as one of the characteristics of the Alabama prison system which supported the conclusion that the quality of health care provided to inmates violated the eighth amendment. The deficiencies in mental health treatment programs found by the District Court in *Newman* closely resemble those found to exist in the Texas prison system:

Mental illness and mental retardation are the most prevalent medical problems in the Alabama prison system. It is estimated that approximately 10 percent of the inmates are psychotic and another 60 percent are disturbed enough to require treatment. To diagnose and treat these almost 2400 inmates, the Board of Corrections employs one clinical psychologist, who works one afternoon each week at the M&DC. There are no psychiatrists, social workers, or counsellors on the staff. Severe, and sometimes dangerous, psychotics are regularly placed in the general population. If they become violent, they are removed to lockup cells which are not equipped with restraints or padding and where they are unattended. While some do obtain interviews with qualified medical personnel and a few are eventually transferred for treatment to a state mental hospital, the large majority of mentally disturbed prisoners receive no treatment whatsoever. It is tautological that such care is constitutionally inadequate.

*Newman v. Alabama*, 349 F.Supp. 278, 284 (M.D.Ala.1972) (footnotes omitted). The District Court also noted that at least one psychiatrist was employed on a contract basis to diagnose a limited number of the worst cases. 349 F.Supp. at 284, n. 4.

During the pendency of this action, the lack of professional treatment staff in TDC prisons, when considered in proportion to the number of inmates estimated to suffer from mental disorders, has been as pronounced as that in the Alabama system. The lack of treatment on TDC units also closely parallels that described in *Newman*. The major difference between TDC's system of mental health care and Alabama's is that TDC operates its own Treatment Center for inmates with serious mental disorders. However, it is evident that little, if any, actual treatment is provided even at that facility, which basically serves as a large holding pen for mentally ill prisoners.

In *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977), the Fourth Circuit, taking note of the Supreme Court's standards in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), explored in detail the issue of the right to minimally adequate mental health treatment in a prison context. The court first stated that it saw "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart. Modern science has rejected the notion that mental or emotional disturbances are the products of afflicted souls, hence beyond the purview of counseling, medication and therapy." 551 F.2d at 47. Accordingly, it set forth the following standard for assessing when inmates are entitled to mental health treatment:

> [A prison inmate] is entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

*Id.*

▪ The components of a minimally adequate mental health treatment program may be ascertained by resort to judicial precedent in previous prison cases, by consideration of the expert testimony in the instant case, and by applying the basic principles of minimally adequate care to the specific problem of mental health care. These all lead to the following conclusions with respect to basic minimum standards for mental health treatment in the Texas Department of Corrections. First, there must be a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment. *See Pugh v. Locke*, 406 F.Supp. at 333; *Laaman v. Helgemoe*, 437 F.Supp. at 319, 324; *Barnes v. Government of Virgin Islands*, 415 F.Supp. at 1235; *Anderson v. Redman*, 429 F.Supp. 1105, 1121 (D.Del. 1977). Second, as was underscored in both *Newman* and *Bowring*, treatment must entail more than segregation and close supervision of the inmate patients. Third, treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders. *See Pugh v. Locke*, 406 F.Supp. at 333; *Laaman v. Helgemoe*, 437 F.Supp. at 324. Fourth, accurate, complete, and confidential records of the mental health treatment process must be maintained. Fifth, prescription and administration of behavior–altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment. Sixth, a basic program for the identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program. *See e. g., Collins v. Schoonfield*, 344 F.Supp. at 277. TDC's mental health care program falls short of minimal adequacy in terms of each of these components and is, therefore, in violation of the eighth amendment.

▪ One additional constitutional problem exists. TDC provides no hearing or other procedure in advance of transferring seriously disturbed inmates from the prison units to the Rusk State Hospital. The Su-

preme Court's recent decision in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), makes plain that the stigma associated with the involuntary transfer of a prison inmate to a mental hospital requires that certain procedures— including a hearing—be afforded the inmate prior to such a transfer. Therefore, before transferring any inmate to Rusk State Hospital, TDC must avail him of the minimal procedural protections set forth in that opinion.

### Special Needs Inmates

### A.

### 1. Compendium

Included within TDC's inmate population are a large number of persons whose physical and mental handicaps severely limit their ability adequately to cope with prison conditions.

The straitened circumstances under which these inmates live are contrary to reason and common sense. Physically handicapped inmates must either manage as best they can, with virtually no special assistance, in physical environments which pose extreme difficulties for them, or spend their days vegetating, denied access to virtually all the programs and activities available to non–disabled inmates. Mentally re-

tarded inmates must live up to the standards set for all other inmates or else be punished. Their mental handicaps earn them no special considerations whatever; rather, they must endure recurrent abuses from other inmates and from security officers, both of such groups either deliberately taking advantage of their gullibility and weaknesses or simply refusing to deal with them differently, regardless of their defective mentalities. In short, TDC provides essentially no accommodations for handicapped inmates which would enable them more effectively to function and contend with their desperately onerous situations in prison.

### 2. Physically Handicapped Inmates

Included within the category of physically handicapped inmates, as used here, are those whose mobility is impaired, as well as those with sight and hearing problems. A handicapping condition may be permanent or long–lasting, or may be the temporary result of an accident, illness, or medical procedure.[153] In either situation, the use of devices such as a cane, braces, a wheelchair, or sight or hearing aids may be necessary. TDC inmates have experienced numerous difficulties in obtaining such devices and having necessary maintenance performed.[154]

---

**153.** Although the examples discussed in this section primarily highlight the difficulties experienced by permanently and seriously disabled inmates, similar mobility problems are also faced by inmates with temporary disabilities or minor impairments. Many of the special problems faced by such inmates are detailed in the section on medical care. The inappropriate work classifications and assignments given to inmates with partial disabilities, and interference by security officers with medically–ordered convalescent periods or restricted duties, and the rigorous difficulties experienced by inmates in obtaining special medical devices are set out in that section.

**154.** Several inmates who were partially paralyzed were required to function without wheelchairs. One inmate, temporarily paralyzed in a construction accident, was never given a wheelchair during the two and one–half years he suffered from paralysis. For a part of this period, he was given a cart to ride, but because he was housed on the third tier of cells, he was forced to climb stairs several times a day. An-

other inmate, whose arms were severed at the elbow in a work–related accident at TDC, experienced great difficulty and delay in being fitted with artificial limbs. The unavailability of guards to escort the inmate to an artificial limb clinic required cancellation of several of his infrequent appointments to have his prostheses fitted and to learn their use. Several inmates with serious vision impairments encountered grave obstacles, before securing recognition and treatment of their conditions, and receiving glasses and other visual aids.

Special devices, once acquired, have been poorly maintained by TDC. One inmate, who is completely deaf in one ear and whose hearing is impaired to the extent of sixty–five percent in the other, twice experienced delays of several months when repairs of her hearing aid became necessary. A paraplegic inmate brought his own adapted wheelchair with him to TDC, but it subsequently broke and collapsed, because routine maintenance had not been performed on it.

Facilities at TDC's various units are not adapted for use by inmates with mobility impairments. At the units, housing areas above the first level may only be reached by climbing stairs which lack handrails or handholds. Nevertheless, a number of inmates with significant mobility impairments have been assigned to upper level cells. Some TDC cells will not accommodate regular sized wheelchairs; others contain enough space for a wheelchair to pass through the doors into the cell, but not enough room exists to enable the chair to be turned around. In either situation, the daily routine of mobility–impaired inmates becomes a dangerous exercise in gymnastics. Several paraplegic inmates described the contortions they resorted to, in order to use the toilets or sinks in their cells.[155] TDC's showers also cause difficulties, since they are surrounded by a tile rim or curb, which prevents wheelchairs from being wheeled into the shower area. As a result, wheelchair inmates cannot shower without the assistance of several other persons, and the conditions under which this is accomplished are far from ideal.[156]

TDC's barrier–infested units have the effect of preventing or hindering mobility–impaired inmates from gaining access to general activity areas, such as dining halls or classrooms. They also deny such inmates the opportunities to work and recreate with other inmates and participate in many institutional programs.[157] Some of the most severely impaired inmates are housed in administrative segregation, because this is the most convenient place to feed them. TDC has made no efforts to make its facilities more readily accessible to handicapped persons, either through physical modifications or through a program of special assistance to impaired persons which would assist them in surmounting the physical hurdles they face. Even the simplest, most logical accommodations, such as placing all inmates with mobility impairments in first floor cells or assigning them to sedentary jobs, have not been effected. In this area, as in so many others, unit officials are apparently so severely inhibited by their own allegiance to uniformity and inflexibility that they are unable to deal humanely with persons in need of individualized, special consideration.

A number of inmates with severe mobility impairments are housed together in a ward at the Huntsville Unit Hospital. Most of them are not otherwise ill. However, as

155. One paralyzed inmate, whose wheelchair could not be used in his cell, was reduced to scooting along the floor, and then pulling himself up to the toilet. The same inmate fell several times, in attempting to balance himself while using the sink. Another paralyzed inmate described his own maneuvering:

I must place my hands on the lips of the commode in a manner of getting a grip on it and literally pulling myself over backwards from the bunk, scooting buttocks first onto it from the bunk.

&ast; &ast; &ast; &ast; &ast; &ast;

The Court: How do you get back from the commode to the bunk?
The Witness: I have to scoot as far over on the edge of the commode with my hip, usually my left hip, hung on the edge as much as possible, reach out and grab this metal brace supporting the bunk to the side of the wall, hold onto it and push off the commode and propel myself back onto the bunk scooting. Because the sink of this inmate's cell was inaccessible to him, he had to depend upon the whim of inmate building tenders for water. At one point, unit officials ordered inmates to stop bringing him water to bathe with.

An expert in counseling and rehabilitation of mobility–impaired persons confirmed these inmates' accounts of the types of maneuvers that would be necessary to get around in a typical TDC cell. She further stated that such maneuvers were dangerous, not only because of the possibility of falling, but also because any bruises on parts of the body upon which paraplegic inmates sit or lie can lead to the development of bedsores.

156. One paralyzed inmate was showered, with the assistance of other inmates, by being placed on a stool and shoved under the spray of water. Another such inmate was scalded, because he could not reach the controls in the shower.

157. In its 1974 report, the Texas Legislature's Joint Committee on Prison Reform noted that a paraplegic inmate had been turned down for parole because he did not participate in work and recreational activities. The inmate had been denied access to these programs because of his handicaps, but TDC failed to inform the Parole Board that he was a paraplegic.

a result of their status as hospital patients, these inmates are denied some of the privileges afforded to general population inmates; for example, they may not purchase tobacco, coffee, or any type of food at the commissary, since dietary and medical concerns cause such items to be forbidden to other hospital patients. In addition, mobility–impaired inmates are denied access to movies, educational programs,[158] outdoor recreational facilities, and dining rooms. The major activity of inmates confined to this ward is watching television, punctuated with brief interludes of physical therapy.

A physical therapy program is provided for some of HUH's inmates, but its goal of enabling mobility–impaired persons to function as normally as possible often goes unrealized; inmates who have received physical therapy are unable to use their newly developed skills and knowledge, because of the physical barriers that prevail at the units. As recognized by Dr. Gray, TDC's Medical Director, this problem thwarts most

of the benefits of therapy and is a source of frustration to therapist and patient alike.[159]

TDC has no systematic or effective method of teaching or helping mobility–impaired inmates (particularly those who are paralyzed, sedentary or bedridden) to take care of themselves.[160] A paraplegic inmate who lived in the HUH ward, described above, testified that he never observed or received any training in such matters at TDC. He recounted several horrifying examples of the plight of paralyzed inmates, who suffer from extremely serious decubitus ulcers, or bedsores.[161] As has been made reference to in the medical care section, these can be easily prevented through a program of cleanliness, frequent turning, and knowledge of how to prevent bruises to paralyzed portions of the body. At the HUH ward, no regular program of assistance for bedridden patients exists; some inmates have been left to lie in their own wastes for long periods of time, a situation which enhances

158. A paraplegic inmate confined in the HUH hospital ward sought permission to participate in educational programs offered at the Huntsville Unit. Defendant Estelle concluded that it was physically impossible for him to do so, because classes were offered on the third floor of an adjacent building. The inmate testified that other prisoners had volunteered to assist in transporting him to the classroom, but officials would not allow him to receive that kind of assistance.

159. In discussing the physical therapy program at the Huntsville Unit Hospital, Dr. Gray described its limitations:

The problem we have with this program is that when they're discharged from the hospital with their braces, their crutches, et cetera, into the Huntsville Unit, . . . it has very little level area where you can walk on crutches and braces to your cell and away from it. Practically every cellblock we have has a series of steps that you have to go up and down to get to your cell, and it makes it very difficult . . . . [O]ther units have some problems, but ours is the worst problem . . . . The end result of this, our program falls apart. We can get a man up and ambulating. We can get him out, and as soon as the Building Department finds him there and sees that he can't get to eat, and he can't get to work, they sneak him in and get him admitted to the hospital two or three nights later, and the whole program is shot . . . . It's real frustration for him [the physical

therapist] to work a couple or three months and us spend seven or eight hundred dollars on braces and what not, and then have the whole thing fall apart, and the inmate will be totally frustrated, because he wanted to get a job.

This account not only demonstrates the futility of the existing physical therapy program, but also makes it clear that security personnel can and do interfere with the rehabilitation of inmates, and that Dr. Gray is apparently powerless to prevent it.

160. According to an expert in the field of rehabilitation, elements of a rehabilitation program which should be provided to paralyzed patients at the TCD hospital ward, so as to assure them some measure of independence, need to include instruction regarding skin care, bowel and bladder management, dietary guidelines, mobility requirements, and safety precautions.

161. One such inmate had a small bedsore the size of a dime upon his admission to TDC in August of 1973. It became progressively worse because of lack of treatment, reaching a size of *several inches wide and several inches deep*, before it was finally alleviated by surgery in 1977. Most of the paralyzed inmates at HUH have had bedsores. One had three or four, which were two to four inches in diameter. Another had sores so deep that they penetrated to the bone, with a yellowish green substance oozing from them.

the development of bedsores. Even inmates capable of self care experience difficulties in maintaining cleanliness on HUH's special ward: shower facilities used by HUH's physically handicapped patients lack safety bars; the faucets in these locations cannot be reached from a sitting position. Moreover, a four-inch high curb around the shower impedes the use of wheelchairs.

The limbs of inmates which are permanently paralyzed or temporarily immobile, and which cannot be exercised by the patient, must be frequently manipulated by a therapist to avoid painful shrinkage, cramping of unused muscles, and eventual loss of muscle function. However, regular therapy of this nature is unavailable to inmates housed on the various units. While HUH employs a physical therapist, he is unable to provide such care to all of the thirty or forty mobility–impaired inmates assigned to the hospital.

The total picture of physically handicapped inmates in TDC is one marked by the extreme indifference and inflexibility of prison officials. TDC's treatment of a particular paraplegic inmate stands out as an example of the inhumanity that is often manifested in these situations. The inmate's paralysis had been diagnosed as psychological rather than physiological in origin. TDC medical and security personnel, convinced that the inmate was deliberately faking paralysis, decided to "treat" him by denying him the use of a wheelchair and requiring him to move throughout the unit without assistance. The inmate was reduced to scooting about the unit on his buttocks, propelling himself with his hands. Other inmates were not permitted to bring him water for bathing to his cell. On more than one occasion, this inmate literally spent hours moving in his awkward and unsafe fashion from one part of the unit to another. He was accompanied by security officers, who would not assist him or permit other inmates to do so.[162]

Dr. Frank Rundle, a psychiatrist who testified as rebuttal witness for the plaintiff–intervenor, characterized the treatment of this inmate as "the most outrageous treatment that I have ever encountered even in prison systems. . . ." He testified to the psychiatric help that should have been given to this inmate:

> Whether a paralysis is caused by a psychological mechanism or by an organic one, treatment is required, and this is a treatable condition. Psychotherapy with someone with this condition has a good chance of success and, as far as I could tell, it was never offered to him.

In response to defense counsel's suggestion that this inmate had no mental disease or defect, but rather was "faking pure and simple", Dr. Rundle stated that he could not conceive of a psychiatrist concluding there was nothing wrong with the inmate; that "under any circumstances the way he was treated is not defensible, even if he were lying and faking straight out." The doctor added the observation that:

> Anyone who could go so far in such a self–destructive endeavor as to develop a permanent physical disability, which would occur through the disuse of his limbs, I just think it indicated there is something wrong.

In May of 1978, thirteen months after the onset of his paralysis, the inmate in question finally was allowed to begin a program of physical therapy. The record contains no indication that he has received any psychotherapy.

---

**162.** On one occasion, a trip from one part of the Huntsville Unit to another took him an hour and forty–five minutes. The inmate was required to pull two bags of his personal property along with him, and travelled over a rough asphalt surface. The several officers who accompanied him told other inmates who offered to help him that they would be charged with a disciplinary offense, if they touched him or his property. When this inmate was transferred from the Huntsville Unit to the Retrieve Unit, his journey from his cell to the place where he could catch the "chain" bus took three and one–half hours. The journey began at two o'clock in the morning, and was accomplished by the inmate's scooting on his buttocks the entire distance, with the exception of one place. There, an officer "assisted" him by wetting an outside ramp with water, so he could slide down it. It should be added that weather conditions were extremely cold on this occasion.

### 3. Mentally Retarded Inmates

Approximately ten to fifteen percent of TDC inmates are mentally retarded.[163] These inmates, many of whom have extremely low intelligence levels, are present in every TDC unit. Because of their mental handicaps, these individuals encounter great difficulties in adjusting to prison life, for TDC offers no programs to assist them with the day–to–day problems they must grapple with in their attempts to function in the general inmate population.

Mentally retarded persons meet with unremitting hardships in prison. They are slow to adjust to prison life and its requirements, principally because they have almost insurmountable difficulties in comprehending what is expected of them. Not understanding or remembering disciplinary rules, they tend to commit a large number of disciplinary infractions. Because they are often not as well coordinated as persons of average intelligence, they also frequently fail to meet work performance quotas and are, therefore, subjected to disciplinary actions for laziness or refusal to work.

Although a large number of inmates with low intelligence quotients appear before TDC disciplinary committees, they are almost never provided with a counsel substitute to assist them in the proceedings. Mentally retarded individuals are highly unlikely to possess the abilities to represent themselves adequately. Thus, when they face a disciplinary committee, they have an inherent inclination to plead guilty, in order to avoid the anxiety which such confrontations cause them. A disproportionate number of inmates in TDC with low intelligence quotients have been repeatedly sentenced to solitary confinement.[164]

Mentally retarded prisoners are markedly and abnormally prone to receive more injuries than the average inmate. Some of their injuries occur on the job; others are suffered at the hands of other inmates or security officers. Additionally, inmates with low intelligence levels are prime targets for exploitation. Consequently, they are peculiarly in need of special protection from physical, emotional, sexual, and financial abuse at the hands of others.

It is common for mentally retarded inmates in TDC to serve longer sentences than inmates not fitting this category. Several reasons are evident. As previously noted, retarded inmates are more likely to have poor disciplinary records than their peers, which disqualify the former for early parole. They are frequently unable to succeed in institutional programs whose completion would increase their chances for parole, and they are also unlikely to be able to present well–defined employment and residential plans to the Parole Board.

Notwithstanding that low intelligence inmates could be easily identified from the beginning of their TDC confinements, by the use of the IQ scores obtained during the diagnostic process, TDC has made no effort to distinguish them in this manner. Furthermore, programs have not been formulated nor policies instituted to address the special difficulties suffered by mentally retarded inmates. Special education programs offered by the Windham School District serve only a fraction of the inmates in need of them.[165] Moreover, special educa-

163. Defendants' records contain various estimates of the number of mentally retarded inmates in the TDC system. Windham School District has estimated that ten to fifteen percent of the population is mentally retarded, which would suggest a total of 2600 to 3900 mentally retarded prisoners. This estimate appears to be relatively accurate. Analysis of IQ scores revealed 1,609 inmates with scores of seventy or below, and an additional 2,157 inmates with scores of between 71 and 89.

164. An exhibit prepared by the plaintiff–intervenor from TDC computer information demonstrates that a positive correlation exists between mental disability and the incidence of solitary confinement. Inmates with low IQ's had proportionately more confinement than inmates with average IQ's. The lower the individual inmate's IQ, the more likely he was to have suffered repeated solitary confinements.

165. Windham School District identified 467 inmates between the ages of eighteen and twenty–one (the age group required to be served by special education classes) who were classified as educable or trainable mentally retarded persons. Of that population, only 268 were actually served in the 1977–1978 school year. Thus, almost one–half of the school aged inmates in

tion programs are only one component of special services needed by mentally retarded inmates, for the reason that these programs cannot address all of their habilitation needs.

Several TDC officials agreed that prison is not an appropriate setting for mentally retarded persons. Regardless of this consensus, TDC has taken no steps to obtain alternative care for such inmates. Rather, they are simply lost in the system, where their usual lot is abuse, exploitation, and frequent punishment. The consequences for a mentally retarded offender who is not provided appropriate services were described by Miles Santamour, an expert in the field of mental retardation:

> Well, he'll continue to be victimized, I think, in a correctional system. He'll continue to spend longer periods of time in the correctional system than the average person. His chances of recidivating are more. He'll deteriorate. He'll continue to feel unworthy. He'll continue to fail in placement in jobs, and he'll stumble around once he gets out of prison and probably get into trouble or get himself into situations that are not in his best interest.

### B.

■ Prison officials have a constitutional duty to provide the inmates under their management with "reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment." *Newman v. Alabama*, 559 F.2d 283,

291 (5th Cir. 1977). Inmates saddled with special needs–physical disabilities or mental handicaps–are owed the same duty in these respects as healthy prisoners. The fact that unusual accommodations may be necessary, in light of their special needs, to accomplish the provision of minimal conditions of incarceration does not absolve prison officials of their duty toward handicapped inmates. Those whose needs are more specialized or complex than average inmates may not be denied their eighth amendment rights to adequate living conditions, protections from physical harm, and medical treatment by being forced to fit into a mold constructed for persons of average intelligence and physical mobility.

■ The eighth amendment reflects "the evolving standards of decency that mark the progress of a mature society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958). Community standards, as reflected in a number of state and federal laws,[166] make it clear that the evolving standards of decency include special concern for the misfortunes of those who are physically and mentally handicapped.

Several courts have taken cognizance of the harms to mentally retarded persons which flow from their intellectual limitations, and have mandated that governmental entities be sensitive to their problems. *See Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala.1971), 334 F.Supp. 1341, 344 F.Supp. 373, 387 *aff'd sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974);

need of special education for mental retardation were not included in the classes. Furthermore, there has been a decrease from earlier years in the number of mentally retarded persons included in these programs. There are no programs for the estimated 2,100 to 3,300 mentally retarded inmates who are not of school age.

166. *See, e. g.*, The Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, the Education for the Handicapped Act, 20 U.S.C. 1401 *et seq.*, Architectural Barriers Act of 1968, as amended, 42 U.S.C. § 4151; Texas Architectural Barriers Act, Tex.Rev.Civ.Stat.Ann. art. 601b, § 7.01 *et seq.*; Texas Mentally Retarded Persons Act, Tex.Rev.Civ.Stat.Ann. art. 5547–300 (Ver-

non's). The plaintiff–intervenor's evidence on the issue of special needs inmates included reference to numerous federal and state laws which were not specifically mentioned in its amended complaint. However, the court made clear before this evidence was presented that it was being considered only in relation to the general constitutional claims advanced by the parties. (Order of June 5, 1979.) It is not at all uncommon for courts to look to statutes and regulations in assessing the existence and gravity of alleged eighth amendment violations. *See Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977), and *Alberti v. Sheriff of Harris County*, 406 F.Supp. 649 (S.D.Texas 1975).

*Halderman and the United States v. Pennhurst*, 446 F.Supp. 1295 (E.D.Pa.1977), *aff'd as modified*, 612 F.2d 84 (3rd Cir. 1979), *cert. granted* —— U.S. ——, 100 S.Ct. 3046, 65 L.Ed.2d 1135 (1980); *Davis v. Watkins*, 384 F.Supp. 1196 (N.D.Ohio 1974).

 The evidence shows that TDC has failed to meet its constitutional obligation to provide minimally adequate conditions of incarceration for mentally retarded inmates. Their special habilitation needs are practically unrecognized by TDC officials, and they are subjected to a living environment which they cannot understand and in which they cannot succeed. Moreover, prison officials have done little to protect these mentally handicapped inmates from the type of abuse and physical harm which they suffer at the hands of other prisoners. Their conduct is judged by the same standards applicable to prisoners of average mental ability, and they are frequently punished for actions, the import of which they do not comprehend. Furthermore, mentally retarded prisoners facing disciplinary charges are rarely provided the assistance of counsel substitute, a right clearly contemplated by the due process clause. *Wolff v. McDonnell*, 418 U.S. 539, 570, 94 S.Ct. 2963, 2981, 41 L.Ed.2d 935 (1974) (see the section of this opinion relating to disciplinary violations).

A constitutional failure is also occasioned by TDC's treatment of the physically handicapped. Inmates with mobility impairments must attempt to function in a regular unit–where a multitude of architectural barriers make it extremely difficult and painful for them to move about, and where no special accommodations to their disabilities are made–or must spend their time isolated in segregation or in a hospital ward, thereby virtually denying them all opportunity for activity. TDC has no obligation to make prison life the same for physically handicapped inmates as it is for others. But the evidence made it plain that only minor accommodations on TDC's part would be necessary to enable physically handicapped inmates to function more easily and participate more fully in such ameni-

ties as TDC affords. TDC has not seen fit to make these accommodations, and mobility–impaired inmates are therefore forced to endure the equivalent of administrative segregation–or worse–simply because of their handicaps. The failure to make those minor adjustments needlessly subjects physically–handicapped prisoners to cruel and unusual punishment.

Furthermore, the right of physically handicapped inmates to minimal levels of medical care has been systematically ignored. Allowing bedridden or sedentary inmates with mobility impairments to develop bedsores–which could be minimized or prevented by proper hygiene and nursing–constitutes deliberate indifference to their serious medical needs. That same indifference is characterized by the failure to provide sufficient ongoing physical therapy to mobility–impaired inmates to prevent atrophy and muscular deterioration. *See generally, Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and the section of this opinion concerning medical care.

Thus, it will hereafter be ordered that defendants provide minimally adequate living conditions, protection, and medical treatment to all physically handicapped and mentally retarded inmates, in accordance with the general principles set forth in this section.

## V. DISCIPLINE

### Hearing Procedures

### A.

Basic disciplinary procedures are the same throughout the TDC system, although minor variations among the different units are present. Upon entering the prison system, each inmate is authorized to receive the TDC booklet entitled *Rules and Regulations and Grievance Procedures* (hereafter "Rulebook"). This booklet includes general institutional rules and a listing of eighteen disciplinary violations. In some instances, a brief description of behavior constituting the offense is set out. The Rulebook is largely legalistic in its tone and phraseology. For this reason, it is not readily understandable to most of the inmate population,

since the average TDC inmate reads at about a fifth grade level. Although a Spanish version of the Rulebook exists, it is not widely distributed; indeed, several unit officers had no idea such a document existed.

TDC also maintains computer–coded lists which set out and define sub–categories of the substantive offenses shown in the Rulebook. One hundred "solitary offenses" (presumably those for which an inmate may be sent to solitary confinement) and ninety–six other offenses are specified on these lists, which, in some respects, are easier to read and understand than the often vague and ambiguous provisions of the Rulebook. However, many of the violations listed among the sub–categories are not identified in the Rulebook, and some are not self–explanatory (e. g., "Running Head", "Listening"). While these lists are supplied to TDC officers for assistance in preparing charges against inmates, they are not furnished to inmates. The latter are thus faced with a body of law which, for all practical purposes, is secret to them. No formal means exist by which inmates are made cognizant of offenses which do not appear in the Rulebook; nevertheless, the Rulebook provides that ignorance of a rule will not excuse a violator from punishment.

Each unit enforces its own rules as well as TDC's rules. The unit rules are sometimes orally described to the inmates, at an orientation which is contemporaneous with their arrival at the unit. Copies of these rules are not, however, distributed to inmates; indeed, it appears that the rules do not exist in written form at most of the units.

The normal disciplinary process is invoked at TDC, when an officer observes or is informed of a rule violation and submits a written report concerning it. In the Rulebook, a specific rule provides that officers have the discretion to handle disciplinary violations without resorting to formal pro-

cedures, whereas a separate rule requires that every observed violation be reported. There are no guidelines to indicate which rule should control; but the evidence manifests that, in practice, officers often fail to make formal written reports of violations.[167]

An officer who decides to press formal charges against an inmate submits a handwritten report describing the circumstances of the offense to his superior officers. After being reviewed and edited by supervisors, the report is typed by an inmate "bookkeeper" onto the upper portion of what is called an "offense report." Omission of facts helpful to the charged inmate, and changes in the officer's account to make the offense appear more serious than originally reported, have occasionally occurred during this process.

When a charge is thus lodged against an inmate, an instrument designated as a "violation notice" is prepared, and a copy of it is given to the charged inmate. The name and TDC number of the charged inmate, the time of the alleged offense, the name of the charging officer, and the title and code number of the offense are included in the violation notice, but allegations regarding the facts constituting the offense are ordinarily not specified. An inmate must face the subsequently–convened disciplinary committee with only this skimpy and inadequate information concerning the charges against himself, for he is deprived of any other accusatory data until the time of the hearing.

When an inmate is served with a copy of the violation notice, he is solicited to sign it, apparently for the purpose of evidencing its receipt by him. At the same time, an officer may also ask a charged inmate to sign a form waiving the latter's right to a twenty–four hour notice before hearing. When the waiver form is signed by an inmate, a disciplinary hearing may begin forthwith. If he refuses to sign either the violation

---

**167.** This discretion enables officers to protect inmate enforcers and to punish inmates viewed as malcontents, such as writ writers. Thus, a vicious assault by a building tender may go unreported, while a "disrespectful attitude" on the part of a writ writer may well result in his conviction and severe punishment.

notice or the waiver form, an additional officer is called to witness the refusal. The evidence indicated that, when an inmate is presented with a waiver form, he is not informed that he is being asked to waive a constitutional right. It is notable that the Rulebook makes no mention of a waiver of the waiting period.

In the interval between the filing of charges and the hearing, a disciplinary committee member is charged with the duty of conducting an investigation of the charges. It is fair to say that, except in rare instances, no pre–hearing investigation actually occurs. Those investigations which, in fact, do transpire consist merely of a discussion of the incident between the charging officer and the investigating officer. The charged inmate is never questioned, nor are possible witnesses sought for him. A more complete investigation may be conducted, however, if the incident is serious enough to require the filing of an "incident report", which is an inter–office communication from a supervising officer to the Director. The fruits of these investigations are not necessarily available for use at disciplinary hearings.

Pending a disciplinary hearing, an inmate–even one charged with a minor, non–violent offense–is nearly always held in "administrative segregation". By reason of this confinement, the accused inmate is effectively deprived of the opportunity to seek counsel substitute, to obtain documentary evidence, and to discuss his case with any persons whom he may wish to call as witnesses.

Disciplinary hearings may be held at any time, varying from immediately after an offense occurs (if the twenty–four hour notice is waived) to several months after the alleged offense. In general, hearings are held within a week of the alleged commission of the offense. The tribunal which hears the charges, a disciplinary committee, consists of three persons. Any ranking security officer may sit on such a committee, which is usually chaired by a Building Major or an Assistant Warden. TDC policy prohibits wardens from sitting. Although some effort is made to obtain non–security employees for service on disciplinary committees, the Rules do not make this essential.

At the inception of a hearing before a disciplinary committee, its members are required to make the determination of whether the accused inmate is in need of a counsel substitute to prepare and present the inmate's defenses to the charges. TDC witnesses were able to recall only two incidents when, in fact, a representative was appointed, even though Department statistics show numerous disciplinary hearings-and resultant solitary confinements–which involved illiterates, inmates with limited ability to speak English, mentally disturbed inmates, and those with very low intelligence quotients.

The Rulebook gives an inmate the right, in most circumstances, to have witnesses called for him at the hearing.[168] A list of the accused inmate's requested witnesses is given to a TDC officer, who determines whether they should be called. TDC staff members could remember very few instances when witnesses were actually called. Under no circumstances is the charged inmate allowed to be present when the witnesses testify, nor can he submit questions

---

168. Rule 4.2.3.3.b:

*Evidence and Witnesses*

(1) The inmate normally shall have the right to call witnesses and present documentary evidence in his defense. The Committee shall determine if the inmate desires to present such evidence and/or witnesses and this determination shall be noted in writing and made a part of the hearing record.
(2) The Committee may require the inmate to disclose the expected nature of any testimony to be given by his witnesses and the Committee may, in its discretion, impose rea-sonable limits on the number of witnesses so as to avoid repetitious testimony.
(3) The Committee, in its discretion, may disallow the inmate to call witnesses and present documentary evidence in his defense where permitting him to do so will be unduly hazardous to institutional safety or correctional goals.
In the event that the Committee shall disallow presentation of documentary evidence or the calling of witnesses by the inmate, their reasons for so doing shall be reduced to writing and made a part of the hearing record.

to them in writing, notwithstanding that the rules explicitly provide for confrontation and cross–examination of witnesses in at least some circumstances.[169]

At a disciplinary hearing, the charging officer's report (as set out in the offense report) is usually read to the inmate. This being done, the inmate is asked to enter his plea, either guilty or not guilty, and to sign the offense report. Although there is a space on the offense report form for the inmate's version of the incident, it is not common to ask the inmate to write in it. An inmate is, however, customarily allowed to explain the incident orally, if he so desires. In some instances, the disciplinary committee will insert the inmate's narration, but more often than not, this part of the form is left blank. The charging officer is usually not called as a witness at the hearing, with the consequence that neither the committee nor the inmate has an opportunity to interrogate him regarding his account of the incident. Occasionally, the charging officer himself sits on the disciplinary committee–in violation of express TDC policy–and participates in the resolution of the inmate's guilt or innocence, and also in the punishment phase of the hearing.[170]

After the disciplinary committee hears the inmate's account of the incident, he is led from the hearing room. Thereupon, the committee briefly confers, then recalls the inmate into the hearing room and announces its decision as to his guilt or innocence, as well as the punishment imposed against him, if any.[171] A notation of the committee's action is made on the offense report, by checking boxes labelled "guilty" or "not guilty" and by inserting any punishment inflicted. If the inmate is found guilty, the only rationale for the committee's decision is a statement in the offense report, sometimes added, that the inmate was found guilty on the basis of the charging officer's report.

A sentence may range from a reprimand, as a minimum, to a cumulative maximum of solitary confinement, loss of accumulated good time, and a recommendation for a change in good time earning status. If a penalty includes a recommendation for loss of good time or change in good time earning status, a "state disciplinary report" must be filed. These reports are somewhat more formal than the unit offense reports, but they contain essentially the same information. State disciplinary reports are reviewed by the State Disciplinary Committee, which is comprised of a single member of the State Classification Committee. This official testified that he usually reviews each state disciplinary report in less than a minute. Approval of the findings as to the guilt or innocence of the inmate and the sentence imposed is virtually automatic, since the brevity of the reports makes it impossible to determine the sufficiency of the evidence and whether proper procedures were followed. In consequence, no significant review of the quality of the justice administered at unit disciplinary proceedings actually occurs.

The Rulebook contains a detailed description of the rights of inmates charged with

---

**169.** Rule 4.2.3.3.c(3):

(c) In exercising its discretion with regard to the cross examination of witnesses, the Committee shall consider whether permitting confrontation or cross examination would be likely to endanger or disrupt the rehabilitative nature of the disciplinary process or the safety of the institution or of any person therein. The Committee shall endeavor to extend these privileges wherever possible and, if the right of confrontation and cross examination is requested by the inmate and denied by the Committee, the Committee shall enter such denial in the record of the hearing with a written statement of the reasons for the denial.

**170.** More frequently, officers who have played significant roles in having inmates charged with offenses (e. g., have instructed another officer to file the charges) will sit on the disciplinary committees which try the offenses. Such practices undercut any semblance of impartiality.

**171.** Hearings involving alleged abuse of the named plaintiffs, conducted in 1975, resulted in a finding that a unit disciplinary committee conducted more than fifty "hearings" in thirty minutes. The first sixteen of the accused inmates were summarily consigned to solitary confinement.

disciplinary offenses and the procedures which are to be followed at disciplinary hearings. These rules, enacted in 1974 after the Supreme Court's decision in *Wolff v. McDonnell*, appear to comport with the requirements enunciated in that opinion. However, it is conspicuously manifest from the record that these procedures are not, and never have been, routinely followed at any of the TDC units. Many TDC officers who testified with reference to disciplinary hearing procedures obviously had no notion that their habitual practices violated state regulations. When TDC's training course on disciplinary due process is examined, this lack of knowledge is more understandable. A film strip, designed to inform officers of the requirements of the *Wolff* decision, consists almost entirely of direct quotations from the Court's opinion in that case. No interpretative commentary or discussion of the practical impact of these requirements is given, nor is there any relation back to the procedures as they actually exist at TDC.

In 1975, this court issued a preliminary injunction, based on specific findings that TDC violated the *Wolff* procedures in numerous ways with respect to the named plaintiffs in this civil action. Although it was ordered that the violations were to cease forthwith, the evidence at trial made it plainly apparent that the order had little impact upon TDC. The testimony of virtually all TDC officers, including high ranking officials, conclusively showed that the requirements of *Wolff* are either misunderstood or totally ignored, and that the state's own written regulations and procedures are cynically disregarded.

### B.

#### 1. *The Wolff Requirements*

The Supreme Court, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), held that inmates are entitled to certain due process rights at prison disciplinary proceedings, provided loss of good time or other serious sanctions may result from a finding of guilty. The Court's concern for "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application", *id.*, 418 U.S. at 556, 94 S.Ct. at 2974, led it to conclude that the full panoply of rights due to defendants in criminal cases do not apply to inmates at disciplinary hearings. However, the Court found that inmates possess a substantive liberty interest in good time, thus entitling them to minimum procedures to insure that state–created rights in relation to it are not arbitrarily abrogated. In this regard, the Court specifically mandated that inmates faced with serious disciplinary charges be given at least twenty–four hours advance written notice of the claimed violation, and also a written statement by the factfinders which sets forth the evidence relied upon, and the reasons for any disciplinary action taken by them.

The Court in *Wolff* also ruled that "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.*, 418 U.S. at 566, 94 S.Ct. at 2979. Although it did not rigidly prescribe that a disciplinary committee set out its reasons for refusing to call a witness, the Court stated that this course of action would be "useful". *Id.* Decisions as to whether to permit cross–examination and confrontation of witnesses were left to official discretion. Finally, the Court indicated that some form of substitute counsel should be available to assist illiterate inmates "or [in situations] where the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case . . . ." *Id.*, 418 U.S. at 570, 94 S.Ct. at 2981.

 It is the punishment at stake, not the penalty actually inflicted, which determines the content of due process. The defendants thus misunderstand the reach of due process, when they argue that generally little process is due TDC inmates, inasmuch as most hearings result in minor punishments. Under TDC rules, *any* discipli-

nary violation may be cumulatively punishable by solitary confinement, demotion in time–earning status, and loss of good time. The *Wolff* requirements–the *minimum* procedural protections that prisoners must be afforded when solitary confinement or loss of good time or other serious punishments are at stake–are thus applicable to all TDC disciplinary hearings. *Id.*, 418 U.S. at 558, 94 S.Ct. at 2975.

In the course of the opinion in *Wolff,* full and reasoned explanations of the interests and concerns underlying the required procedures are set out, in a context displaying extreme sensitivity and deference to the security and rehabilitative concerns of prison administrators. A close examination of the evidence presented in the instant case reveals that many TDC practices unquestionably violate both the letter and spirit of *Wolff.*

#### a. Notice

TDC officials effectively eviscerate the substance of *Wolff's* requirement that inmates be given written notice of the charges against them at least twenty–four hours prior to their disciplinary hearings. In that decision, the Court specifically recognized the function of notice: "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact." *Id.*, 418 U.S. at 564, 94 S.Ct. at 2978. However, the notice provided to TDC inmates facing disciplinary actions does not fulfill either of these functions.

 The only written notice of charges commonly received by a TDC inmate, a violation notice, includes none of the facts necessary to inform him of the specific acts alleged to have violated the rules, *i. e.,* what occurred, where it occurred, and who was involved. In some circumstances, an inmate may know which event has sparked a

misconduct report, but his interpretation of the occurrence may differ markedly from that of the charging officer. In order to prepare his defense to the charge against him, it is thus practically and prudentially expedient that an inmate be furnished with notice of the officer's description of the circumstances in issue, as contained in the offense report.

Notice of specific allegations is even more crucial where vague, overbroad, or attitudinal charges are involved, considering that TDC inmates are frequently accused of offenses such as "General Agitation" or "Disrespectful Attitude". The mere listing of such a charge gives no significant notice of the conduct in question. The officer's "detailed" account of an attitudinal offense in a violation notice mentions no specific act of the accused inmate upon which the charge is based. When the notice given to an inmate is so abbreviated, he is effectively denied a just hearing; he obviously cannot adequately refute or defend against an account of events not disclosed to him. In attempting to prepare his defense on the basis of the stingily inadequate information provided by the violation notice, an inmate can only speculate relative to the details of the charge, and his opportunity to gather evidence in refutation of the officer's account is effectually foreclosed.[172] No logical reason was advanced for denying copies of the offense report to inmates in advance of their hearings. If copies were made available to charged inmates, they would then possess the same basic information and sources of possible investigation that are available to the disciplinary committee.

Another major drawback which diminishes the effect of notice is the fact that an inmate charged with a disciplinary offense is ordinarily held in administrative segrega-

---

**172.** The inadequacy of the violation notices is also in contravention of Rule 4.2.3.1, which states in part:

> *Notice.* The inmate shall be given written notice of the charges at least 24 hours in advance of the hearing. Such notice of charges shall state briefly:

> a. The factual nature or basis of the charge or charges in sufficient detail to inform the inmate of the particular misconduct of which he is accused.

tion pending his hearing.[173] So confined, he has no opportunity to question potential witnesses or to gather other evidence in preparation for his disciplinary hearing. Since notice holds little meaning if the right to investigate and prepare is thwarted, such confinement effectively nullifies an inmate's due process rights.

Given the due process infirmity, and taking into account the punitive character of administrative segregation, this type of confinement should be deemed appropriate only where it is necessary to safeguard institutional security. Manifestly, administrative segregation should not routinely be imposed upon inmates facing a disciplinary hearing, in the absence of facts warranting a decision that such a threat to security exists. Even when facts portending danger to security are established, inmates who are thereupon administratively segregated must have some realistic alternative opportunity to exercise their due process rights when preparing for their disciplinary hearings.

An additional potential intrusion on the *Wolff* requirements is occasioned by the frequent use of forms, which, if signed, waive the inmate's rights to a twenty–four hour waiting period between notice of charges and hearing. In particular, undue coercion of an inmate is implicit in the TDC policy that a second officer must witness the inmate's refusal to sign a waiver form, for the presence of two officers may well imply to an inmate that his assertion of the right will likely lead to unpleasant consequences. Furthermore, in the course of their regular activities, prison inmates often sign forms which signify receipt of various items. Thus, because the frequent signing of forms is unremarkable, an inmate may imprudently waive his right to twenty–four hour notice--which he might otherwise regard as valuable--unless the form's full meaning is cogently brought to his attention. It appears that the import of the waiver is not made clear to TDC inmates

facing disciplinary charges. The troubling procedure presently employed makes abuse of the inmates' rights probable.

It is conceivable, of course, that in an individual case, an inmate would be eager to dispose of his hearing at once, so as to be able to complete his punishment sooner. Although knowing and intelligent waivers should not be discouraged, the record in this cause shows that the waivers obtained by TDC seldom fit this characterization. The loose, casual, and potentially coercive process described by the witnesses falls far short of the formalities which should accompany waiver of a constitutional right.

Plaintiffs have further argued that TDC rules fail to provide adequate notice to inmates, in that they are not apprised of the conduct that is prohibited. General principles of due process require that inmates not be punished for forbidden actions of which they had no prior notice. *Gates v. Collier*, 349 F.Supp. 881, 895 (N.D.Miss. 1972), aff'd 501 F.2d 1291 (5th Cir. 1974). There are no "institutional needs and objectives", *Wolff v. McDonnell*, 418 U.S. at 556, 94 S.Ct. at 2974, which would preclude the recognition of this right in the prison disciplinary setting. Although TDC has a set of written rules, insufficient efforts have been made to insure that inmates are aware of and understand these rules. There are no means by which illiterate or intellectually handicapped inmates, or those who cannot read English, are informed of the rules. The Rulebook, as noted previously, is written as though for college–level readers, and it is inevitable that even reasonably literate inmates will experience difficulty in understanding it. Generally, then, TDC lacks any systematic method for insuring that all of its inmates have notice of the operative disciplinary rules.

#### b. Statement of reasons

*Wolff* requires that inmates receive a written statement of a disciplinary committee's decision, which must set out a summa-

---

**173.** The decision to place an inmate in administrative segregation may be made by any two correctional officers.

ry of the evidence relied upon, and explicate the rationale for both the finding of guilt and the punishment pronounced. TDC's written rules have a similar provision.[174] Nevertheless, it is evident from the record that the disciplinary committee statements furnished to inmates by TDC do not meet these minimum constitutional requirements.

The only record of the disciplinary hearing ever given to inmates is a copy of the offense report, which generally records only the finding of guilt and the punishment imposed, and includes no statement explaining the foundation or rationale of the decision. At most, it is noted that the inmate was found guilty on the basis of the officer's report. Although such a statement does, in the barest possible terms, tell what evidence was relied upon, it contains no explicit reasons for the decision, nor is there an expression of why an officer's story was found credible or whether other versions were even considered. Also, no explanation is given for the particular form of punishment imposed.

In *Wolff*, the Supreme Court took note of the purposes to be served by written explanations of a disciplinary committee's actions. First, a record of proceedings is preserved, which may be useful to other bodies reviewing either the results of the hearing or the individual inmate's disciplinary record. In this connection, it is to be noted that a TDC inmate may appeal an adverse decision of the disciplinary committee to prison officials, by means of the TDC grievance procedure.[175] Additionally, the State Disciplinary Committee must approve all punishments involving loss of good time or change in status. Records are also reviewed by the unit warden, to determine whether to recommend that the State Classification Committee restore previously forfeited good time or approve a change to a higher good time earning status. Finally, written records of the proceedings are relied upon by the Classification Committee in making job and program assignments and by the Parole Board in making decisions respecting parole. With the totally uninformative post–hearing statements currently issued at TDC, these reviewing bodies cannot effectively fulfill their functions, for their members can only theorize with regard to the reasons for the disciplinary committee's action.

A second purpose of written records recognized in *Wolff* is "to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, . . . will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Id.*, 418 U.S. at 565, 94 S.Ct. at 2979. The present system of maintaining disciplinary records at TDC does not serve to prevent administrators from acting unjustly, for the records are so abbreviated that individuals or bodies which scrutinize them are unable to discern improper procedures or abuses of discretion. Inmates attempting to set the record straight suffer from many of the same disadvantages that would occur without a written record, because neither procedural irregularities nor the reasons for the particular decision are revealed.

### c. Witnesses

The *Wolff* Court held that inmates facing disciplinary proceedings must be allowed to call witnesses and present documentary evidence, when permitting them to do so will not be unduly hazardous to institutional

---

**174.** Rule 4.2.4:

*Findings and Disposition*

The Committee, after due deliberation, will make its findings and actions known to the inmate, including any recommended loss of overtime.

Subsequent to making its determination, the Committee shall prepare written findings of fact and reasons why punishment, if any, was imposed. Such findings shall include a written statement of the evidence relied upon by the Committee to reach their decision and a copy of these findings will be furnished to the inmate.

**175.** TDC's grievance procedure permits inmates to submit written complaints, including appeals from disciplinary decisions to prison officials, on a specified form. The officials have total discretion in dealing with such complaints.

safety or correctional goals. The Court noted that the right to present evidence is ordinarily basic to a fair hearing, but that in a prison setting, the possibility of reprisals against witnesses may necessitate curbs upon this right. The Court suggested, but did not require, that a disciplinary committee state its reasons if it refuses to allow a witness to be called. However, TDC has incorporated a requirement in its rules that such a statement be given and that it be made a part of the record.[176]

Although TDC rules provide for calling witnesses at disciplinary hearings,[177] it is very uncommon, in practice, for witnesses actually to appear. The record reveals that in those instances where witnesses have been requested by accused inmates, they are not often permitted to attend, for reasons which do not have any apparent relation to legitimate institutional concerns. Moreover, the rationale for denying the presence of a particular witness or group of witnesses is not documented in the record, as required by TDC rules.[178]

In the operations of a disciplinary committee, one of its members decides whether witnesses requested by the charged inmate should be called at the dispositive hearing. The only guidelines for making such determinations consist of the general language in the Rulebook, to the effect that "reasonable limits" may be imposed to "avoid repetitious testimony" and that witnesses may be disallowed when their presence "will be un-

duly hazardous to institutional safety or correctional goals." Basically, these officers make decisions on highly individual and *ad hoc* bases, often denying witnesses to an accused inmate for no legitimate reason.[179]

Several TDC officers gave evidence that they both choose and limit the number of persons who may testify at disciplinary hearings. Requests by inmates to have persons such as the Warden or Director as witnesses are automatically denied, even though it is possible, in some cases, that these officials may have relevant and material testimony to offer. Such practices unnecessarily abridge the inmates' rights to select the witnesses they wish. If the numbers must be limited, the inmate, not the officer, should be permitted to decide the identity of those chosen, in most instances.

The charged inmate is *never* permitted to be present during the questioning of witnesses by the disciplinary committee. This invariable practice, which violates TDC rules,[180] hampers the witnesses' abilities to provide helpful information, for there is no assurance that the committee will make the pertinent inquiries from the accused inmate's standpoint. Furthermore, unless a witness has had discussions with a charged inmate—which is unlikely, given the latter's opportunities for preparation—the witness may not even know what facts are in issue. It is common for witnesses testifying under these conditions to provide no information of value to the committee or only informa-

---

176. See Rule 4.2.3.3.b(3), quoted in fn. 168.

177. See Rule 4.2.3.3.b, quoted in fn. 168.

178. See fn. 168.

179. Certain TDC officers testified about their *ad hoc* policies regarding the convocation of witnesses. One officer stated, in effect, that any person who was not present during the alleged commission of a disciplinary offense would be precluded from testifying, even if the potential witness has information relating to the reasons for an inmate's action. By this criterion, information as to the inmate's motive or intent is irrelevant. Such a policy, of necessity, arbitrarily usurps the disciplinary committee's opportunity to consider all relevant circumstances in determining an inmate's guilt *vel non*, and likewise in assessing his punishment.

Many inmate "infractions", such as refusal to work or to change cells when ordered, may be attempts by inmates to draw attention to the fact that they have been given conflicting orders; *e. g.*, a doctor has ordered a medical lay-in, but the hall guard has ordered the inmate to work. In such a situation, to forbid the doctor to be called as a witness at a disciplinary hearing, simply because he was not present when the inmate refused to work, is both absurd and a mockery of any notion of fair hearing and rational punishment.

180. The TDC Rules obviously contemplate the charged inmate's presence during the questioning of witnesses, except in unusual circumstances. See Rule 4.2.3.3. quoted at n. 169.

tion that is detrimental to the charged inmate.[181] These unreasonable practices severely limit the effectiveness of an accused inmate's right to call witnesses.

From the standpoint of institutional security, valid reasons may be extant for not permitting an inmate's confrontation and cross–examination of witnesses at his disciplinary hearing or for excluding specific witnesses therefrom. However, TDC rules require the documentation of the reasons, when an inmate is denied these opportunities.[182] The record unambiguously establishes that TDC fails to prepare the necessary documentation in, by far, the greatest number of the disciplinary hearings.

#### d. Counsel substitute

The *Wolff* requirement that a counsel substitute be provided for inmates unable to represent themselves at disciplinary hearings has been effectively ignored by TDC, since it is plain that TDC disciplinary committees routinely disregard their responsibilities under both TDC rules [183] and the minimal requirements of *Wolff*. Virtually all inmates, even those with observable learning, mental, or language difficulties, are denied the aid of counsel substitute, when they appear before disciplinary hearings. It appears that the vast majority of inmates are not even aware that they have a right to request the assistance. Those with the greatest need for such help–the illiterates, the poorly educated, the mentally disabled, and the non–English speaking–are the least likely to be cognizant of this right, since the only notice regarding it is in the relatively complicated and confusing Rulebook.

The *Wolff* decision and the related TDC rules contemplate that the officers conducting disciplinary hearings take the initiative in determining whether inmates need assistance and in providing it when necessary. Once a finding has been made that use of a counsel substitute is necessary, the appointed substitute must be permitted to exercise, for the charged inmate, all the rights to which he would be entitled were he defending himself. To that end, a counsel substitute must have the opportunity to confer with the inmate he is to assist, to gather evidence, and to discuss the accusation with potential witnesses at a time before the disciplinary hearing is held.

#### 2. *Impartial Hearing Body*

It is fundamental to any fair hearing procedures that accused persons be judged by an impartial hearing body, for without the presence of impartial decision-makers, fair procedures are meaningless. The *Wolff* court recognized that hearing bodies must not be so biased that their decisions are reached in an arbitrary manner, but determined that the composition and operation of the Nebraska disciplinary committee then under consideration had not been demonstrated to be impermissibly partial. *Id.,* 418 U.S. at 570–71, 94 S.Ct. at 2981–82. Thus, in *Wolff*, the Court did not provide guidelines for an evaluation and determination of a disciplinary committee's impartiality or lack thereof. From other decisions, however, it is evident that due process requires that hearing bodies be independent, fair–minded, and capable of an individuated judgment in each case, based upon the evidence presented at the hearing. In the context of prison disciplinary hearings, two standards must be met: (1) the disciplinary committee must not include persons who were involved in the incident being judged; and (2) individual members of the disciplinary committee must not have such pre–existing biases or opinions as to

---

**181.** Inmate witnesses may feel pressured to agree with the officers' version of events, so as to avoid trouble for themselves. retaliation and brutality by officers against inmates who do not conform is common at TDC. See the section of this opinion relating to security.

**182.** See Rule 4.2.3.3.b(3), quoted in n. 168 and Rule 4.2.3.3.c(3)(c), quoted in n. 169.

**183.** Rule 4.2.3.3.

*Representation Before the Committee.* If the Committee finds that the inmate, for any reason, is unable to adequately understand the case or present his defense, he will be permitted to obtain aid either from another inmate or member of the staff as the Committee may direct.

preclude them from deciding, with open minds, the cases which come before them. *Morrissey v. Brewer*, 408 U.S. 471, 486, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972); *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 716 (7th Cir. 1973), *cert. denied* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974).

■ TDC has visibly failed to meet the first of these standards. The record discloses that certain officers who have (1) filed charges, (2) ordered the filing of charges, or (3) participated in incidents which led to charges, have served on disciplinary committees which determined the inmates' guilt or innocence of such charges. TDC rules explicitly forbid a charging officer from sitting on the disciplinary committee which hears that charge.[184] This rule, and fundamental tenets of due process, logically require that no officer who has been involved, in any respect, in the incident in question or who has had any part in the charging process may sit on the committee which evaluates and passes upon the particular charge.

### 3. *Failure to Follow State Rules*

■ As had been observed, TDC practices not only violate the minimum due process requirements detailed in *Wolff*, but also violate TDC's own written disciplinary procedures, which were apparently designed to fulfill the mandates of the *Wolff* decision. Defendants' failure to follow its own procedural rules and regulations is an independent violation of due process. *See Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *U. S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Finley v. Staton*, 542 F.2d 250 (5th Cir. 1976); *Pacific Molasses Company v. FTC*, 356 F.2d 386, 387–90 (5th Cir. 1966). This holds true, even if the rules and regulations provide protections beyond those which are constitutionally required. *Service v. Dulles, supra; United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969).[185]

The existence of rules creates the expectancy that they will be followed; hence, inmates have a right to disciplinary hearings conducted according to the procedures which the state has established as appropriate for this type of proceeding. Disciplinary hearings unquestionably can exert grave effects upon an inmate's status in prison and may result in punishments excessively prolonging the amount of time an inmate must serve in prison. It was because such significant interests might be implicated that the *Wolff* court established minimum requirements for a fair hearing. If these mandated procedures are not actually followed, the state's implementation of the requirements by way of written regulations serves no purpose, except to create an illusory semblance of compliance. Moreover, giving consideration to the perspicuous evidence that TDC's written rules concerning disciplinary hearings are rarely, if ever, conformed to, the defendants' reiterated protestations that these rules and regulations can withstand constitutional challenge are beside the point.

---

**184.** Rule 4.4.1
*Unit Disciplinary Committee*
The Disciplinary Committee on each unit will administer the disciplinary program. No officer who accuses an inmate of a violation may be a member of the Disciplinary Committee that considers the alleged violation. Medical records shall be readily available at *all* Disciplinary Committee proceedings.

**185.** "An executive agency must be rigorously held to the standards by which it professes its action to be judged. See *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626. Accordingly, if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed. See *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403. This judicially evolved rule of administrative law is now firmly established and, if I may add, rightly so. He that takes the procedural sword shall perish with that sword." *Vitarelli v. Seaton*, (Frankfurter, J., concurring), 359 U.S. 535, 546–47, 79 S.Ct. 968, 976–77, 3 L.Ed.2d 1012 (1959).

### 4. Vague and Overbroad Rules

Plaintiffs also maintain that specific TDC disciplinary rules, such as those prohibiting "general agitation", "disrespectful attitude" and "laziness" are unconstitutionally vague and overbroad, because they fail to put inmates on notice of proscribed activity or punish protected activity. A single district judge has no jurisdiction to declare TDC's disciplinary rules unconstitutional and to enjoin their continued enforcement. The provisions of 28 U.S.C. § 2281 (repealed), preclude a district court from enjoining, on the grounds of unconstitutionality, the enforcement, operation, or execution of any order made by an administrative board or commission which is acting under a state statute, unless the issue is heard and determined by a court of three judges. This statute, although repealed prospectively in 1976, P.L. 94–381 §§ 1, 2, Aug. 12, 1976, 90 Stat. 1119, is still applicable to actions, such as this one, commenced on or before the effective date of its repeal.

Any questions that may have existed as to whether rules of the Texas Department of Corrections are covered by § 2281 were effectively laid to rest by the Fifth Circuit in *Sands v. Wainwright*, 491 F.2d 417 (5th Cir. 1973), *cert. denied* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974). There, the court specifically determined that TDC rules and regulations are of statewide application and, therefore, fall within the scope of the statute. The Fifth Circuit also rejected an attempt to distinguish between the written regulations and the prison officials' practices:

> The "practices" whose enforcement the inmates seek to enjoin are, in reality, the Rules and Regulations of the Texas Department of Corrections, *as applied.*

> \* \* \* \* \* \*

> If a federal court were to uphold the constitutional arguments by plaintiffs' counsel ..., that court would have to insist that new regulations be instituted and that further enforcement of present regulations, unmodified, be enjoined. This is exactly the type of relief § 2281 reserves for district courts of three judges.

491 F.2d at 428 (emphasis in original).

If the constitutional attack on state rules can be deemed "insubstantial" as a matter of law, a single district judge has the power to dismiss the case on the merits, without the convening of a three–judge court. In a complaint brought by TDC inmates challenging the constitutional validity of the prison rule against "general agitation," the Honorable Ross Sterling, United States District Judge for the Southern District of Texas, found the plaintiffs' position to be "insubstantial" and upheld the TDC rule. *Carter v. Wallace*, CA No. 75–G–89 (S.D.Tex. November 30, 1979). An appeal from that decision is currently pending before the Court of Appeals for the Fifth Circuit.

Despite Judge Sterling's decision, it does not appear that the plaintiffs' claim here can be accurately characterized as "insubstantial." First, *Carter v. Wallace* pertained to only one of a number of rules being challenged in the instant action. Moreover, the Supreme Court has cautioned that the rule of insubstantiality should not be lightly invoked.

> A claim is insubstantial only if "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy."

*Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973), quoting *Ex parte Poresky*, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933). No decisions of the Fifth Circuit have specifically addressed the issues raised by the plaintiffs. With the decision in *Carter v. Wallace* now before that court, it would be premature to conclude that settled law mandates rejection of the plaintiffs' constitutional challenges.

### 5. *Relief*

Certain minimum components will be necessary, in order to remedy the constitutional violations delineated in this section.[186] In general terms, TDC will be required to bring both its written policies and its practices into compliance with the Supreme Court's opinion in *Wolff v. McDonnell.* Furthermore, TDC must, in practice, follow the rules it has promulgated to govern disciplinary procedures.

Specific remedies which will be necessary must include the following:

(1) Before confining an inmate to administrative segregation pending a disciplinary hearing, TDC officials must ascertain if facts exist to support a conclusion that administrative segregation is necessary to safeguard institutional security, detail in writing the reasons ɪor administrative segregation (including the facts which support the conclusion that segregation is necessary), and insure that the inmate is furnished with alternative means to gather evidence and prepare his defense in anticipation of the disciplinary hearing.

(2) An inmate faced with disciplinary charges must not be subjected to any form of coercion designed to persuade him to waive his right to twenty-four hour notice prior to the disciplinary hearing. When offered the opportunity to waive twenty-four hour notice, an inmate must be fully informed, in terms intelligible to him, of the nature of his constitutional rights in this regard.

(3) Reports of disciplinary hearings in which the result is unfavorable to the accused must be maintained, and specifically set out the content of all evidence presented and considered at the hearing. Additionally, the reports must explain the causes for each individual decision as to guilt or innocence of the charged inmates and the determinative reasons for any punishments which are imposed. It is also necessary that the charged inmates receive copies of these statements at or shortly after the time they are informed of the committee's decision.

(4) TDC officials must inform accused inmates of their general right to call witnesses. Inmates must be able, either personally or through counsel substitute, to communicate with a reasonable number of potential witnesses in advance of the disciplinary hearing. When requested witnesses are not allowed to testify, the committee must set out in writing the reasons for the negative decision. Further, accused inmates must have input into the questioning of witnesses.

(5) Each disciplinary committee must make a reasoned determination in each individual cause before it of whether the particular inmate is in need of a counsel substitute, taking into account his literacy, mental abilities, and understanding of the English language. Any inmate seriously deficient in any of these respects must be permitted to confer with a counsel substitute. After having been accorded the right to consult with both his inmate client and potential witnesses and to obtain documentary evidence, the counsel substitute will then represent the inmate at his hearing.

(6) No TDC disciplinary committee may include an officer who has filed charges, ordered the filing of charges, or participated in any incident which led to the charges.

(7) Given TDC's failure to observe the requirements of due process, as well as its own written rules, in conducting disciplinary hearings, all such hearings which it conducts in the future must be recorded by tape recorder or by an equally efficient method.

(8) Inmates accused of disciplinary violations must be provided with a more detailed

---

**186.** The delineation of relief here specified is not intended to be exhaustive, but merely notes those items which will be among those included in the order granting injunctive relief in this civil action.

notice of charges than is currently provided. This notice must include all the basic information contained in the offense report filed by the charging officer.

### Solitary Confinement

#### A.

The violation of any TDC rule is punishable by solitary confinement, at the discretion of a disciplinary committee. Although TDC regulations indicate that the punishment should be used sparingly, and then only when other less restrictive forms of punishment have been unsuccessful, solitary confinement is widely and frequently used throughout the TDC system.

Inmates in solitary confinement are kept in single cells resembling the cells inhabited by general population TDC inmates. However, in addition to the traditional barred cell door, the solitary confinement cells have an outside solid steel door, which is pierced only by a tiny window. Although the policies differ among the various units, it is not uncommon for the solid steel door to be closed while inmates are confined in these cells, decreasing ventilation and light and effectively shutting them off from all contact with the outside world. Lights in some of the solitary cells are controlled by officers, who turn them off on occasion, leaving the confined inmates in total darkness. With the exception of a few minutes in which they are permitted to shower, three times a week, inmates in solitary confinement spend twenty–four hours a day in their cells. They are permitted to have nothing with them except a Bible. Occasionally, the inmates so confined experience difficulties with sanitation, resulting from poor janitorial practices and inadequate maintenance of plumbing. At a few of the units, the solitary confinement cells are situated in buildings separated from the main institutional structures. According to the evidence, inmates in solitary confinement cells in these separate buildings are subjected to poor ventilation and harsh temperature conditions–extremely cold in the winter and exceedingly hot in the summer.

The most serious deprivation inflicted upon inmates in solitary confinement is a dangerously restricted diet. Under TDC policy, these inmates are fed small portions of vegetables twice a day and one regular meal every three days.[187] This form of diet is, at the least, nutritionally inadequate. Expert nutritionists who studied the diet reported that it provides only ten to sixteen percent of Recommended Daily Dietary Allowances, as defined by the Food and Nutrition Board of the National Academy of Science. Deficient in vitamins and minerals, the diet causes significant weight losses, and its distinctly negative effects, even upon the physical condition of previously healthy inmates, are readily apparent in a few days. For inmates with existing medical problems, the consequences of the solitary diet can be extremely serious.[188]

Under TDC rules, the maximum term for solitary confinement is fifteen days. After an inmate has served this period of time, the rules require that he be given a complete diet for two full days. After this interval passes, "recalcitrant" inmates may be relegated back to a solitary confinement status. This is occasionally done, and the record contains examples of inmates who were thus committed to extended periods of

---

187. On occasion, the "regular" meal served to inmates in solitary confinement is a meatless breakfast.

188. For example, in order that their blood sugar and insulin be kept in an appropriate balance, diabetics must carefully coordinate diet with exercise. Solitary confinement changes such inmates' diets and limits their opportunities to exercise, thus increasing the possibility of imbalance that could lead to insulin shock or diabetic coma. In the face of a TDC policy that diabetic inmates should not be admitted to solitary confinement, the record contains several examples of inmates with that condition who were thus committed. At least one such inmate had to be removed after a short time, because he went into an early diabetic coma. Inmates with hypoglycemia or ulcers are also likely to have their conditions worsened by the diet given to those in solitary confinement.

time in solitary confinement, often while suffering from serious medical complications.[189] Lengthy exposure to the harsh conditions of solitary confinement lead to acute physical suffering on the part of many inmates who were thus repeatedly incarcerated.

In addition to causing physical deterioration, the conditions of solitary confinement occasioned severely negative and pernicious psychological effects on some inmates. Expert psychologists who testified declared that this form of punishment is particularly traumatic and harmful for inmates with latent or developed emotional and psychological disorders. Suicides, attempts at suicide, and self-mutilations are common among inmates thus confined. In their testimony, several vividly described the despair and irrationality they experienced during long periods of solitary confinement.

TDC has promulgated rules which require: (1) that inmates be examined by a medical assistant prior to being sent to solitary confinement; (2) that inmates with certain medical classifications or conditions not be so confined; (3) that inmates in solitary confinement be observed once a day by medical personnel; and (4) that records of the inmates' body weights be kept, while they are immured in solitary confinement. Guidelines issued by Dr. Gray, the Medical Director of TDC, require that an inmate be removed from solitary confinement, (1) if he shows a rectal temperature of 100.6 degrees for five minutes, (2) if there is a difference of more than twenty millimeters in his diastolic and systolic blood pressure, (3) if his respiration rate is thirty or more, or (4) if he suffers a weight loss of twenty-five percent during his period of confinement.

Although these regulations evince that TDC officials expect inmates in solitary confinement to suffer adverse physical effects, there appears to have been no earnest attempt to prevent or minimize these injurious consequences. The evidence demonstrated that, in numerous instances, the regulations were simply not followed. Many inmates whose medical conditions or classifications should have disqualified them from solitary confinement under the regulations were, nevertheless, consigned to such punishment without a medical examination. Daily medical checks, when they did occur, were often superficial, having been performed by personnel who made observations of the inmates by only momentarily looking through the cell doors into the poorly lighted cells. Dr. Gray's removal guidelines, which were not always followed, often failed to safeguard inmates from the grave medical outgrowths of solitary confinement. For example, in the estimation of one expert nutritionist, waiting until an inmate had lost twenty-five percent of his body weight before removing him from solitary confinement "border[ed] on extreme negligence".

TDC officials advanced no penological justification for the deleterious and debasing character of solitary confinement. Several expert witnesses from other correctional systems testified that the hardships imposed by TDC upon inmates in solitary confinement are primitive and unnecessary. The Federal Bureau of Prisons stopped pun-

---

**189.** One inmate spent twenty months in solitary confinement, interrupted with periods in administrative and hospital segregation. This punishment was administered to the inmate for his continued refusal, on medical grounds, to accept an assignment to work in the agricultural fields. During that period, his normal weight of 150 pounds dropped to ninety pounds, and he experienced various medical difficulties. Another inmate was in and out of solitary confinement several times in the first five months of 1976; at least two of the terms for single offenses exceeded fifteen days. Still another inmate served three fifteen day terms in solitary confinement for one offense in December 1976 and January 1977. One other prisoner spent sixty-eight days in solitary confinement in 1972, during which time unit officials duly recorded evidence of his deteriorating condition. He was finally removed from solitary confinement in a semi-comatose condition. The hospital notes of Dr. Gray, TDC's medical director, attributed the inmate's condition to negligence on the unit.

ishing inmates in this manner forty or fifty years ago, and the conditions of solitary confinement in other state prison systems are generally much less severe than in TDC.[190]

### B.

The Eighth Amendment prohibits punishments that serve no valid penological purpose and needlessly inflict pain. *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). Also prohibited are punishments which are grossly disproportionate to the severity of the offense. *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1977); *Coker v. Georgia*, 433 U.S. at 592, 97 S.Ct. at 2866; *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Furtado v. Bishop*, 604 F.2d 80, 88 (1st Cir. 1979), *cert. denied* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); *Wright v. McMann*, 460 F.2d 126, 130–31 (2d Cir. 1972), *cert. denied* 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). Plaintiffs contend that TDC's use of solitary confinement violates both of these principles.

In *Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971), *cert. denied sub nom. Sellars v. Beto*, 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972), the Fifth Circuit declined to find that the conditions of solitary confinement at TDC, as they existed in 1969, constituted cruel and unusual punishment. The plaintiffs have advanced several arguments in support of the proposition that *Novak* is no longer controlling, and that the constitutionality of TDC's solitary confinement conditions should be considered anew.

The eighth amendment is not static, but, rather, "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). It is undeniable that the standards of review for eighth amendment violations have significantly changed since *Novak* was decided. The majority in *Novak* believed that the then prevailing interpretations of the eighth amendment required a quite limited scope of review; accordingly, the standards, "barbarous" and "shocking to the conscience", were applied very restrictively. During the 1970's however, the Supreme Court greatly expanded the scope of the eighth amendment. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977).

The Fifth Circuit, while declining expressly to overrule *Novak*, has indicated that the relevant criteria for evaluation of Eighth Amendment claims have changed since that decision.

> *Novak* is evidence that although national awareness of intolerable prison conditions was beginning to take shape ... courts were not yet ready to intervene in any significant way .... The grant of relief in prisoner suits of this type did not begin in this circuit until 1972 .... It was *Gates v. Collier* in 1974 ... that first marked a broad–scale intervention by this court in the supervision of prison practices.

*Bogard v. Cook*, 586 F.2d 399, 420–21 (5th Cir. 1978), *cert. denied* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). Thus, in *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), the Fifth Circuit stated that, "[i]t is much too late in the day for states and prison authorities to think that they may withhold from prisoners the basic necessities of life, which include reasonably adequate food, clothing, shelter, sanitation, and necessary medical attention."

---

**190.** American Correctional Association standards state that it is essential that food not be used as a reward or punishment, and that segregated inmates be on a full regular diet. California correctional authorities provide inmates in solitary confinement with a nutritionally adequate regular diet, less only dessert.

A few changes have occurred in the conditions of solitary confinement at TDC, since the *Novak* decision was issued. Mattresses are now provided to most inmates, and a degree of flexibility has been evidenced regarding both the closing of the solid steel doors and the deprivation of light. On some units, it is still common to close the solid door of the solitary confinement cells, whereas at others it is closed only if an inmate creates a disturbance. While lights in these cells were controlled by security officers at the time of trial, there was no indication that inmates in solitary confinement were routinely deprived of all light. Apparently, then, the lighting conditions vary according to the supervising guards' policies or whims.

The bread and water diet described in the *Novak* decision has been replaced by a twice–daily vegetable diet, which is supplemented every three days by a regular meal. The *Novak* court did not have before it specific information about the caloric value of the food served. In the instant case, it is clear from the record that the diet presently provided inmates in solitary confinement is wholly inadequate, since it contains only ten to sixteen percent of the inmates' daily nutritional requirements and is drastically deficient in vitamins and minerals. As a result of this diet, it is common for healthy inmates to lose ten to fourteen pounds in a fifteen day period, and to suffer from a variety of minor physical ailments.[191] The severely restricted diets have a much more adverse effect on unhealthy inmates, who are often not given a proper physical examination before their placement in solitary confinement nor adequate medical observation thereafter. It is apparent that, by this diet, TDC attempts to starve its most troublesome inmates into abject submission.

Several courts since *Novak* have ruled that it is inappropriate for prison officials to deny inmates necessary food. For example, in *Finney v. Hutto*, 410 F.Supp. 251, 276–77 (E.D.Ark.1976); *aff'd* 548 F.2d 740 (8th Cir. 1977), *aff'd* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the district court invalidated the serving of a restricted diet of "grue"[192] to inmates in solitary confinement. *Cunningham v. Jones*, 567 F.2d 653, 659 (6th Cir. 1977); and *Landman v. Royster*, 333 F.Supp. 621, 647 (E.D.Va.1971), expressly held that severely restrictive diets for inmates in solitary confinement constitute cruel and unusual punishment. The district court in *Landman* aptly explained why the deprivation of food is cruel and unusual:

> [T]he pains of hunger constitute a dull, prolonged sort of corporal punishment. That marked physical effects ensue is evident from the numerous instances of substantial weight loss during solitary confinement.
>
> \* \* \* \* \* \*
>
> The practice [of imposing a bread and water diet] is therefore both generally disapproved and obsolescent even within this penal system. It is not seriously defended as essential to security. It amounts therefore to an unnecessary infliction of pain. Furthermore, as a technique designed to break a man's spirit not just by denial of physical comforts but of necessities, to the end that his powers of resistance diminish, the bread and water diet is inconsistent with current minimum standards of respect for human dignity. The Court has no difficulty in determining that it is a violation of the eighth amendment.

333 F.Supp. at 647.

Inmates relegated to solitary confinement at TDC are deprived of more than

---

191. This weight loss is especially significant, in light of the fact that most inmates, unlike their free world counterparts, work at hard physical labor. Thus, they are less likely to have excess weight prior to being committed to solitary confinement.

192. "Grue" is the name of a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs and seasoning into a paste and baking the mixture in a pan. Arkansas' inmates in solitary confinement received four–inch squares of this substance at each meal. 437 U.S. at 683, 98 S.Ct. at 2569.

food. Held in extreme isolation, sometimes in darkness or near darkness for twenty–four hours a day, they are permitted no mitigation of these conditions–no exercise, no recreation, or any other form of temporary release from the nightmarish conditions of their setting.

■ The applicable standards have rapidly evolved since the *Novak* decision was rendered, and the record contains substantial documentation of the manifold harms imposed upon the confined inmates by this squalid, degrading, and unwholesome form of punishment. However, due deference must be given to a subsisting, apparently still viable, decision of the Fifth Circuit. Although changes have occurred during the intervening years, the system of solitary confinement at TDC today is substantially identical to that wh.ch was approved in *Novak.* Perhaps the standards of decency which have emerged in the last nine years make what was then acceptable no longer adequate, but that is an issue more appropriately decided by the Court of Appeals than by a district court. It is, therefore, reluctantly concluded that the general conditions of solitary confinement at TDC do not constitute cruel and unusual punishment, as it has been defined in the *Novak* decision.

■ At the time of *Novak,* TDC had the same rule presently in effect, which allows for a "recalcitrant" inmate to be returned to solitary confinement for additional fifteen day terms, if he is given a regular diet for two full days after each such fifteen day period. The court in *Novak* found it to be the rare occasion for an inmate to spend successive terms in solitary confinement. Evidence presented in this case, however, indicates that consecutive confinements have been imposed on inmates more frequently since the time of the *Novak* decision. Particularly egregious examples of this practice are set out in the margin.[193] No hearings are held to determine the pro-

priety of the recommitments. Subsequent to the Fifth Circuit's decision in *Novak,* the Supreme Court decided *Wolff v. McDonnell,* holding that due process hearings must accompany the placement of inmates in solitary confinement. *See* 418 U.S. at 571–572 n. 19, 94 S.Ct. at 2982 n. 19. Since an inmate's remand to a repeated fifteen day interval in solitary confinement is predicated, under TDC rules, on that person's "recalcitrance," *Wolff* requires no less than a full due process hearing to determine whether that factual predicate is met.

■ TDC has committed an independent due process violation, by failing to follow its own regulations regarding the care and oversight of the physical and mental health of inmates in solitary confinement. *See Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *U. S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Finley v. Staton,* 542 F.2d 250 (5th Cir. 1976); *Pacific Molasses Company v. FTC,* 356 F.2d 386, 387–90 (5th Cir. 1966). These regulations are honored more in the breach than in their observance. Contrary to TDC directives, solitary confinement is imposed frequently and often arbitrarily. It has been commonly wreaked upon inmates in disfavor with TDC officials, including those who have pursued their constitutional rights by filing lawsuits against TDC. TDC's policy mandating that inmates be given physical examinations before being subjected to the intense physical and mental trauma of solitary confinement is essentially ignored, as is the requirement that the medical condition of unhealthy and physically impaired inmates so confined be adequately supervised by medical personnel. A number of inmates have been placed in solitary confinement, despite the fact that they are burdened by medical defects which, according to TDC regulations, should prevent them from ever being exposed to such confinement. To comport with the

**193.** See footnote 189 of this section.

Constitution, TDC must hereafter scrupulously follow its own rules regarding the administration of solitary confinement.

*Administrative Segregation*

A.

Conditions in administrative segregation are not so harsh as those in solitary confinement. Inmates are fed the diet regularly offered to other inmates, and they are usually locked behind a barred door, instead of a solid steel door. The cells are basically similar to those which house general population inmates. Nevertheless, administrative segregation has many adverse characteristics. Inmates in this status suffer substantial isolation and are not permitted many of the privileges which inmates in the general population take for granted. They can leave their cells only to shower and, occasionally, go to the writ room. No opportunity for recreation or exercise is afforded to these inmates. They are permitted to have in their cells only mail, legal writing materials, and a Bible. It is not uncommon for two, three, or even more inmates to be housed in a single administrative segregation cell, for weeks or months at a time. Such overcrowding is particularly onerous, because the inmates remain in their cells virtually twenty–four hours a day.

Very few rules govern the placement of inmates in administrative segregation. Since this status is characterized as non–punitive, inmates are not given any type of hearing prior to their being assigned to it. Subject to the approval of the warden, any two officers may decide to consign an inmate to administrative segregation, for any reason considered sufficient by them.

In the past, an inmate placed in administrative segregation could languish for months before the appropriateness of the assignment was evaluated. The TDC rulebook requires that inmates held in adminis-

trative segregation be allowed to appeal their status to the Unit Disciplinary Committee after seventy–two hours; however, the evidence shows that, in practice, inmates were rarely accorded such an appeal. Thus, many inmates suffered the deprivations of administrative segregation for months or years at a time or alternated between solitary confinement and administrative segregation for extended periods.[194] In an attempt to keep track of inmates who had become essentially permanent residents of administrative segregation cells, Director Estelle changed TDC policy, in late 1978 or early 1979, so as to require periodic review of the reasons for confining inmates under these conditions. The new policy calls for a re–evaluation of the status of such inmates, by a member of the Classification Committee, after the inmate has served approximately thirty to forty–five days in administrative segregation. A determination is then made as to whether the continued segregation is justified, and the same type of review must be conducted each ninety day period thereafter. The re–examination includes a "hearing", which was described as a discussion between the Classification Committee members, the inmate, and the warden of the particular unit (or his delegate) concerning the reasons for the inmate's segregation.

Confusion about the identity of the official having the power to terminate administrative segregation under the new policy was apparent from the evidence. Director Estelle and S. O. Woods, a member of the Classification Committee, testified to different understandings. Woods opined that the Classification Committee has the responsibility to decide whether to continue the inmate in the administrative segregation status, while Director Estelle testified that the warden of the unit involved is the only authority empowered to make the decision.

The ease by which an inmate can be placed in administrative segregation, the

---

**194.** The evidence shows that inmates have spent lengthy periods of time, even as much as thirty months, in segregation, often for no identifiable reason.

lack of any formal process, and the absence of accountability for administrative segregation decisions have allowed prison officials discriminatorily and illegitimately to subject writ writers and other disfavored inmates to segregative confinement. The record is replete with examples of the arbitrary and unfounded placement of inmates in administrative segregation, many of whom remained there for quite lengthy periods of time.[195]

TDC does have rules and regulations which delineate the grounds upon which an inmate may be confined in administrative segregation. He may be held for a maximum of three days "pending investigation" of potential disciplinary charges. An inmate may be held for a longer period of time, if he has been charged with a disciplinary violation and is "awaiting disciplinary action." Four additional grounds are set out for the involuntary segregation of inmates: (1) the protection of the particular inmate; (2) to await the inmate's trial for a crime committed in TDC; (3) when the inmate is a "custody risk"; and (4) if the inmate, after being punished, nevertheless cannot reasonably and safely be returned to the regular inmate population.[196] No written procedures or guidelines exist for determining whether inmates meet any of these criteria before they are confined in administrative segregation.

### B.

■■■ A Fourteenth Amendment liberty interest is created when state prison regulations allow for the transfer of inmates to administrative segregation only upon the occurrence of specified events or conditions. *Vitek v. Jones*, 445 U.S. 480, 489–491, 100 S.Ct. 1254, 1260–61, 63 L.Ed.2d 552 (1980); *Wright v. Enomoto*, 462 F.Supp. 397, 402 (N.D.Cal.1976, three–judge court), *aff'd* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); *Mitchell v. Hicks*, 614 F.2d 1016,

1019 (5th Cir. 1980). Such regulations confer upon inmates the right not to be transferred to administrative segregation except for the reasons delineated, since the regulations engender a justifiable expectation on the part of inmates that they may remain in the general population, unless their behavior or general situation come within the designated bases for segregation. *Mitchell v. Hicks*, 614 F.2d at 1020. *See Hoss v. Cuyler*, 452 F.Supp. 256, 289–290 (E.D.Pa. 1978); *Bono v. Saxbe*, 450 F.Supp. 934, 941 (E.D.Ill.1978); *Lamb v. Hutto*, 467 F.Supp. 562, 566 (E.D.Va.1979). Thus, the determination of whether such grounds exist in the individual case becomes extremely critical, "and the minimum requirements of procedural process appropriate for the circumstances must be observed." *Vitek v. Jones*, 445 U.S. at 491, 100 S.Ct. at 1261, quoting *Wolff v. McDonnell*, 418 U.S. at 558, 94 S.Ct. at 2975.

■■■ Due process in the administrative segregation context calls for no less than the procedural protections outlined in *Wolff v. McDonnell*. Conditions in TDC's "non–punitive" administrative segregation cells are more punishing than solitary confinement in many state prison systems. Moreover, TDC has made "no showing that prison administration or safety will be jeopardized if defendants are required to accord plaintiffs at least the minimal protections called for by *Wolff*." *Wright v. Enomoto*, 462 F.Supp. at 403. Clearly, the current TDC procedure of "reviewing" administrative segregation decisions thirty to forty–five days after the inmate has been placed in segregation do not even approximate the constitutional minimum as outlined in *Wolff*. Nor does TDC's written rule giving inmates placed in administrative segregation the right of appeal to the unit disciplinary committee within seventy–two hours comport with due process, for the evidence showed that, in fact, inmates were rarely

---

**195.** See the section of this opinion on access to the courts.

**196.** TDC Rule 4.3.1.

granted an appeal. However, even if the seventy–two hour appeal procedures were rigidly followed, they fall short of the requirements of the Fourteenth Amendment, for there is no legitimate reason to require all inmates to suffer the deprivation of segregation for three days before their cases are heard.[197]

To comport with *Wolff*, TDC must afford constitutional processes to inmates, before they are placed in administrative segregation. A hearing before a fair and impartial body, to determine if an inmate should be committed for one of the reasons specified in the TDC rules, must be provided.[198] If subsequently committed by the hearing body, the inmate must be given a written statement of reasons for its decision. Except where legitimate institutional concerns are implicated, the inmate must have the right to call witnesses and to present evidence to the hearing body. Counsel substitute should be appointed for the particular inmate, if it is determined that he is incapable of representing himself. Twenty–four hour advance notice should be afforded to such an inmate prior to his hearing. The notice requirement may be delayed only where the failure immediately to segregate an inmate could threaten the security of other inmates or employees. When such an emergency situation exists, the inmate may be segregated without prior notice and a hearing, but he must be provided these procedures as soon as practicable. *Wright v. Enomoto*, 462 F.Supp. at 404. Records of such emergency confinements must be kept which specify, in detail, the reasons relied upon to justify the action taken. Moreover, for the reasons enumerated in the discussion of disciplinary procedures, inmates may not be confined to administrative segregation pending disciplinary hearings, absent exigent circumstances. Furthermore, an inmate confined pending disciplinary charges must be afforded a hearing on the charges as soon as practicable—in no event later than ten days after being sent to segregation—or be released from administrative segregation.

Once an inmate is placed in administrative segregation, due process requires that his status be reviewed periodically, to determine whether there is a valid reason for his continued segregation. *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975), *McCray v. Bennett*, 467 F.Supp. 187, 192–193 (M.D.Ala.1978). TDC's current review policy does not meet the requirements of due process in this respect. Its provisions for review thirty to forty-five days after an inmate is first placed in segregation and every ninety days thereafter allows an inmate to deteriorate in the dormancy of segregation long after the valid reasons for such confinement may have expired. Furthermore, the lack of clear specificity as to the officer who possesses the power to release an inmate from segregation is such as to render the review procedure potentially meaningless. TDC must, therefore, formulate a plan which provides for more frequent review and which clearly outlines the processes and decision–making powers involved in that review.

In addition to requiring minimum hearing and review procedures, the Constitution prohibits the imposition of administrative segregation in an arbitrary and capricious manner. *See McCray v. Bennett*, 467 F.Supp. at 193–194. As said in *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975):

---

**197.** As noted below, if an emergency situation exists, an inmate may be segregated without a hearing, provided that he is given such a hearing as soon as practicable. There may be cases where such a hearing cannot be held within seventy–two hours. However, there is no justification for a policy which confines all inmates, whether in emergency situations or not, to administrative segregation for seventy–two hours without a hearing.

**198.** Of course, no hearing is required when an inmate genuinely requests to be placed in administrative segregation; but he must be released whenever he so desires. Furthermore, his status must be reviewed as frequently as that of other inmates in administrative segregation, to ascertain if he still desires to remain in that status.

It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for past misconduct. It is clear, then, that the frequent use of administrative segregation groundlessly to punish TDC inmates for whom officials have antipathetic feelings contravenes the guarantees of the Constitution.

■■■ Even if accomplished according to appropriate procedures and for valid reasons, long term confinement of inmates in administrative segregation, without opportunities for recreation, constitutes cruel and unusual punishment. Many courts have held that long term deprivation of exercise and recreation—as withheld from segregated inmates at TDC—violates the eighth amendment proscription against cruel and unusual punishment. *See Miller v. Carson*, 563 F.2d 741, 751, n. 12 (5th Cir. 1977) (deprivation of exercise may, by itself, constitute an unconstitutional impairment of health forbidden by *Estelle v. Gamble*); *Hardwick v. Ault*, 447 F.Supp. 116, 125 (M.D.Ga.1978) (limiting segregated prisoners to two hours exercise a week is cruel and unusual punishment); *Sinclair v. Henderson*, 331 F.Supp. 1123, 1130–31 (E.D.La. 1971). Accordingly, in the decree hereafter to be entered, TDC will be ordered to institute a program of regular exercise for inmates confined in administrative segregation for more than three days. The form such exercise is to take may be determined by prison officials; however, it is imperative that inmates be permitted to engage in some activity which enables them to leave their cells daily and which involves significant opportunity for strenuous and active physical movement, for at least an hour, on each occasion.

■■■ An additional eighth amendment violation occurs on those occasions when two or more inmates are crowded into a forty-five or sixty foot administrative segregation cell. As outlined in the section of this opinion on overcrowding, such confinement constitutes cruel and unusual punishment for general population inmates, and it is no less cruel and unusual for those inmates placed in the allegedly non-punitive status of administrative segregation.

## VI. ACCESS TO THE COURTS

The inmate plaintiffs in this civil action have fought an uphill battle in pursing their constitutional claims, for their efforts to communicate with counsel and to present their case to this court have been repeatedly impeded by TDC's restrictive policies and practices. The difficulties they have encountered are symptomatic of the consistent manner in which TDC obstructs the inmates' access to the courts.

### A.

The evidence shows a persistent pattern of TDC interference with attempts by inmates to pursue legal actions. Practices and policies at the various units significantly restrict the times and places inmates may work on legal matters, severely inhibit communication among inmates about legal matters, encumber inmate efforts to have legal papers notarized, encourage the discriminatory harassment of inmates who take their grievances to court, and intrude on the communications between attorneys and their inmate clients. It does not appear that any of these burdensome practices and policies serve to advance legitimate institutional goals.

TDC apparently has no system-wide rules about where and when inmates may work on legal matters, these decisions being left to the discretion of the officials at the individual units. Most units permit legal work to be done only in the law library (more commonly known as the "writ room"); inmates in these units are not allowed to attend to legal matters in their cells or to

store legal materials there.[199] If legal materials are found in a cell, the resident inmate may be charged with possession of contraband, and the materials may be confiscated, often never to be seen again. Even letters from attorneys may not be kept in the cells; as soon as they are read by the inmates concerned, they must be immediately stored in the writ room.

Other units have the reverse policy, equally restrictive, of requiring that all legal work be done in the cells. Inmates must request specific books from the law library, a few at a time, which are delivered to their cells. The cells themselves are small, overcrowded, and devoid of any desk or writing surface. All of these limitations combine to make legal research and preparation of legal documents an extremely difficult, if not impossible, task.

For those inmates in units where legal work is permitted only in the writ room, the amount of time they may spend on legal matters is limited.[200] Most units restrict inmates to a maximum of ten to fourteen hours a week in the writ room.[201] These restrictions have caused some inmates to miss court filing deadlines. Space limitations do not justify the rules, for there frequently were empty seats in the writ rooms. The defendants' claims that staff shortages require restrictive writ room hours are also not persuasive. While it is undeniable that TDC is severely understaffed, no legitimate reason was advanced to demonstrate why the writ rooms must be singled out for constant guard surveillance. Many other areas of the prison where inmates gather, such as the dayrooms and dormitories, do not have security officers

posted inside observing all inmate movement. No evidence indicated that inmates who frequent the writ room pose greater security risks than the population in these other areas.

Various unit rules and practices also make it virtually impossible for inmates to consult with one another about their legal work. These regulations constitute a substantial impediment to the access of inmates to the courts, for communication with other inmates is often quite important. Co–plaintiffs in civil actions or co–defendants in criminal appeals may need to discuss litigation strategy or work together in the preparation of pleadings. Inmates pursuing civil rights, personal injury, or medical malpractice actions may need affidavits from others who witnessed relevant incidents. Those with relatively little legal knowledge or experience may need to consult with more learned inmates, in order properly to pursue legal remedies.[202] However, since many units forbid or severely limit inmate communications in the writ room, and possession of legal materials or pursuit of legal work outside the writ room is often a disciplinary violation, opportunities for inmates to talk or work together are almost entirely foreclosed. Indeed, inmates are frequently prevented from discussing legal business, no matter where they happen to be. Written communications through the mails pertinent to legal matters is precluded by a TDC rule prohibiting correspondence between inmates.

Burdens on inmate litigation efforts also arise from the inadequate and intrusive procedures for the notarization of inmates' legal documents. No system–wide policy

---

**199.** Apparently, the only system-wide TDC rule relevant to the proper time and place for legal work is Rule 3.10, which prohibits the storage of personal legal materials in the cells, with the exception of four of the inmate's own law books.

**200.** There were a number of reports of inmates who were, on occasion, arbitrarily denied access to the writ room altogether.

**201.** Inmates in solitary confinement have no access to the writ room whatsoever. Those in administrative segregation can go there only when specifically escorted and at the convenience of a security officer.

**202.** This type of communication is particularly important, since the two legal assistance programs staffed by attorneys at TDC are limited in the type of cases they may handle and the number of inmates they may serve.

exists, but the general procedure in most units requires inmates seeking such notarization to leave their documents, unsealed, in a receptacle set out for that purpose, and to wait for an official to notarize them. TDC officials often take this opportunity to read the inmates' legal papers. One former writ room officer testified that he was instructed to read all of the documents which were submitted for notarization. Many notaries, who are frequently high ranking prison officials, have harassed inmates seeking notarization, in an effort to discourage their recourse to legal action. Indeed, on occasion, these officials have simply refused to notarize documents and have even confiscated them.

In addition to instituting and enforcing practices and policies designed to limit inmates' opportunities to pursue legal activities, TDC officers routinely harass and punish those prisoners whom they perceive as litigious. These inmates, known as "writ writers," are earmarked by TDC officials as troublemakers and are constantly hounded wherever they go within the prison system.[203] Their persistence in legal activity can cause them to lose even minor comforts or privileges which TDC prisoners are otherwise capable of enjoying.

Practices designed to retaliate against writ writers have ranged from the overt to the subtle, from the imposition of inconvenience to the perpetration of violence. Inmates who use the writ room are frequently strip-searched when they enter or leave, irrespective of the fact that they are under constant supervision while inside that room. If required to leave the unit for the hospital or to make a court appearance, such an inmate must carry with him all of his legal materials—a task which may involve a large amount of time and physical effort. The record is replete with examples of inmates who received less favorable job assignments, or lost relatively good jobs they already held, because prison officials disapproved of their legal activities. Conversely, the promise of a better job has been offered to inmates who agree to desist from litigation efforts.

Some writ writers have been moved from the general population to administrative segregation. There, they have spent months, and even years, for no discernible security reasons. Many other writ writers are the target of discriminatory and arbitrary application of the TDC disciplinary rules. The record shows frequent, even routine, incidents where these inmates are groundlessly charged with disciplinary violations. Indeed, inmates who have merely commented to officers about potential legal action have found themselves confronted with citations for rulebreaking. Verbally contemplating a lawsuit against a TDC guard has been considered "threatening an officer"; mentioning a possible investigation by an attorney has been deemed "disrespectful attitude." A number of inmates with good disciplinary records have been sent to solitary confinement and have lost good time for such offenses. Furthermore, writ writers typically draw disproportionately more severe sentences than other inmates, when they are found guilty of disciplinary violations.

TDC officials have also caused violent attacks to be perpetrated on writ writers, in retaliation for their legal activity. Various inmates testified that they had repeatedly suffered brutality at the hands of TDC employees because of their writ writing. One notoriously violent inmate was instructed by higher-ups to prey upon one of the plaintiffs in the instant action and "scare him off the Ruiz case". He accordingly proceeded to—non-fatally—slit the writ-writer's throat.[204]

Another noteworthy example of the type of punitive harassment visited upon in-

---

**203.** At trial, it was revealed that the central files of some inmates contained notations mentioning their litigiousness.

**204.** The incident is described in more detail at n.60.

mates seeking relief in this case occurred at the time of a 1976 hearing before this court. All of the inmates who testified at the hearing were transferred by TDC while handcuffed in an extremely painful position–a position which had never before been seen by these inmates, who had many times traveled under the authority of bench warrants. It was ordered by the court that the inmates not be subjected to this kind of treatment on their return trip to the units. Nevertheless, it developed from later testimony that TDC officials caused these inmates to be handcuffed in that exact position for their return journey.

Finally, TDC officials have imposed unreasonable and unnecessary hardships on inmates who attempt to communicate with their attorneys. Prisoners and their lawyers are not permitted to have private, confidential conferences; security officers stand within earshot as they confer. Documents may not be passed directly between the attorney and client; rather, they are carried by the officer, who has the opportunity to read them during the transportation process. Facilities for attorney–inmate interviews are totally inadequate. Attorneys experience difficulty scheduling appointments at the prison, and often have to wait for hours before being allowed to see their clients. On occasion, they have been forbidden interviews altogether. Attorneys are not permitted to interview inmates in punitive segregation, nor are they allowed to interview more than one inmate at a time. They may not bring a tape recorder or typewriter into the interview room, even though officers may visually observe the room at all times, and inmates are searched before and after such interviews. Attorneys are also forbidden access to their client's prison file without a court order. To make matters even more difficult, a number of attorneys visiting TDC to see

their clients have been exposed to personal and petty harassment by TDC officials.[205]

Throughout the pendency of this action, it has been necessary that injunctions be issued, to restrain many of the retaliatory and restrictive practices described in this section. The evidence at trial revealed that the defendants disregarded many of these orders. This type and degree of intransigence is inexcusable, and acknowledgement will be taken of it, when the specific form of permanent relief to be ordered in this case is considered.

### B.

"It is clear that ready access to the courts is one of, perhaps *the*, fundamental constitutional right." *Cruz v. Hauck*, 475 F.2d 475, 476 (5th Cir. 1973) (Emphasis in original). Prisoners' constitutional right of access to the courts has been recognized by the Supreme Court for almost forty years. The Court has repeatedly "struck down restrictions and required remedial measures to insure that inmate access to the courts is adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). *See also Wolff v. McDonnell*, 418 U.S. 539, 577–80, 94 S.Ct. 2693, 2985–86, 41 L.Ed.2d 935 (1974); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), *affirming Gilmore v. Lynch*, 319 F.Supp. 105 (N.D. Cal. 1970, three–judge court); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex Parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). Access to courts involves a variety of related rights, including the right of access to a law library containing basic legal materials, the right to legal assistance, the right to communicate with the courts, attorneys and

---

**205.** Plaintiffs initially raised challenges to the restrictiveness of TDC's correspondence rules. While this action was pending, they were declared unconstitutional by the Fifth Circuit in *Guarjardo v. Estelle*, 580 F.2d 748 (5th Cir.

1978). To comply with that decision, TDC adopted new correspondence rules in late 1978. The adequacy or degree of compliance with those rules is not an issue before this court.

public officials, and the right to exercise all of the foregoing rights without fear of punishment or retaliation. The record reveals that the defendants have unjustifiably thwarted inmates' access to the courts and have thereby violated their fourteenth amendment right to due process and their first amendment right to petition for the redress of grievances.

In *Bounds v. Smith*, 430 U.S. at 828, 97 S.Ct. at 1498, the Court held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." The Court did not require that all prison systems set up identical legal assistance facilities and programs. Thus, as long as meaningful access to the courts is guaranteed, the states are free to experiment with various means of achieving this goal. 430 U.S. at 830, 97 S.Ct. at 1499.

■■■■ TDC has established a two-dimensional framework through which inmates may obtain legal assistance. Law libraries are maintained at each unit. In addition, two separate programs exist through which attorneys provide legal assistance to TDC inmates. However, the mere presence of these avenues to legal assistance does not fulfill defendants' constitutional obligations, if significant infringements upon inmates' opportunities to exercise their rights remain. For example, the existence of an adequate law library serves no purpose, if inmates are not permitted reasonable opportunities to use it. Moreover, mere physical access to the law library is useless to inmates who lack the knowledge to use it, when they are forbidden the opportunity to learn from someone,

such as other inmates, who are skilled in such matters. *Glover v. Johnson*, 478 F.Supp. 1075, 1096–97 (E.D.Michigan 1979). Unless TDC demonstrates that the legal assistance programs are able to serve all inmates requesting assistance, it may not foreclose inmates' rights to obtain assistance from other inmates and to be provided reasonable access to unit law libraries. *Johnson v. Avery; Novak v. Beto*, 453 F.2d 661, 664 (5th Cir. 1971), *cert. denied*, 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972) (the state carries the burden of proving the adequacy of its legal assistance programs).

■■■ At trial, TDC elicited no evidence concerning the adequacy of its legal assistance programs and clearly did not carry its burden of demonstrating that the legal needs of the prison population are served by the existent programs. One of the two legal assistance programs operated in the Texas Prison System is the Texas Inmate Staff Counsel program. It was the subject of review by the Fifth Circuit in *Corpus v. Estelle*, 551 F.2d 68 (5th Cir. 1977), where it was held that the program was incapable of providing all necessary legal assistance to inmates. Therefore, the Court stated, TDC could not bar inmates from assisting each other in legal matters. The second program is one operated by the Texas State Bar. It appears from the evidence in the instant case that a number of inmates have been unable to obtain legal assistance from either program.

■■■ TDC continues to place unreasonable impediments in the path of inmates' access to the courts. As previously detailed, TDC hampers inmates' opportunities to engage in productive legal research, to obtain notary services,[206] and to communicate about legal matters with other in-

---

**206.** Some of plaintiffs' concerns with inadequate notary services may have been obviated by the Fifth Circuit's recent decision in *Carter v. Clark*, 616 F.2d 228 (5th Cir. 1980). There, the Court held that a local federal district rule requiring notarization of all pleadings filed by prison inmates was in contravention of a feder-

al statute which provides that in all federal court proceedings, written declarations made under penalty of perjury were permissible in lieu of notarized affidavits. 28 U.S.C, § 1746 (1976). Thus, TDC inmates do not need access to notary services in order to file federal pleadings. To the extent that they continue to need

mates. "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. at 419, 94 S.Ct. at 1814. *See Bounds v. Smith*, 430 U.S. at 824–825, 97 S.Ct. at 1496 (right to notary services); *Corpus v. Estelle* (right to receive legal assistance from other inmates); *Novak v. Beto* (right to receive legal assistance from other inmates). For restrictive practices to be upheld, defendants have the burden of demonstrating that they are necessary for institutional security and that no alternative means of safeguarding security is reasonably available. *Taylor v. Sterrett*, 532 F.2d 462, 472 n.14 (5th Cir. 1976). The defendants have advanced no such justifications and have failed in their burden, leading to the conclusion that TDC's limitary practices are unconstitutional.

It is also a violation of prisoners' rights unreasonably to restrict their opportunities to communicate with legal counsel, including paralegals and law students of their choice. *Procunier v. Martinez*, 416 U.S. at 419, 94 S.Ct. at 1814, *Adams v. Carlson*, 488 F.2d 619, 630–32 (7th Cir. 1973). The right of access to counsel is not limited to those already represented by an attorney of record, but extends equally to prisoners seeking any form of legal advice or assistance. *Nolan v. Scafati*, 430 F.2d 548 (1st Cir. 1970). TDC has shown no valid exculpation or rationalization for the various practices through which its officials have hampered inmates' consultations with

legal counsel. Therefore, the constitution commands that such practices cease.

Moreover, TDC officials have not been content to hamper inmate access to the courts by the enforcement of restrictive rules and regulations; they have also engaged in a variety of harassing and punitive practices designed to discourage inmates from legal activity.[207] The Fifth Circuit has firmly established the invalidity of any official attempts to penalize prisoners' access to the courts. *Campbell v. Beto*, 460 F.2d 765, 768 (5th Cir. 1972) ("prisoner access to the courts is not to be curtailed or restricted by threats, intimidation, coercion or punishment"); *Hooks v. Kelley*, 463 F.2d 1210 (5th Cir. 1972); *Andrade v. Hauck*, 452 F.2d 1071, 1072 (5th Cir. 1971). (Prisoners may not be disciplined in any manner for attempting to gain access to the courts.)

The defendants in this case have a long history of hostility toward inmates who attempt to pursue legal actions. *See, e. g., Dreyer v. Jalet*, 349 F.Supp. 452, 474 (S.D. Tex.1972), *aff'd* 479 F.2d 1044 (5th Cir. 1973); *Cruz v. Beto*, 603 F.2d 1178 (5th Cir. 1979); *Corpus v. Estelle*, 551 F.2d 68 (1977). During the pendency of the litigation, this court has found it necessary to issue five separate protective orders designed to minimize TDC harassment of the plaintiffs and witnesses in this case. In rejecting defendants' appeal from the court's protective order of December 30, 1975, the Fifth Circuit agreed that plaintiffs, because of their participation in this suit, had been subjected to

threats, intimidation, coercion, punishment, and discrimination, all in the face

---

notary services in connection with legal proceedings in other courts, TDC remains under an obligation not to unreasonably restrict access to those services.

**207.** One such activity is the practice of frequently strip searching inmates who use the unit writ rooms. This tactic is an unacceptable form of harassment. Routine body searches in prison, conducted without probable cause, have been condemned in general. *See, e. g., Hurley v. Ward*, 584 F.2d 609 (2d Cir. 1978); *Frazier v. Ward*, 426 F.Supp. 1354 (N.D.N.Y.1977); *Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976). The

burden is on the state to show that a strip search is "reasonable", that it is necessitated by "a legitimate penological need" and that the need cannot be met by less intrusive means. *U. S. v. Lilly*, 576 F.2d 1240, 1246 (5th Cir. 1978). The defendants have made no such showing in this case, and all the evidence points to the conclusion that no legitimate security concern underlies the strip searches of inmate writ writers. Singling out these prisoners for an unnecessary indignity constitutes retaliatory harassment.

of protective orders to the contrary by the district court and our long–standing rule that the right of a prisoner to have access to the courts to complain of conditions of his confinement shall not be abridged.

*Ruiz v. Estelle*, 550 F.2d 238, 239 (5th Cir. 1977). In light of TDC's past record, and evidence of its continuing unwillingless to respect plaintiffs' fundamental right to meaningful, unimpeded access to the courts, a detailed order for relief in this area will be required, and it will be necessary that TDC's compliance be closely monitored.

## VII. OTHER CONDITIONS OF CONFINEMENT

### A.

The plaintiffs and the plaintiff–intervenor have contended that the conditions relating to fire safety, sanitation, work safety, and work hygiene in TDC institutions endanger the health and safety of TDC inmates. Evidence was presented in the form of testimony and reports from experts in health and safety who inspected TDC facilities in 1976 and 1978. Many of the minor, easily corrected problems were remedied after they were brought to the attention of TDC supervisors. Others, although corrected in the past, have recurred, suggesting that TDC's own maintenance and inspection procedures do not keep pace with the routine problems. Of the more serious problems observed, TDC has made plans to ameliorate some, gradually, and claims that others pose no risk of harm to inmates and therefore do not require correction.

### 1. Fire Safety

It is self–evident that institutions which house large numbers of persons must be so designed as to permit their safe evacuation in case of fire. This is particularly true for prisons, where most doors are kept locked at all times, and access to the outside of buildings is normally prohibited.

As the expert witnesses testified, TDC prisons are woefully deficient in the number of fire exits from its buildings. The few available exits in the housing areas are too small and inadequately constructed to serve effectively during an actual fire. The corridors leading to the exits are extremely long, thereby increasing the likelihood of persons becoming trapped by fire in the dead–end corridors. In the event of a serious fire, according to the experts, inmates who are unable to exit the building within five minutes are likely to perish.

TDC, in defense, maintains that its institutions are constructed of materials that do not burn easily and are equipped with ventilation systems which would prevent the spread of smoke or toxic fumes from a fire. Restated, its contention appears to be that since the likelihood of a fire is minimal, adequate fire exits need not be maintained. However, it is undisputed that inmates have cotton mattresses, papers, and other combustible materials in their cells, and that smoking among inmates is a very common occurrence. There was also testimony that inmates have deliberately set fires on occasion. Thus, the possibility of a fire at TDC is not remote.

The potential for serious injury in the face of a disaster was vividly illustrated in January of 1978, when an explosion of natural gas occurred on the nine–wing dormitory at the Ramsey I unit. The explosion caused a large portion of the second floor ceiling of the dormitory to collapse, blocking the only stairway, and inmates attempting to escape the ensuing fire had to jump–through an open space in the middle of the dormitory–from the second floor balcony to the first floor. As noted in the official TDC reports of this event, it is miraculous that more of the inmates were not injured in escaping the building. Only one inmate was hurt; he received second and third degree burns from the fire and was sent immediately to John Sealy Hospital. In light of the inadequate avenues for emergency exits on the unit, it is only good fortune that prevented the occurrence of more injuries.

Work areas at TDC are also plagued by a shortage of readily accessible fire exits.[208] For example, the fire evacuation "plan" at the tag plant consists of having inmates break through a plexiglass wall, if a fire occurs in the front part of the plant. The building's only two exits are adjacent to each other. In several of the other industrial facilities, expert inspectors noted that fire doors were either inoperative or access to them was blocked. Many defective fire extinguishers were also observed, and TDC's fire and safety officer testified that the extinguishers are frequently damaged or abused. Unsafe storage of flammable or combustible materials was also noted. TDC has made some efforts to correct many of these deficiencies, yet many of them continue to recur.

### 2. Sanitation

Throughout the trial, numerous witnesses, including many experts, testified concerning the sanitation practices at TDC units, giving descriptions of the housing areas, water supply, waste water and solid waste management, food service areas, and food processing facilities.

### a. Housing areas

Housing areas on TDC units are kept quite clean. Cleaning materials are widely available and frequently used. Most inmates shower and receive a set of clean clothes daily. Only a few negative observations about sanitation in the housing areas were noted. Experts were critical of the fact that mattresses are not sanitized between users, and that some extremely soiled and potentially unhealthy mattresses are in use. Witnesses also complained of occasional plumbing break–downs in the cells and long delays in restoration of plumbing services. However, there was no indication that any of these problems seriously impair the overall sanitation of the units.

It was also noted that inmates do not have any hot water available from the taps in their cells. However, they can occasionally obtain hot water for washing purposes from building tenders and have access to hot water in the shower rooms once a day. This clearly mitigates any sanitation concerns that would otherwise arise from a lack of hot water.

Experts testified, however, that the housing areas are not adequately heated or cooled, and do not have sufficient ventilation or lighting. Again, however, it was not demonstrated that these conditions are so severe as to contribute to the existence of serious threats to the inmates' health and safety.

The only sanitation related problems which may cause serious health concerns are those associated with overcrowding. The spread of disease is increased when the persons are confined too closely and particularly when they must sleep directly adjacent to toilets and urinals. Plumbing problems are likely to be experienced in overloaded systems, and the lack of ventilation and presence of excessive heat are also worse when many people are confined in close proximity. Absent overcrowding, however, the overall sanitation and cleanliness levels in TDC housing areas do not create the serious possibility of widespread health problems. On the contrary, TDC apparently does the best it can to keep its units clean and well maintained.

### b. Water supply and plumbing

In recent years, TDC has requested and received several appropriations from the state legislature to upgrade the quality and quantity of its water supplies on several units. Although experts were critical of several aspects of the water supply at TDC units, it appears that most of those infirmities have been corrected, and that the experts' concerns did not directly implicate

208. The dangers from the shortage of fire exits at the Huntsville Unit Hospital have been de-

scribed in the section of this opinion relating to medical care.

the quality of the water for safe drinking purposes.

A repeated criticism of TDC plumbing systems, particularly at the older units, was that they are interlaced with cross–connections, an arrangement of pipes which can lead to the infiltration of used water into the fresh water supply system. Even the defendants' expert in sanitation stated that the presence of just one cross–connection can be potentially harmful. Obviation of the potential harm can be accomplished through the relatively simple task of installing devices called vacuum breakers. Nevertheless, despite the fact that TDC officials learned of the health hazards posed by cross–connections as early as 1976, the 1978 expert inspection revealed a number of potentially dangerous cross–connections to be still in existence at some of the units.

c. Wastewater and solid waste disposal

As is the case with most industries and municipalities, TDC monitors its own water treatment operations and takes samples of its effluent, to discover whether it falls within the levels required by state law. The record reveals that some of TDC's effluents are not within the limits required by the state. However, TDC has made serious efforts in recent years to meet state standards, including the construction of some new sewage treatment facilities and the upgrading of old ones. There was no indication that TDC's violations cause any imminent danger to public health or to the health of the inmates.

Solid waste disposal procedures at TDC's landfill operations have also been out of compliance with state requirements, particularly when waste materials are infrequently covered at the landfill sites. TDC is reportedly aware of its deficiencies in this respect, and is taking steps which would enable it to comply with state requirements.[209]

d. Food service areas

Witnesses testified that TDC's kitchens and dining areas appeared clean and well–maintained. Furthermore, the food served to inmates had been generally adequate in terms of both quantity and quality. However, the expert inspections revealed numerous violations of state health standards in the food service departments at most TDC units. It was reported that several unit kitchens would have been closed by public health inspections, if they were evaluated according to the standards applicable to food service establishments which serve the general community. Deficiencies observed by the experts were itemized on a unit–by–unit basis, and a complete list was included in the experts' reports. Examples included improper settings on dishwashers, deficient handling and storage of foodstuffs, incomplete cleaning, and observable insect and rodent infestations. Moreover, TDC kitchen facilities are not regularly inspected by state and local authorities, to determine compliance with public health standards.

e. Food processing areas

TDC produces most of its own foodstuffs. Beef, pork, and poultry are raised, slaughtered, and processed on TDC units, for use by TDC's food service operations. Vegetables, fruits, grain, and cotton are also grown on the prison farms, and a canning plant preserves surplus crops for use throughout the year within the TDC system. TDC also operates dairies and pasteurizes the milk produced by its cows. Egg–laying operations on several units pro-

209. A more serious threat is occasioned by the handling of the wastes from the kidney dialysis machines at HUH. Rather than handling such wastes separately, as is recommended by experts, TDC disposes of them with other solid wastes. In the compacting practice, the plastic containers holding the waste products extracted from the dialysis patient's blood become broken and are generally dispersed throughout other discarded materials. This is a dangerous practice, because serum hepatitis is frequently present in dialysis patients.

vide eggs for the system. These enterprises provide food to a large number of TDC inmates and employees. Any excess foodstuffs are sold to other state agencies.

The expert inspectors found TDC's food processing operations in violation of state public health law in several serious respects. At the canning plant, faulty equipment and inadequate safeguards against dust, flies, and other sources of contamination were said to increase the likelihood of improperly canned foods. Milk pasteurization processes were also severely criticized; poor sanitation procedures and inadequate equipment were declared to result in the production of inadequately pasteurized milk, which could not be lawfully sold in the general community. Most of the observed deficiencies at the meat processing plant have been alleviated by the construction of a new meat processing facility; however, some violations of state standards relating to the inspection of carcasses have occurred at the new plant.

Finally, with respect to the egg–laying and gathering processes, it was a frequent observation that the eggs were not properly cleaned, with a result that feces–encrusted eggs were sent for use at the units.

### 3. Work Safety and Hygiene

TDC operates an enormous business conglomerate. In addition to its extensive agricultural holdings, TDC carries on numerous industrial enterprises; mattresses, brooms, textiles, soap, machinery, and furniture are among the products which emanate from TDC industrial shops. These operations generate large revenues and employ many people. In 1978, TDC's industry division reported an income of almost $25,000,000.00. In 1980, the agriculture division is expected to produce food, feed, and fiber worth more than $26,000,000.00. TDC also has its own construction division, to which over 2,000 inmates are assigned, that performs all construction work in the system, thereby saving millions of dollars in construction costs.

Plaintiffs and the plaintiff–intervenor have alleged that TDC inmates are forced, in violation of the eighth amendment, to work under conditions which are dangerous and unsafe. The reports and testimony of the work safety and hygiene experts who inspected the TDC facilities, as well as the testimony of inmate workers and TDC employees, show that a number of practices and conditions which exist in TDC workplaces do, in fact, violate health and safety standards contained in state laws.

A number of extremely serious accidents have occurred in TDC workplaces, because of unsafe or improperly used equipment. In the agricultural operations, accidents have involved unsafe farm machinery and the hazardous, archaic trailers used to transport workers to the fields.[210] In the industrial plants, inmates have been injured through the misuse of machinery, some of which lacked adequate guard devices. Protective devices on machinery are frequently removed to facilitate expedited operation, and many machines guard devices were placed on them, for the first time, immediately prior to the expert inspections made in connection with this litigation.

Another unsafe practice common in TDC work areas is the failure of workers to wear protective safety devices, such as goggles and gloves. Defendants maintain that these devices are available at all workplaces where they are necessary. They add that inmates are encouraged by their supervisors to wear them, but that many dislike the devices and work without them. It is ironic

---

210. For example, one inmate lost both his arms while loading a thrasher machine. The thrasher was being used improperly and without a protective guard device at the instruction of supervisory officials, who were attempting to expedite the harvest. Another inmate was killed when his tractor, which lacked a roll bar, turned over and crushed him. In a separate tractor mishap, an inmate's foot was severed. Numerous inmates have been injured while mounting, dismounting, or riding in the trailers used to carry them to the field. TDC's former fire and safety officer testified that none of the trailers are fit to carry humans.

that inmates in TDC are generally punished for almost any type of nonconformist behavior, yet TDC employees testified that it would be inappropriate infringement of the inmates' rights to discipline them for failure to wear safety devices at work.

Work hygiene involves the protection of workers from diseases, illnesses, or infirmities which are caused by working conditions. Testimony relating to work hygiene focused primarily upon noise and dust levels, extreme heat and humidity, and the unsafe use and storage of materials which could emit toxic vapors.

The most serious violations of work hygiene standards existed in the TDC textile mill, where extremely unsafe dust and noise levels have been found to exist for many years. However, during the trial of this action, TDC was in the process of completely overhauling its textile operations and installing new machinery, which was reported to comply with relevant health and safety standards.

With respect to noise levels, earplugs are generally available in the work areas where they are needed, and the major problem is TDC's unwillingness to force inmate workers to use them. Some deficiencies were observed in the handling and storage of potentially toxic chemicals, but TDC appears to have corrected them. There are, however, violations of state standards stemming from the extreme temperature and humidity levels in some workplaces.

Perhaps TDC's major problem in terms of workplace safety—one which undoubtedly contributes to many of the state law violations—is the lack of an adequate program for safety inspections and for the supervision of safety programs. Indeed, all of the work safety experts agreed that TDC does not have sufficient work safety and health programs. Safety inspections occur much too infrequently. Only a relative handful of the work related accidents are ever investigated, and there is no recordkeeping system to assist in the routine correction of health and safety deficiencies. Finally, there are no regular inspections of TDC facilities by state occupational safety officials.

## B.

Plaintiffs contend that the various conditions relating to the health and safety of TDC food and work areas transgress the Constitution as well as state public health laws. The evidence clearly denotes a number of state law violations. Defendants have correctly pointed out that recommended standards do not necessarily establish constitutional minima, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and have further maintained that most state public health laws are not applicable to TDC operations. Resolution of this state law issue would be an appropriate exercise of the court's pendent jurisdiction and would obviate the need to resolve these matters on constitutional grounds.

### 1. *Pendent Jurisdiction*

A court considering federal claims has the power also to consider and decide state law claims, when the federal claim involved is substantial, and the state and federal claims derive from a common nucleus of operative fact which would ordinarily be expected to be tried in one judicial proceeding. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This power should be exercised, however, only where the court determines it to be appropriate, taking into account considerations of judicial economy, and convenience and fairness to the litigants. *Id.* at 726, 86 S.Ct. at 1139. An enormous quantity of evidence has been considered relative to every facet of TDC's operations and conditions of confinement, including substantial expert testimony about sanitation, work safety, and the extent to which TDC conditions allegedly fail to meet relevant state standards. The interests of judicial economy would definitely be served by resolution of the state law issues in this action, for it has been found that TDC operations violate numerous state public health laws. To defer decision of the applicability and enforcibility of those laws against TDC for another proceeding would

require a major duplication of evidence and resources. Moreover, a determination of this issue, which has been argued and fully briefed by all parties, would clearly work for their convenience as well, and would not impose any unfairness upon them.[211] It is both desirable and appropriate, therefore, that pendent jurisdiction be exercised, to resolve the state law issue of the applicability of the state health and safety laws to the defendants.

A similar course of action taken by the district court in *Taylor v. Sterrett*, 344 F.Supp. 411, 418 (N.D.Tex.1972), was affirmed by the Fifth Circuit:

> It could hardly be expected that a United States District Court, in the exercise of appropriate pendent jurisdiction, would decline the enforcement of laws which the state of its own volition, had enacted for the improvement of prison conditions within its jurisdiction.

449 F.2d 367, 368 (5th Cir. 1974).

2. *Applicability of State Health and Safety Laws*

 The defendants maintain that TDC operations are not covered by those state sanitation and work safety statutes which fail to specifically include state agencies within the ambit of their coverage.[212] Some Texas statutes refer explicitly to state agencies; therefore, the defendants contend that legislation which makes no such reference is not intended to apply to state agencies.[213] An opposite interpretation, according to the defendants, would violate a general rule of statutory construction, *i. e.*, that state agencies should not be considered to be within the purview of a statute unless the intention to include them is clearly manifest. *See* 82 C.J.S. *Statutes* § 317 (1953). However, there are two notable exceptions to that general principle which are applicable to the situation here presented. First, application of a statute to state agencies may be permissible where such an interpretation will not impair the sovereign powers of the state. *United States v. Brown*, 555 F.2d 407, 416 n.16 (5th Cir. 1977), *cert. denied* 433 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). Clearly, no such impairment is presented here. Second, the state will not be assumed to be excluded from those statutes enacted to further the

---

**211.** The fact that the plaintiffs and plaintiff–intervenor did not separately plead state law issues in their complaints does not alter this conclusion. Plaintiffs did allege that living and working conditions violated applicable minimum health and safety standards, evidence was presented on the allegation, and specific state standards were identified by the various experts at trial. Furthermore, the defendants raised the issue of the direct applicability of state statutes. Therefore, application of the principles of liberal construction of pleadings implicit in Rules 15(b) and 54(c), F.R.Civ.P., leads to the conclusion that the issue has been properly raised and that relief justified by the facts may be afforded.

**212.** Defendants dispute that state statutes mentioned below are applicable to TDC. All references are to Articles of Tex.Rev.Civ.Stat.Ann. (Vernon's 1976):

Art. 4476–5, Food, Drug and Cosmetic Act;
Art. 4476–7, Meat and Poultry Inspection Act;
Art. 4476–9, Sterilization of dishes, broken or cracked dishes and unlaundered napkins;
Art. 4476–10, Sanitary employees where food or drink is handled;
Art. 4477–1, Minimum standards of sanitation and health protection measures;
Art. 4420, May enter and inspect;
Art. 5173–5179, 5182, 5182a, Industrial safety and hygiene.
Art. 165–3, Texas Milk Grading and Labeling Law;
Art. 165–8, Texas Egg Law.
They agree that the following statutes are applicable:
Art. 4477–5, Clean Air Act;
Art. 4477–7, Solid Waste Disposal Act;
Art. 3959, Fire Escape Act.
Because defendants' arguments with respect to each specific statute are similar, those arguments will be discussed on a categorical basis. Reference will be made to specific statutes, where useful for illustrative purposes.

**213.** For example, Tex.Rev.Civ.Stat.Ann. art. 4477–1 § 12 (Vernon's 1976) expressly includes "[a]ny governing body of any municipality or other agency", § 12(a) includes "[e]very person, firm, corporation, public or private"; and § 14 applies to "[a]ll persons, firms, corporations, and governmental agencies." In contrast, arts. 4476–5, 4476–7, 4476–9 and 4476–10 contain no such specific reference to governmental agencies.

public good and to prevent injury and wrong. *Nardone v. United States*, 302 U.S. 379, 384, 58 S.Ct. 275, 277, 82 L.Ed. 314 (1937). State sanitation and work safety laws were obviously enacted to serve the public good, and to prevent injury and illness to residents of the state. Requiring TDC to comply with the minimum standards set forth in these statutes does not infringe upon any rights of the state; it merely insures that all of its inhabitants enjoy the protections the statutes were designed to provide.

Moreover, the nature of the statutes in question gives reason to believe that the legislature's failure to specifically mention state agencies is not evidence of an intention to exclude operations such as those at TDC. In areas where it is customary for state or local governmental agencies to provide a public service which affects general health and safety (*e. g.*, water supply, sewage, and maintenance of public buildings), those agencies are specifically mentioned in the relevant statutes.[214] TDC, however, conducts a number of other operations, such as meatpacking and the manufacture of a variety of goods and products, which are not usually within the province of state agencies. It is entirely conceivable that the regulatory statutes do not specifically include state agencies because of the legislature's inadvertent failure to realize that a state agency is engaged in such functions, rather than a deliberate intention to exempt TDC operations—and the persons performing the work therein—from the standards imposed upon similar processes and activities in the private sector.[215]

Furthermore, many of the statutes at issue apply, by their terms, to "persons" in the state.[216] The United States Supreme Court has recognized that no hard and fast rule excludes a state from being considered a "person" in the construction of state laws. "Whether the word 'person' or 'corporation' includes a State of the United States depends upon its legislative environment." *Georgia v. Evans*, 316 U.S. 159, 161, 62 S.Ct. 972, 973, 86 L.Ed. 1346 (1942). "The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *United States v. Cooper*, 312 U.S. 600, 605, 61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941). Two factors militate in favor of a conclusion that "persons" includes state agencies such as TDC. First, the Texas Code Construction Act, in providing for a continuing statutory revision program, states that in each code enacted or revised in 1967 or thereafter, the term "person" shall be defined to include governments, governmental subdivision, and governmental agencies. Tex.Rev.Civ. Stat.Ann. art. 5429b–2, § 1.04(2) (Vernon's Supp.). While this act applies only to codes passed after 1967, and not to conventional civil statutes, *see Harris County v. Suburban Utility Co.*, 547 S.W.2d 72, 74 (Tex.Civ. App.–Houston, 1977), it does suggest a general legislative intent that state agencies be regulated by those same statutes which apply to "persons." Second, the Attorney General of Texas, in two separate opinions, has determined that TDC is to be considered a "person" for purposes of licensure under the provisions of the Texas Penal Code relating to operation of a barber

---

214. Acts expressly mentioning state agencies include Art. 4477–5, Clean Air Act, and Art. 4477–7, Solid Waste Disposal Act, both of which regulate activities typically conducted by governmental bodies.

215. For example, Tex.Rev.Civ.Stat.Ann. arts. 4476–5, 4476–7, 4476–9, and 4476–10 (which do not expressly mention state agencies) regulate food and drugs, meat and poultry inspections, sterilization of dishes, and food service employees, respectively.

216. These include Tex.Rev.Civ.Stat.Ann. art. 4476–5 (prohibiting adulteration and contamination of food), art. 4476–7 (providing for the inspection of and prohibiting the adulteration of meat and poultry), art. 4476–9 (prohibiting the use of unsterilized or broken dishes or food processing implements or unlaundered napkins), art. 4476–10 (requiring that food handlers be sanitary), and art. 165–8 (requiring sanitary handling of eggs).

school. Tex.Att'y Gen. Op. Nos. M–651 (June 19, 1970) and M–651–A (July 15, 1970).

When some of the statutes in question are viewed individually, their language appears to encompass TDC operations. Looking specifically at the Texas Food, Drug, and Cosmetic Act, Tex.Rev.Civ.Stat.Ann. art. 4476–5 (Vernon's 1976), it is clear that its statutory terms and supplementary regulations are applicable to TDC canneries, meat processing plants, dairies, dining halls, and food preparation areas. Its plain language provides, without qualification, that:

Section 3. The following acts and the causing thereof within the State of Texas are hereby declared unlawful and prohibited:

(a) The manufacture, sale, or delivery, holding or offering for sale of any food, drug, device, or cosmetic that is adulterated or mishandled;

(b) The adulteration or mishandling of any food, drug, device, or cosmetic.

Section 5(a) provides penalties for any "person" who violates the provisions of the Act. Furthermore, the regulations promulgated pursuant to the statute apply to all "food service establishments" and "food processing establishments." The former is defined by the regulations to include establishment serving individual portions without a charge; the latter covers commercial establishments where food is manufactured or packaged for human consumption. TDC's operations fit both of these definitions.

Section 5 of the statute covering the sterilization of dishes and food processing implements and banning the use of broken dishes, Tex.Rev.Civ.Stat.Ann. art. 4476–9, is binding on any "person . . . conducting any . . . place where food is manufactured." TDC's food processing plants are clearly such places.

Tex.Rev.Civ.Stat.Ann. art. 4476–10, requiring that food service and processing employees observe sanitation standards, applies by its terms, to any "person . . . or organization operating or managing any public eating place or any place where food or drink is manufactured, processed, prepared [or] dispensed." TDC is certainly an organization which processes and dispenses mass quantities of food.

The Meat and Poultry Inspection Act for Texas, Tex.Rev.Civ.Stat.Ann. art. 4476–7, Section 10–which prohibits the adulteration of meat and poultry–applies to any "person" transporting meat or poultry in "intrastate commerce" or preparing meat or poultry for such transportation. While TDC primarily produces meat for the use of the inmate population rather than for sale on the open market, the evidence indicates that the meat processed at some units and sent to others, and that excess meat is given or sold to employees at a reduced rate. Thus, these activities come within the broad definition customarily given to the term "commerce". *State v. Thomas*, 473 S.W.2d 639, 641 (Tex.Civ.App.–Tyler, 1971); 12 *Tex.Jur.2d, Commerce* § 1 (1960) ("[Commerce] includes traffic by the purchase, sale, and exchange of commodities, the transportation of persons and property, and all the instruments by which such intercourse is carried on."). In addition to the ban on adulteration, the Act contains requirements for the inspection of meat. Section 15 of the Act exempts from the inspection provisions any person transporting meat exclusively for the use of his nonpaying guests and employees, but such persons are still required to comply with the non–adulteration component of the Act. It is questionable whether inmates, who are involuntary guests paying their debts to society, are nonpaying guests within the meaning of this section. In any case, the evidence reveals that visitors to the prison do pay for their meals, a fact which clearly makes the exemption inapplicable to TDC.

Section 7 of the Texas Egg Law, Tex. Rev.Civ.Stat.Ann. art. 165–8, mandates, without qualification, that "all shell eggs for human consumption shall be properly handled to prevent undue deterioration"

and "[a]ll eggs shall be handled under reasonably sanitary conditions." TDC's egg–handling operations fall directly under these statutory terms.

Workplace standards regarding temperature and humidity are found in Tex.Rev. Civ.Stat.Ann. art. 5173, which applies to "every factory, mill, workshop, mercantile establishment, laundry, or other establishment." The plain import of this language would appear to include TDC operations.

Texas' Occupation Safety statute, Tex. Rev.Civ.Stat.Ann. art. 5182a, imposes certain requirements on "employers." Section 2(5) of that statute defines an employer as "every person . . . having control or custody of any employment, place of employment or any employee." A "place of employment" is defined by Section 2(9) to be "every place where, either temporarily or permanently, any trade, industry, or business is carried on, or where any person is directly or indirectly employed by another for direct or indirect gain or profit. . . ." Manifestly, TDC's massive industrial and agricultural operations constitute "industry" and "business" and, as such, its workplaces are "places of employment" and subject to the strictures of the Occupation Safety statute.

General statutes relating to the operations of state agencies indicate a legislative intent that TDC conduct itself in conformity with state health and safety laws. For example, the statute dealing with minimum standards of sanitation and health protection measures, Tex.Rev.Civ.Stat.Ann. art. 4477–1 § 2(e) (Vernon's 1976) declares "[a]ny place, conditions or building controlled or operated by any governmental agency, state or local, which is not maintained in a sanitary condition" to be a nuisance dangerous to public health. It is only logical that the determination of what constitutes a sanitary condition in a public building should be made by reference not only to the terms of that particular public health statute, but also to minimum state standards contained in other public health provisions.

Furthermore, those laws pertinent to the operation of a prison system also evidence a legislative desire that TDC follow state health and safety standards. The policy of the state–that the prison system shall be managed and operated in a manner consistent with the operation of a modern prison system, and that all inmates shall receive humane treatment–is set out in Tex.Rev. Civ.Stat.Ann. art. 6166a (Vernon's 1976). Art. 6166g provides that the director of the Department of Corrections shall be responsible for the proper care, treatment, feeding, clothing and management of the inmates. Art. 6166t specifies that the director shall insure that all prisoners are fed good and wholesome food, properly prepared under wholesome and sanitary conditions. In evaluating whether TDC has met its statutory responsibility to maintain a modern, humane, and sanitary prison environment, it would seem necessary to consult standards already ·set forth by the state in its general health and safety laws. These laws represent "a valuable reference for what is minimal for human habitation in the public view" and serve as a "valuable index into what levels of decency the public, expressing itself through the Legislature, is prepared to pay for." *Williams v. Edwards*, 547 F.2d 1206, 1214 (5th Cir. 1977). *See also Vest v. Lubbock County Commissioners Court*, 444 F.Supp. 824, 834 (N.D.Tex.1977) (Texas public health law directly applies to the operation of the Lubbock County jail).

For all of these reasons, the Texas health and safety statutes at issue are found to encompass the operations in the food and work areas at TDC institutions. Indeed, any attempt by the legislature to deny prison inmates the protection of public health laws afforded to all other residents of the state would raise serious questions of constitutional compliance with the Equal Protection Clause of the fourteenth amendment. Regardless of whether the inmates constitute a suspect class under traditional equal protection analysis, any statutory scheme which, in letter or actual

operation, treated them differently from other citizens in terms of health and safety, would require justification on a rational basis. That is, a rational connection would be required between the purposes of the statutory scheme and the reasons for excluding this particular group, namely, prison inmates. *See United States Agriculture Department v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973).

■ Here, no rational connection could exist between the effort to maintain general public health and safety, on the one hand, and the exclusion of inmates from that effort on the other. Nothing peculiar to a prison setting is evident or conceivable that renders it subject to exclusion from health and safety concerns. Certainly it cannot be said that inmates are less in need of the law's protection in this area than the general public. Indeed, the fact that inmates have no choice but to eat the food provided them, and to work and live in prison facilities, suggests that the inmates may be in greater need of such protection than members of the outside populace, for the latter have the power to boycott an unclean eating place or to leave an unsafe work facility. Nor can it be maintained that the financial savings which might result from non–compliance constitute a valid justification for excluding TDC from the ambit of state health and safety laws. The mere saving of money does not excuse an otherwise irrational discrimination against a particular group of persons. *See Moreno* and *Doe v. Plyler*, 628 F.2d 448, 459 (5th Cir. 1980).

■ Finally, there is no legitimate penological objective which could rationally account for substantially lower health and safety standards at TDC than those which accrue to the non–institutionalized citizenry. No security considerations are implicated by the health and safety laws. No concerns with rehabilitation enter the picture; indeed, rehabilitation could certainly be fostered more easily in a healthy environment

than in an unhealthy world. No effort to punish inmates justifies exposing them to unnecessary health risks, for their confinement constitutes punishment enough. If anything is clear from the recent development of prison law in our courts, it is that prisoners may not be exposed to hardships unrelated and unnecessary to the effectuation of legitimate penological goals. *Pugh v. Locke*, 406 F.Supp. 318, 328 (M.D.Ala. 1976).

Under a rational relationship analysis, then, the exclusion of TDC inmates from the health and safety protections accorded the general public would seem to defy the equal protection command of the fourteenth amendment. Nothing indicates that the Texas legislature intended such a result, and it is, therefore, totally reasonable to interpret the state statutes in a manner consistent with the Constitution.

The evidence reveals that TDC has long operated under the misconception that it is exempt from state health and safety laws, and that state agencies charged with conducting inspections and otherwise monitoring compliance with those laws have by and large failed to visit TDC facilities. Now that it has been determined that TDC must comply with generally applicable state standards, it will be necessary that its compliance be supervised and monitored in order that violations may be corrected. Perhaps the state agencies themselves will undertake such supervision; if not, the court will consider making arrangements for other forms of regulation and oversight.

### 3. *Constitutional Claims*

With respect to general sanitation, food processing, and work safety, the evidence does not indicate that stricter standards than those contained in the applicable state statutes need be enforced to remedy harmful conditions. Therefore, a decision as to plaintiffs' constitutional claims on these issues is unnecessary. However, with respect to fire safety, the particular characteristics of prisons, designed as they are to confine

persons, require more specific development of minimal fire safety requirements than are contained in the state law. Tex.Rev. Civ.Stat.Ann. art. 3959 (Vernon's 1966), which the defendants admit applies to TDC, specifies the number and type of fire escapes which must be provided in all public buildings in which sleeping compartments exist above the first floor. The evidence suggests that TDC facilities do not comply with the requirements set forth in this statute, and, at a minimum, defendants must make alterations in order to conform to those basic standards. However, a review of the terms of this statute indicates that the statutory requirements do not take into account the specific characteristics of prisons (large numbers of persons in areas of relatively small square footage, locks on doors to cells, halls, and outside exits), and that even if the defendants were in full compliance with that statute, TDC inmates would continue to face an unreasonable risk of serious harm in the event of a fire or other disaster in the prisons.

■ The state has a constitutional obligation to house inmates in facilities that provide reasonable guarantees of their personal safety; failure to provide adequate fire safety facilities clearly violates this duty and must be remedied. *Battle v. Anderson*, 447 F.Supp. 516, 525 (E.D.Okl.1977), 457 F.Supp. 719 (1978); *Gates v. Collier*, 349 F.Supp. 881 (N.D.Miss.1972) *aff'd* 501 F.2d 1291 (5th Cir. 1974).

■ The evidence overwhelmingly demonstrates the inadequacy of TDC's fire evacuation facilities and plans, and the resultant unreasonable risks of death and serious injury to which all TDC inmates and employees are constantly exposed. The fact that no serious injuries have thus far been occasioned by TDC's lack of adequate fire safety programs does not in any way diminish the harm which the continued exposure to these risks imposes. In order to afford plaintiffs the minimal protections to which they are entitled under the eighth amendment, it is imperative that TDC construct an adequate number of fire exits, which will enable all inmates safely to evacuate any TDC building within five minutes. In addition, fire safety and disaster plans for every facility must be developed. In making these changes, the specific characteristics of prison buildings must be taken into account; otherwise, the plaintiff class will not be afforded the minimal protection to which they are entitled. Because the applicable state law does not provide adequate guidelines for the construction of safe, adequate fire exits in prison buildings, reference to, and compliance with, the fire safety standards contained in the Life Safety Code (1976), National Fire Protection Association, will be required. Several expert witnesses testified concerning its provisions, and the evidence demonstrates that they must be adopted, if adequate relief is to be granted. The adoption of these particular standards is not without precedent, as the court in *Battle v. Anderson* ordered them implemented in the Oklahoma prison.

## VIII. TOTALITY OF CONDITIONS

■ Many courts confronted by prison cases have determined the issues, not by looking at each individual area of prison life separately, but by viewing them collectively and deciding whether the totality of prison conditions is such as to violate the constitution. The ambient circumstances affecting inmates, considered as a whole, were found unconstitutional in *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977); and *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974).

Based on a review of the exhaustive evidence and the applicable law, separate constitutional violations have been found in the areas of overcrowding, security and supervision, health care delivery, discipline, and access to the courts at TDC. Basically, these violations exist independently of each other, although the harms caused by each

have been exacerbated by the others. However, even if the conditions in any one of these areas were considered not sufficiently egregious to constitute an independent violation, their aggregate effects upon TDC inmates undeniably contravene the constitution. The grave consequences of rampant overcrowding, inadequate security, substandard health care, inappropriate disciplinary practices, and substantially impeded access to the courts manifestly dictate this result.

## IX. DEFENDANTS' *RIZZO* ARGUMENT

■ Defendants have vigorously argued that this court is powerless to remedy constitutional violations shown to exist in the TDC system, because no "affirmative link" has been proven to exist between the defendants and the violations. In support of this position, which they maintain is applicable to all constitutional violations, they cite *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In *Rizzo*, certain citizens of Philadelphia brought a class action against city and police department officials, seeking equitable relief from an allegedly pervasive pattern of unconstitutional police brutality. The district court found for the plaintiffs and ordered extensive relief, including revisions of internal police department procedures. The Supreme Court reversed, suggesting that the alleged brutality was not proved to be pervasive, and holding that the plaintiffs had failed to establish an adequate causal relationship between the individual incidents of police misconduct and the acts or policies of the defendant officials. Absent a more specific "affirmative link," the Court held that the widespread relief ordered by the lower court was not justified.

Reliance on *Rizzo* in the disposition of a case such as the instant action is totally inappropriate, as illustrated by *Campbell v. McGruder*, 580 F.2d 521 (D.C.Cir.1978). As there noted, *Rizzo* prevents the deployment of comprehensive federal court injunctions "for the purpose of preventing speculative and probably only sporadic future miscon-

duct by local officials toward an imprecise class of potential victims, especially when that misconduct is not part of a pattern of persistent and deliberate official policy." However, as the court added, "[t]he case at bar [involving the District of Columbia jail] stands in clear contrast to the situation in *Rizzo*. Here, the constitutional violations are alleged to have actually affected the entire, clearly defined class and to have stemmed from continuing policies of the Department of Corrections, so that only injunctive relief classwide in scope can effectively end the multiple and continuing wrongs." 580 F.2d at 526.

Likewise, the case at hand is in sharp contrast to *Rizzo*. There is no "imprecise class" of victims, nor is there anything "speculative" about the misconduct. The entire inmate population is victimized by a number of TDC's systemwide policies and practices, as was clearly proven at trial. *Rizzo*, on the other hand, involved a few citizens in the city of Philadelphia who were brutalized by a few police officers; no systemic harm was proven. "The relatively tenuous connection between the violations and the defendants in *Rizzo* stands in sharp contrast to the direct relationships that exist [, as here,] between the suffering of [the] inmate population and those who control institutions." Eisenberg & Yeazell, *The Ordinary and the Extraordinary in Institutional Litigation*, 93 Harv.L.Rev. 465, 505 (1980).

Furthermore, *Rizzo* has constituted no bar to the Fifth Circuit's affirmance of widespread injunctive relief in prison cases quite similar to the instant action. *See Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), and *Williams v. Edwards*, 547 F.2d 1205 (5th Cir. 1977).

■ To the extent that the defendants have claimed lack of knowledge of the constitutional violations, the record shows this to be generally untrue. Moreover, "a prison official may not take solace in ostrichism." *Little v. Walker*, 552 F.2d 193, 197

(7th Cir. 1977). Given the duties which the defendants, by virtue of their authority, owe to the inmate population,[217] the defendants are clearly chargeable with notice of the type of constitutional violations which have been proven.

## X. GENERAL RELIEF

### A. *Unit Size, Structure and Location*

The TDC prison system is divided into sixteen units for male inmates, each housing between 800 and 4,000 inmates.[218] Typically, these units are located on large tracts of land in rural areas, in order that extensive farming operations may be conducted. Every TDC unit is administered by its warden, who has one or two principal assistants. As with all other facets of the prison system, the lines of authority in each unit are centralized. Thus, even in unit prisons housing thousands of inmates, the warden and his principal assistants have the responsibility for supervising all phases of activity, through the agency of a number of subordinates.

With few exceptions, TDC unit prisons are constructed according to the architectural design known as the "telephone pole" configuration. This design is characterized by centralized facilities located adjacent to long halls; the halls are intersected at right angles by housing wings, each of whose predominant feature is also a long hall. In prisons of this design, groups of inmates must be marched up and down the halls *en route* to various activity areas. Much of the entire institutional space is occupied by halls, and one of the primary duties of security officers is the direction and supervision of traffic in these corridors.

Plaintiffs have alleged that the large inmate populations and the physical designs of the institutions have contributed to the unlawful conditions and practices which have been found to exist throughout the TDC system. In support of this argument, they presented extensive evidence that large institutions are disfavored by modern penologists. Penological experts testified at trial that effective and humane operation of a prison unit requires the warden to be personally acquainted with each member of the unit populace, including staff, officers, employees and inmates. Additionally, he must be entirely familiar with all of the unit's operations, by means of frequent personal inspections and observations. Stating the effect of this evidence somewhat conversely, the physical size and population of the unit should be so limited that significant facts about its staff, officers, employees, inmates, and operations are readily apparent or difficult to conceal or obscure from the warden.

Numerous expert witnesses, including the experts in corrections who testified for the defendants, asserted that not more than 400 to 800 inmates should be housed in a single

217. The defendants in this case are Director Estelle and the members of the Texas Department Board of Directors. Defendants made certain stipulations: Under Tex.Ann.Stat., Art. 6166j, Director Estelle "carries out the policies of the Board of the TDC and manages TDC affairs; he is empowered with the consent of the Board, 'to prescribe reasonable rules and regulations governing the humane treatment, training and discipline of prisoners' and to provide for their classification." Under Texas Ann.Stat., Art. 6166g, the Board is charged "with the exclusive management and control of TDC, and is 'responsible for the management of the affairs of the Department of Corrections and for the proper care, treatment, feeding, clothing and management of prisoners confined therein.'" Further, under Texas law the Board "shall manage and control the prison system through the manager [director] selected by it,"

and the Board is required "to delegate to such manager authority to manage the affairs of the prison system, subject to its control and supervision." Defendants also acknowledged in the pretrial order that the members of the Board "act under color of state law within the meaning of 42 U.S.C. § 1983, as does defendant Estelle." They further agreed that TDC facilities "are operated and staffed by personnel employed and discharged by defendant Estelle with the approval of the Board. Such personnel, including the wardens, have no statutory authority and act only by authority delegated to them pursuant to the policies and procedures enacted by the Board members and administered by the director."

218. See breakdown of units by population in fn. 1.

institution. If the population and size of a unit is increased beyond this point, the experts opined, the incremental administrative burden which is involved inversely decreases the warden's opportunities to oversee, inspect, and give personal direction to unit programs and activities, for the warden must delegate important functions to subordinates. In the absence of close supervision by the warden, deficient performance of their operational duties may go undetected by him, leading, in turn, to the existence of hazardous, unhealthful, or unnecessarily uncomfortable conditions under which the inmates work and live. Moreover, in institutions of great size, it becomes exceedingly difficult for the warden to have adequate personal knowledge of the characters, abilities, traits, and idiosyncrasies of the unit's officers. If the warden lacks this acquaintance, ill-trained, psychologically unfit, or brutal officers may mishandle or mistreat inmates without his knowledge.

The penological experts also emphasized that the warden should have an acquaintance with the individual inmates on his unit. This personal knowledge, the penologists testified, enables the warden to have an appreciation of the inmates' everyday problems, which may be—and frequently are—of the most serious, acute, and pressing nature. With these insights, the warden may be able to assist in alleviating the inmates' difficulties; moreover, inmates' recognition that they are individualized by the warden, according to the expert witnesses, tends to counteract and neutralize the feelings of alienation and lack of a sense of self which always accompany institutionalization. Furthermore, they testified, the warden's heightened perceptions arising from his exposure to the inmates as particularized persons assist him in making the practical, sometimes intuitive, judgments as to which inmates are most in need of close observation and supervision.

There was also substantial evidence to the effect that the telephone pole prison design is disfavored by prison planners and administrators, because it epitomizes a philosophy of prison operation which accentuates centralization and mass movement and control. Architects testified that the modern trend in prison architecture is toward modular, decentralized prisons, a conception and formulation which attempts to ameliorate the negative effects of institutionalization. Thus, most new prisons are designed according to a modular or "pod" concept, wherein small groups of less than fifty inmates live, eat, work, and study.

In support of their argument that TDC institutions are obsolete, plaintiffs and plaintiff–intervenor submitted evidence that, in the last ten years, no other prison system in the United States has built institutions designed to house more than 1,000 inmates. Most correctional standards received in evidence recommended a maximum of 400 inmates in a single institution. It was further noted that a number of prison systems are converting their large, more traditional prisons into modular prisons, by an architectural process known as retrofitting.

Defendants assert that the size and design of their prisons is not unconstitutional, but merely indicative of a correctional philosophy not shared by many other penological experts. They maintain that the TDC philosophy, which stresses self–sufficiency, productive use of inmates, and protection of the outside community from escapes, has resulted in efficient, well–managed, and superior prisons. Effectuation of this philosophy, they say, requires the maintenance of large, highly–regimented prisons, designed in the "telephone pole" fashion. The defendants thus characterize plaintiffs' attack on the size and design of their prisons as a challenge to their philosophy of management, a dispute which they claim does not have constitutional implications and is therefore not a matter which may be appropriately decided by the courts.

Certainly it is not the province of the courts to intervene and adjudicate between competing theories of prison management, assuming that the systems under review are being operated constitutionally. Moreover, in the past, courts have been particularly cautious about immersing themselves into

the day–to–day management of prison systems. *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Jones v. North Carolina Prisoners Labor Union*, 433 U.S. 119, 126, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). On the other hand, despite the deference to which prison administrators are entitled in the exercise of their authority, the federal courts cannot avoid the duty to protect constitutionally guaranteed rights. *Procunier v. Martinez, supra*; *Taylor v. Sterett*, 600 F.2d 1135, 1140–41 (5th Cir. 1979).

The constitution does not guarantee the right to confinement in a pleasant prison, nor in one with the minimum possible amount of regimentation. Enlightened correctional philosophy may have as its goals the achievement of a personalized, decentralized prison experience, but the constitution has not been interpreted to require the achievement of these goals. Plaintiffs' evidence that TDC prisons are highly regimented and that an inmate confined in one of them loses his sense of individuality does not, however, establish that the size or structure of the TDC prisons creates harms of constitutional statute. Nevertheless, many of the conditions of confinement in TDC have been found to violate the constitution. The issue thus becomes whether these conditions can be effectively and completely remedies without modifications in the existing structures of TDC unit management.

The relief to be granted to the plaintiff class in this case will require many changes in TDC's operations. TDC will be obliged, *inter alia*, to reduce the inmate population at each unit, to increase the security and support staff, to furnish adequate medical and mental health care, and to bring all living and working environments into compliance with state health and safety standards. Its officials will be charged with the duty of instituting, performing and supervising practices that will extirpate and abate staff brutality, the use of building tenders, abuse of the disciplinary process, and further violations of the inmates' rights to access to the courts. Achievement of all these tasks will be extremely difficult even

under the best of circumstances, and it may be anticipated that elimination of some of the long–standing practices will be particularly troublesome. The record clearly manifests that the necessary changes cannot be effected under TDC's existing organizational structure.

In a typical TDC unit, the number of prisoners is exceedingly large, and the warden's responsibilities are numerous and diffused. The exigencies of time alone are sufficient to preclude him from becoming individually acquainted with many of the inmates for whom he is accountable and from achieving sufficient knowledge of the capabilities and characteristics of many of the staff members under his supervision. Faced with the tasks of running enormous agricultural and industrial enterprises, involving thousands of inmate workers, wardens must rely on the relatively small staff of subordinate officers to handle routine matters of discipline, prisoner management and control, and the provision of services to inmates. However, even subordinate security officers' responsibilities are unduly burdensome, for the large number of inmates under their supervision is more than they can reasonably be expected to manage. In addition, the evidence showed that these subordinates are usually overworked, lack effective managerial skills, and have little understanding or appreciation of inmates' constitutional rights.

Actual day–to–day oversight and management of inmates in TDC is performed by the proportionately few subordinate officers, assisted by a large number of inmate building tenders, who have adopted their own ways of dealing with the inmate population. Under the existing conditions at TDC, the wardens have been so deeply obligated to, and intensively engaged in their multitudinous duties and assignments that they have been either unaware of, or unable to control, even the most blatant violations of TDC rules and regulations by their staff. Orders from the warden may or may not trickle down to the persons who must actually implement them, and many such orders are ignored.

The development and perpetuation of the building tender system is a prime example of this lack of control. TDC began its heavy reliance on inmate guards at a time when many other systems were also doing so. Since that time, the practice of using inmate guards has been declared unconstitutional, and a statute has been enacted which forbids it. However, as has been detailed elsewhere in this opinion, the building tender system has continued to this day. Even wardens who have attempted to minimize the role of building tenders have been unable to do so. The same fate has met wardens who have tried to eliminate staff brutality. Similarly, although six years have passed since the Supreme Court specified minimum due process requirements for prison disciplinary hearings, and even though TDC shortly thereafter promulgated regulations in conformance with those requirements, disciplinary practices on the unit level have not even approximated compliance. Indeed, the evidence showed that lower echelon officers on the units frequently were totally unaware of many rules, regulations, and constitutional requirements which TDC executives had given assurance were being followed. The absence of close administrative supervision has thus resulted in the development of an informal system of operation at each unit, in which the rights of inmates are largely ignored. Essentially, the units are run according to unwritten laws of their own, laws which cannot be easily changed.

The evolution of these informal, uncontrollable management procedures is the direct result of the system designed and maintained by the defendants. As they now exist, most TDC units [219] are simply too large to be managed by a single, centralized administrator, and brutalities, cruelties, and unfair procedures, routinely inflicted upon inmates, are the ineluctable consequence. Changes in these practices cannot be effected or implemented by a simple order from the warden or any other upper–echelon TDC official, because they are too far removed from the problems which must be rectified.

It is essential, nevertheless, that changes occur. Plaintiffs' most fundamental constitutional rights have been violated in numerous ways. Since it is convincingly evident from the record that the necessary alterations cannot be effected under the existing unit management structures, it is imperative that they be modified. Each of the organizational components of the TDC system must be of such a size that the warden and his chief assistants are able to supervise all of the staff closely, to individuate the inmates, and to communicate and interact with them on this basis. In short, TDC units must be broken down into much smaller organizational entities than those which currently exist, and each new component must have its own manageable supervisory structure.

It is implicit from the foregoing that physical and structural changes in TDC institutions will be necessary to achieve these purposes. Architects testified that the existing unit structures are capable of being retrofitted, so as to bring about the changes to be ordered. It is conceivable that many of the centralized facilities, e. g., kitchens, laundries, etc., can continue to be used to serve several of the new management units. Furthermore, it is probable that inmates from the organizational components which are in close proximity will be able to work together in TDC's massive agricultural and industrial operations.

The manner in which the organizational changes and retrofitting are to be accom-

---

**219.** It is interesting to note that the Mountain View Unit for women is quite small and is designed according to a campus (decentralized) architectural plan. The Goree Unit, also for women, is also relatively small. Both appeared to be vastly superior to the men's units in many respects. The housing conditions and relations between inmates and staff, in particular, were portrayed by the testimony in a much more favorable light than those in the large men's units. The staff members of these units projected the impression that they knew their charges as individuals and related to them as such. A similar impression was totally lacking from officers in the men's units. The size of these units undoubtedly accounted for the differences.

plished will be the subject of an order to be subsequently entered.

## B. *Prison Location*

It was abundantly obvious from the evidence that qualified professionals and para-professionals in nearly all disciplines required for constitutionally adequate prison management and support services have not been present in sufficient numbers at the various TDC units. The remote and isolated location of the units, the expert witnesses testified, was a significant factor leading to the shortages. In the absence of the skills and experience that these individuals bring with them, the TDC units simply cannot be brought into compliance with constitutional standards. Additionally, since the units are located far from centers of population, the opportunities for employment of inmates in a work release status are greatly diminished. Hence, not only will TDC be enjoined from creating units of excessive size, but it will also be precluded from locating any new unit far from a large population center, unless it is able to establish satisfactorily its ability to recruit and maintain adequate numbers of qualified professionals and para-professionals in all disciplines necessary to the effective functioning of such unit in a constitutional manner.

## C. *Appointment of One or More Special Masters*

Supervision and monitoring of the defendants' effectuation of the decree to be entered in this civil action will require the appointment of one or more special masters. The use of at least one special master to assist the court is necessary for several reasons. First, the decree to be entered will include a comprehensive, detailed plan for the elimination of the unconstitutional conditions found to exist in the Texas prison system. Implementation of the plan will entail a long and complicated process, which must be carefully supervised and monitored. The court does not have the resources necessary effectively to superintend the day-to-day details of the execution of

the program to be set out in the decree. Hence, appointment of one or more special masters, who can devote full energies to that task, report findings, and make recommendations to the court, is imperative, if the comprehensive relief to which plaintiffs are entitled is to be achieved in an efficient and timely manner.

Another factor supporting the decision to appoint one or more special masters is the defendants' record of intransigence toward previous court orders requiring changes in TDC's practices and conditions. During the pendency of this case, for example, the defendants were enjoined from harassing, abusing, or discriminating against inmate writ writers; nevertheless, the evidence shows that many such abuses continued. In addition, the defendants have vigorously contested their deficiencies, in several areas challenged by plaintiffs as unconstitutional, even though these failings were completely evident, e. g., overcrowding, lack of due process in disciplinary hearing procedures, and employment of building tenders as auxiliary guards. Moreover, working relations between defendants' attorneys and counsel for the other parties were so strained during the trial that they found it difficult to cooperate or effectively communicate with each other, with the unhappy result that the courtroom was frequently used as a forum to air their differences, even as to the most petty and trivial matters. Unfortunately, it must be assumed that dealings between the parties are not likely to improve significantly while the objectives of the court's decree are being accomplished. Therefore, it will be important that one or more full-time special masters be available to facilitate communication among the parties, to report factual findings, and to make recommendations to the court for the resolution of disputed matters.

The nature of many of the constitutional violations found to exist further underscores the need for close supervision of the consummation process by a special master. One of the persistent themes in the court's findings relative to defendants' treatment of inmates is that the actual practices on

the units differ sharply from written policy and procedures. Elimination of such abuses is necessary, if plaintiffs' rights are to be protected. However, measuring actual compliance with court–ordered practices will require close monitoring and supervision of all levels of TDC operations, a function which a special master could effectively fulfill.

In short, the relief to be ordered in this case cannot effectively and completely be performed without the appointment of one or more special masters to monitor and supervise defendants' compliance efforts. Therefore, appointment of one or more special masters, in accordance with the provisions of Rule 53, F.R.Civ.P., is both necessary and appropriate. Special masters have been appointed to monitor and oversee defendants' compliance by a number of courts, who have ordered the implementation and enforcement of comprehensive remedies involving substantial changes in prison or jail operations and conditions. *Palmigiano v. Garrahy,* 443 F.Supp. 956, 989 (D.R.I.1977); *Taylor v. Perini,* No. 69–275 (N.D.Ohio Dec. 17, 1975), *modified,* 413 F.Supp. 189, 193 (N.D.Ohio 1976); *Hamilton v. Landrieu,* 351 F.Supp. 549, 550 (E.D.La.1972); *Gates v. Collier,* 501 F.2d 1291, 1321 (5th Cir. 1974).

In order effectively to perform his duties, a special master must be given complete access to TDC facilities and to all information relevant to the fulfillment of the decree, so as to be made cognizant of any failures to comply with its mandates. In connection with this power, a special master shall, *inter alia,* evaluate inmate charges relevant to the issue of defendants' compliance with the court's decree. Reports containing a special master's findings and conclusions with respect to defendants' compliance with the decree, as well as recommendations regarding its modifications or enforcement, shall be submitted to the court for evaluation on a periodic basis, and when specially requested by the court or deemed necessary by the special master.

A review of several analyses of the execution of court–ordered remedies in institutional reform cases reveals that, for a special master to be most effective, his duties, powers, and responsibilities must be clearly delineated and understood by all the parties. To minimize misunderstandings which can hamper a special master's success, it is important that the parties contribute their respective suggestions relative to the definition of the special master's special functions. Note, *Implementation Problems in Institutional Reform Litigation,* 91 Harv.L. Rev. 428 (1977); Note, *"Mastering" Intervention in Prisons,* 88 Yale L.J. 1062 (1979); Special Project, *The Remedial Process in Institutional Reform Litigation,* 78 Colum. L.Rev. 784 (1978). The parties shall, therefore, include in their proposed forms of decree specific recommendations outlining the powers, responsibilities, and limitations which should govern any special master's actions, in order that the remedial decree may be realized in an efficient, fair, and orderly manner.

D. *Development of Detailed Remedial Decree*

As already discussed, correction of the numerous constitutional violations which have been found to exist in the TDC prison system will require effectuation and enforcement of a comprehensive decree, designed to give practical effect to the general findings and conclusions contained in this memorandum opinion. By an order issued contemporaneously with the entry of the opinion, the parties will be given an opportunity to attempt to reach agreement on a proposed form of judgment, which should include specific plans for remedying unconstitutional and illegal conditions and practices at TDC. In the event that the parties are unable, after reasonable effort, to agree upon such a proposed decree, each party will be required to submit a separate proposal to the court for consideration. After consideration of the submissions of the parties, the court will enter a comprehensive judgment. Jurisdiction of this civil action will be retained, until such time as the court determines that full and complete relief has been obtained for the plaintiff class. Assessment of costs and attorneys' fees will be deferred, pending the development of a decree.

## XI. CONCLUSION

The trial of this action lasted longer than any prison case—and perhaps any civil rights case—in the history of American jurisprudence. In marked contrast to prison cases in other states, the defendant prison officials here refused to concede that any aspect of their operations were unconstitutional, and vigorously contested the allegations of the inmate class on every issue. However, the evidence and the applicable law have demonstrated that constitutional infirmities pervade the TDC prison system.

This memorandum opinion has, at some length, cited and summarized the evidence indicating the existence of these constitutional violations. But it is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within TDC prison walls—the gruesome experiences of youthful first offenders forcibly raped; the cruel and justifiable fears of inmates, wondering when they will be called upon to defend the next violent assault; the sheer misery, the discomfort, the wholesale loss of privacy for prisoners housed with one, two, or three others in a forty–five foot cell or suffocatingly packed together in a crowded dormitory; the physical suffering and wretched psychological stress which must be endured by those sick or injured who cannot obtain adequate medical care; the sense of abject helplessness felt by inmates arbitrarily sent to solitary confinement or administrative segregation without proper opportunity to defend themselves or to argue their causes; the bitter frustration of inmates prevented from petitioning the courts and other governmental authorities for relief from perceived injustices.

For those who are incarcerated within the parameters of TDC, these conditions and experiences form the content and essence of daily existence. It is to these conditions that each inmate must wake every morning; it is with the painful knowledge of their existence that each inmate must try to sleep at night. But these iniquitous and distressing circumstances are prohibited by the great constitutional principles that no human being, regardless of how disfavored by society, shall be subjected to cruel and unusual punishment or be deprived of the due process of the law within the United States of America. Regrettably, state officials have not upheld their responsibility to enforce these principles. In the wake of their default, the United States Constitution must be enforced within the confines of TDC by court decree.